No. 24-3576

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RICHARD GIBSON and ROBERTO MANZO, individually and on behalf
of all others similarly situated,

Plaintiffs-Appellants,

v.

CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED,
INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC,
WYNN RESORTS HOLDINGS, LLC, BLACKSTONE, INC.,
BLACKSTONE REAL ESTATE PARTNERS VII L.P., JC
HOSPITALITY, LLC,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Nevada,
The Honorable Judge Miranda Du, District Judge
No. 2:23-cv-00140-MMD-DJA

_____

## BRIEF FOR PLAINTIFFS-APPELLANTS
_____

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................... viii

STATEMENT OF ISSUES .............................................................................. ix

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 7

I.      Casino-Defendants and Rainmaker worked collectively to change the way casino hotel rooms were priced on the Las Vegas Strip .................................................................................................. 7

II.     From 2015 onwards, Rainmaker offered a comprehensive revenue management program to Casino-Defendants ................................ 12

III.    Casino-Defendants use Rainmaker to short circuit the Strip market ............................................................................................. 18

SUMMARY OF ARGUMENT ......................................................................... 21

ARGUMENT .................................................................................................... 22

I.      Standard of review ...................................................................... 22

II.     Plaintiffs plausibly allege that Casino-Defendants and Rainmaker entered vertical agreements that harmed competition ............. 22

        1.    Rainmaker and the Casino-Defendants entered into a set of a vertical agreements ................................................... 23

        2.    The vertical agreements between Rainmaker and Casino-Defendants injure competition by facilitating horizontal collusion ............................................... 27

               a.    Plaintiffs allege direct evidence of harm to competition ................................................................... 29

          b.     Plaintiffs allege indirect evidence of harm to competition ................................................................... 32

III.   Plaintiffs plausibly alleged a conspiracy based on concerted action between Casino-Defendants ............................................. 36

     A.    Plaintiffs allege that Casino-Defendants delegated their pricing to Rainmaker with knowledge that their horizontal competitors did so as well ................................................ 40

     B.    Plaintiffs have alleged a conspiracy based on parallel conduct and plus factors ..................................................... 48

     C.    The district court erred in dismissing Plaintiffs' hub-and-spoke claim ............................................................ 57

          1.     Casino-Defendants need not accept Rainmaker's recommendations 100% of the time to engage in concerted action ..................................................... 58

          2.     Casino-Defendants need not directly exchange confidential information to engage in concerted action ............................................................... 62

          3.     Casino-Defendants need not have joined the conspiracy at the same time to engage in concerted action ................................................................... 66

CONCLUSION ................................................................. 68

011141-11/2833890 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Ad Mgmt. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) ............................................................5, 23

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010)................................................................*passim*

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)................................................................39

*ASW v. Oregon*,
424 F.3d 970 (9th Cir. 2005) .............................................22

*In re Automotive Parts Antitrust Litig.*,
2014 WL 1746579 (E.D. Mich. Apr. 30, 2014) ...............................57

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................39, 48

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ...........................................28

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017)................................48, 52

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................49

*D.C. v. Amazon.com, Inc.*,
2024 WL 3893698 (D.C. Aug. 22, 2024) ........................44

*In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016)................................45, 53

*In re Domestic Airline Travel Antitrust Litig.*,
691 F. Supp. 3d 175 (D.D.C. 2023)................................52

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ................................................................ 38, 46

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ................................................................ 51

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*,
    2023 WL 4677017 (9th Cir. July 21, 2023) ..................................... 49, 50, 51, 53

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................ 33

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) ........................................................ 38, 46, 59

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975) ................................................................ 26

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ........................................................ 38, 39, 59

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) ................................................................ 52

*Interstate Cir. v. United States*,
    306 U.S. 208 (1939) ................................................................ *passim*

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................ 28

*PLS.com LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ................................................................ *passim*

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ........................................... 7, 13, 44, 52

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
    465 U.S. 752 (1984) ................................................................ 48

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
    15 F.4th 885 (9th Cir. 2021) ................................................................ 22

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ........................................................................*passim*

*Newcal Indus. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) ............................................................32

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*,
394 U.S. 700 (1969)............................................................................26

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
838 F.2d 360 (9th Cir. 1988) ............................................................32

*Paladin Assocs. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ........................................................*passim*

*Plymouth Dealers' Ass'n of N. California v. U.S.*,
279 F.2d 128 (9th Cir. 1960) ...................................................6, 58, 59

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..............................................51

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................33, 34

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
61 F.4th 299 (2d Cir. 2023) ..............................................................38

*Shields v. World Aquatics*,
2024 WL 4211477 (9th Cir. Sept. 17, 2024) ...........................29, 30, 32

*Standard Iron Works v. Arcelor Mittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009)................................................51

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ............................................................56

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ..............................................................51

*Twin City Sportservice, Inc. v. Charles Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982) ..........................................................33

011141-11/2833890 V1

*U.S. v. Masonite*,
316 U.S. 265 (1942)................................................................*passim*

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ...............................................61

*United States v. Johnson Controls, Inc.*,
457 F.3d 1009 (9th Cir. 2006) ...........................................29

*United States v. Nat'l Ass'n of Real Est. Bds.*,
339 U.S. 485 (1950)............................................................26

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)..............................................37, 38, 46

*United States v. Union Pac. R. Co.*,
226 U.S. 61 (1912)................................................................7

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
822 F.2d 656 (7th Cir. 1987) ...............................................33

*William O. Gilley Enters. v. Atl. Richfield Co.*,
588 F.3d 659 (9th Cir. 2009) .......................................23, 24

## OTHER AUTHORITIES

Stephanie Assad et al., *Autonomous algorithmic collusion* (Toulouse
School of Economics Working Paper No. 1210, 2021) ....................................65

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Appellants, who are all individuals, state that none has a parent corporation and that no publicly held corporation has a 10% or greater ownership interest in any of them.

011141-11/2833890 V1

## JURISDICTIONAL STATEMENT

The district court had federal subject matter jurisdiction over this case based on federal question jurisdiction because Plaintiffs' federal antitrust claims arise under 28 U.S.C. § 1331.

The district court granted Defendants' joint motion to dismiss and entered final judgment on May 8, 2024. 1-ER-2–19, 2-ER-101. Plaintiffs filed a timely notice of appeal on June 4, 2024. 6-ER-1181. This Court has jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

1.  Whether the district court committed reversible error by finding that
    license agreements between Defendant Rainmaker and Casino-
    Defendants to use Rainmaker's algorithms to set prices could not
    "restrain trade," despite (1) blackletter law holding that "'every
    commercial agreement' is a 'restraint of trade'" and (2) allegations that
    these agreements unreasonably restrained trade by enabling Casino-
    Defendants to charge supracompetitive prices for hotel rooms on the
    Las Vegas Strip.

2.  Whether the district court committed reversible error in finding that
    Casino-Defendants did not engage in concerted action under Section 1
    of the Sherman Act, where Plaintiffs plausibly alleged, consistent with
    longstanding precedent prohibiting the "join[ing] together [of] separate
    decisionmakers," that Casino-Defendants delegated their pricing
    authority to Rainmaker with knowledge that their horizontal
    competitors were also doing so.

## INTRODUCTION

This case involves a modern version of an old story: one in which, rather than set prices independently, competitors delegate their pricing to a single third-party actor and break the competitive machinery of a normal market. The antitrust laws prohibit this: under Section 1 of the Sherman Act, the "key" question in assessing whether "concerted action … restrains trade" is whether an arrangement "joins together separate decisionmakers" and "deprives the marketplace of independent centers of decisionmaking."[1]

Casino-Defendants, five casino-hotels that once competed for guests on the Las Vegas Strip[2]—and which collectively control many iconic properties, including Caesar's Palace and Wynn[3]—have delegated their decisionmaking on price to Defendant The Rainmaker Group's ("Rainmaker")[4] algorithmic pricing software.

---

[1] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).

[2] "Casino-Defendants" are (1) Caesars Entertainment, (2) Treasure Island, (3) Wynn Resorts, (4) Blackstone Inc., and (5) JC Hospitality LLC. Blackstone operated The Cosmopolitan of Las Vegas from 2014–2022. JC Hospitality owns and operates Virgin Hotels Las Vegas, which previously operated as the Hard Rock Hotel & Casino Las Vegas from 2019–2020. 5-ER-695–97 (¶¶30–34).

[3] Several other co-conspirator casino-hotels on the Strip use Rainmaker software as well, including Las Vegas Resort Holdings, LLC, which operates the Sahara Las Vegas, and Tropicana Las Vegas Hotel and Casino, Inc., which operates the Tropicana hotel. 5-ER-697–98 (¶¶35–36).

[4] Defendant Cendyn Group, LLC ("Cendyn") acquired Rainmaker in 2019; Cendyn has substantially continued Rainmaker's business of providing the revenue management system at issue. 5-ER-685 (¶3 n.4). Plaintiffs generally refer to Rainmaker and Cendyn interchangeably as "Rainmaker."

- 1 -

The arrangement is simple. First, Casino-Defendants give Rainmaker real-time access to competitive data regarding occupancy, rates, and guests, in effect running a cable from their computer systems to Rainmaker's software. Then, Rainmaker's algorithms output daily pricing "recommendations" that Casino-Defendants accept at a high rate. The result is that, by joining together in outsourcing their pricing decisions to Rainmaker's "brain," Casino-Defendants set and maintain supracompetitive prices—secure in the knowledge that, because their competitors also use Rainmaker, these prices will not be undercut.

This is not abstract: since at least 2015, Casino-Defendants' room prices have risen significantly faster than a benchmark property on the Strip that does not use Rainmaker, and room prices on the Las Vegas Strip—which are heavily weighted by the prices Casino-Defendants charge—have rapidly outpaced both room prices for the rest of Las Vegas and an industry price index.

Nor is it accidental: Rainmaker promises to "supercharge profit" and "make it rain" by effecting a fundamental change in Casino-Defendants' business strategy: a shift from casino-hotels' historical focus on maximizing revenue by increasing occupancy to a focus on maximizing "profitability" by charging higher room rates—even though this decreases occupancy. Rainmaker executives have stated unequivocally that "the ultimate goal [of hotel revenue managers] is not chasing after

- 2 -

occupancy growth, but instead maximizing profits" and that "[i]nstead of optimizing for revenue, a hotel needs to optimize for profit." 5-ER-685–86 (¶4).

This is not how a competitive market works when competitors operate independently. And by Rainmaker's own account, the shift in focus it urges requires what its executives call "revenue management discipline" 5-ER-710, 792 (¶¶64, 197). Indeed, as the spectre of pricing algorithms has grown in recent years, academics and regulators have sounded the alarm that competitors' use of such tools to set prices produces exactly the anticompetitive effects alleged here. 5-ER-816–21 (¶¶223–35). FTC chairman Maureen Ohlhausen wrote in 2017:

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.[5]

Plaintiffs, a putative class of those who paid for hotel rooms at Casino-Defendants' casino-hotels, brought two claims under Section 1. **First**, Plaintiffs alleged that Casino-Defendants and Rainmaker (1) entered into a set of vertical agreements to use Rainmaker's pricing algorithms that (2) in the aggregate, unreasonably restrained trade by allowing Casino-Defendants to charge supracompetitive prices. This Court recognizes that a "collection of purely vertical

---

[5] 5-ER-821 (¶234).

agreements" may unreasonably restrain trade.[6] Plaintiffs alleged such a collection here.

**Second**, Plaintiffs alleged that Defendants formed a hub-and-spoke conspiracy consisting of Rainmaker (the hub), Casino-Defendants (the spokes), and a conspiracy among Casino-Defendants (the rim). Plaintiffs' allegations fall within a line of cases holding that competitors' common, knowing delegation of decisionmaking on price to a third party is sufficient to establish an illegal horizontal agreement.[7] By using Rainmaker with the knowledge that their competitors were as well, Casino-Defendants "join[ed] together" their once-separate decisionmaking regarding price and thus "depriv[ed] the market of independent centers of decisionmaking."[8]

The district court dismissed both claims. 1-ER-2–19. With respect to Plaintiffs' vertical claim, the court reasoned only that, because Rainmaker does not require its customers to accept pricing recommendations, it could not be that the vertical license agreements between Rainmaker and Casino-Defendants "restrain" trade. 1-ER-17–18. But in reaching this result, the district court ignored blackletter

---

[6] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015).
[7] *See, e.g.*, *U.S. v. Masonite*, 316 U.S. 265 (1942).
[8] *Am. Needle*, 560 U.S. at 195.

law holding that "'*every* commercial agreement' is a 'restraint of trade,' … meaning that every commercial agreement … is 'an agreement among two or more entities.'"[9] Therefore, in cases brought under the rule of reason challenging an explicit commercial agreement, the existence of express contractual agreements satisfies the first step of a Section 1 claim—whether there was an agreement, conspiracy, or combination between two or more entities.[10] Instead, it is at the second step that the key question arises: did the commercial agreement or set of agreements at issue constitute an "illegal *unreasonable* restraint of trade"?[11]

The court made no attempt to evaluate Plaintiffs' extensive evidence that the agreements here had anticompetitive effects and thus unreasonably restrained trade. And its reading of the word "restraint" would gut the plain language of the Sherman Act by immunizing swaths of anticompetitive conduct from scrutiny. This was error. *See infra* pp. 22-27.

With respect to Plaintiffs' horizontal claim, the court concluded that Plaintiffs failed to plausibly allege the "rim" of the conspiracy, i.e., concerted action by Casino-Defendants, because they (1) were not required to accept Rainmaker's

---

[9] *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1154 n.7 (9th Cir. 2003) (quoting *N'west Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 289 (1985)) (emphasis in original).
[10] *Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).
[11] *Paladin*, 328 F.3d at 1154 n.7 (emphasis in original).

pricing recommendations; (2) did not directly exchange confidential information via Rainmaker's algorithms; and (3) began using Rainmaker's algorithms at different times—facts that the court found together undermined the inference Casino-Defendants "tacitly agreed to fix prices." 1-ER-2–17.

But in reaching this result, the court drew inferences against Plaintiffs and ignored well-established caselaw. Indeed, the court's reasoning would effectively immunize algorithmic price fixing from antitrust scrutiny and lead to a variety of absurd results. If liability turned, for example, on whether fixed prices are mandatory, this would allow defendants to avoid liability with simple tricks, e.g., by ensuring that prices generated by a third party agent were always styled "recommendations." But the Ninth Circuit and others have long rejected defendants' arguments that they must adhere to fixed prices to be liable.[12] *See infra* pp. 58-62. Similarly, conditioning liability on whether competitors exchange confidential information through an algorithm would brush aside the central inquiry under the Sherman Act: whether independent centers of economic decisionmaking have been joined, which can occur whether or not competitors share confidential information. Such a rule would also ignore that the exchange of confidential information, or lack

---

[12] *See, e.g.*, *Plymouth Dealers' Ass'n of N. California v. U.S.*, 279 F.2d 128, 132–33 (9th Cir. 1960).

thereof, does not predict whether joint use of an algorithm has anticompetitive effects. *See infra* pp. 62-66.

Antitrust law does not contain such loopholes; it "is aimed at substance rather than form."[13]

Because the Sherman Act was written to "embrace[] all forms of combination, old and new,"[14] "[t]he advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind."[15] Today, competitors can use algorithms to collude more easily and effectively than in the past. This Court should apply longstanding legal principles to these new mechanisms for collusion and reverse the district court's dismissal of Plaintiffs' complaint.

## STATEMENT OF FACTS

### I. Casino-Defendants and Rainmaker worked collectively to change the way casino hotel rooms were priced on the Las Vegas Strip

In a competitive market, casino-hotels would price their rooms independently based on their assessment of how best to compete with others. 5-ER-699 (¶48). And because most casino-hotels' profits come from casino operations, rational, profit-maximizing firms should seek to fill their hotels as close to capacity as possible so

---

[13] *Am. Needle*, 560 U.S. at 193.
[14] *United States v. Union Pac. R. Co.*, 226 U.S. 61, 85-86 (1912).
[15] *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016).

each additional guest can spend money on gaming—because an empty hotel room not only means forsaken hotel revenue, but also lost gaming revenue. 5-ER-699 (¶49). A casino-hotel in a competitive market thus will try to fill each hotel room, i.e., maximize occupancy, by granting concessions or lowering prices. *Id.*

This is how casino-hotels traditionally operated. According to Rainmaker, "[f]or a long time, revenue management was all about filling empty rooms with paying guests." 5-ER-701–04 (¶¶51–55). Similarly, researchers have found that, historically, "Las Vegas casino managers prefer[red] to have high resort occupancy over high ADR[16] with low occupancy because high occupancy fills the property with more potential guests who may generate revenue in other centers." 5-ER-700 (¶50).

The Great Recession, however, dealt a heavy blow to the Strip: in 2008, many Casino-Defendants flipped from generating billions in income to billions in combined losses. 5-ER-825–28 (¶¶243–52). At the same time, a disruptive new trend emerged: gaming revenue declined, which in turn meant that non-gaming revenue became increasingly central to casino-hotels' profitability. 5-ER-825 (¶245). Through at least 2015, most Casino-Defendants faced financial hardship, including years of losses and multiple bankruptcies. 5-ER-825–28 (¶¶243–52).

---

[16] ADR stands for "average daily rate," and refers to the average rental revenue earned for an occupied hotel room per day. 5-ER-700 (¶50 n.13).

Enter Rainmaker. It offered software that allows hotels, including Casino-Defendants, to replace "fixed pricing" with so-called "dynamic pricing." In its marketing, Rainmaker promised that, by using its pricing software, customers could break free of the longstanding competitive dynamic above (whereby casino-hotels compete on price and seek to maximize occupancy) by "shift[ing] [their] focus from occupancy and rate to profitability" (5-ER-702 (¶53))—and in the process "supercharge profit" and increase revenues by 10–12% (5-ER-715, 719, 749–51 (¶¶73, 77, 128, 130)). Rainmaker in effect said: "entrust" us with your pricing strategy, and you'll fill fewer rooms while "mak[ing] it rain." 5-ER-761 (¶146).



## Don't Gamble With Your Profits

Successfully managing the complex revenue strategies of a gaming property is no game. Don't trust your profitability to anything less than the established market leader, with nearly two decades of experience and expertise in revenue management and profit optimization for the gaming industry.

5-ER-775 (¶166).

Rainmaker opened a dedicated office in Las Vegas in 2010. 5-ER-710 (¶64). And over the ensuing years, it formed tight connections with Casino-Defendants. It hosted untold user conferences, events, and other meetings that were targeted at the insular Strip community and attended by Casino-Defendants' employees (5-ER-

838–85 (¶¶270–321)), including "annual casino hotel steering committee meetings" described by a Rainmaker executive as a "[hotel] operator think tank" (5-ER-842–43 (¶279)). It placed Casino-Defendants' employees on its "customer advisory board." 5-ER-844 (¶280). And its "beloved" founders regularly rubbed elbows with Casino-Defendants, including at the annual Las Vegas "Gaming & Leisure Roundtable"—a private, invitation-only annual event comprised of high-level decisionmakers in the casino-hotel industry that Rainmaker long "co-hosted" and where it sponsored an annual "golf invitational" (5-ER-845–58 (¶¶281–91)):



Everyone loves Rainmaker



All the while, Rainmaker aggressively marketed its revenue management software by touting the fact that other Las Vegas properties used it (5-ER-693 (¶21)), broadcasting Casino-Defendants' endorsement and use of GroupRev and GuestRev on its website, in press releases and in gaming industry publications. *See, e.g.*, 5-ER-790–93; 5-ER-900–32 (¶¶191–99 & Appendices A, B).[17] And most critically, Rainmaker leveraged its position to promote collective adherence to its platform's pricing recommendations, using events as a platform to urge "discipline" in revenue management, advising hotels on how to "implement a revenue management discipline" and "help[ing] hoteliers see the importance of a disciplined group revenue solution." 5-ER-693, 792, 875 (¶¶22, 197, 311).

Throughout this time, Cendyn repeatedly urged potential clients that "[t]he goal of a successful hotel is not necessarily to achieve 100 percent occupancy, but rather to optimize revenue." 5-ER-704 (¶55). Dan Skodol, a senior executive at both Rainmaker and (later) Cendyn, stated that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead maximizing profits across all revenue streams." 5-ER-685–86 (¶4).

---

[17] For example, between 2015 and at least 2021, Rainmaker published a list of its casino-hotel "client base" in "Gaming & Leisure" magazine, an industry publication, listing most Casino-Defendants as GuestRev and GroupRev users. 5-ER-900–21.

## II. From 2015 onwards, Rainmaker offered a comprehensive revenue management program to Casino-Defendants

Rainmaker offers two algorithms, "GroupRev" and "GuestRev", that take in Casino-Defendants' data and output pricing "recommendations." By 2015, all Casino-Defendants were using Rainmaker's revenue management platform. 5-ER-763–97, 5-ER-900–32 (¶¶150–205 & Appendices A–B). That same year, Rainmaker (1) integrated competitor rates into its algorithms and (2) launched GroupRev in the Las Vegas market. Both algorithms are described below.

**GuestRev.** The core of Rainmaker's revenue management platform is GuestRev, an algorithm that generates prices for individual hotel rooms. GuestRev "forecast[s] demand accurately at the finest level of granularity" by taking "complex data sets from numerous data sources and translat[ing] them into highly prescriptive recommendations"—daily, room-specific pricing recommendations. 5-ER-715 (¶¶71–72). According to Rainmaker, GuestRev "understands what's going on in your market and at your property, allowing it to react and make the most optimal pricing suggestions accordingly." 5-ER-717–18 (¶75).

GuestRev is directly integrated with hotels' property management systems ("PMS"). 5-ER-718–20 (¶¶76, 80). Each hotel provides GuestRev with granular pricing and occupancy data on a continuous basis; GuestRev in turn generates pricing recommendations on an at-least daily basis. 5-ER-720, 724 (¶¶79–80, 86–

87).

To provide pricing recommendations, GuestRev calculates a market rate based on competitors' near real-time pricing. 5-ER-729–30 (¶¶96–97). GuestRev then compares the hotel-operator's room rates to the market rate and provides pricing recommendations that are ranked with an "Action Index" (from 0 to 100) to categorize the amount of revenue opportunity available. 5-ER-745 (¶124).[18] In one example provided by Cendyn in a tutorial, the action index is set to 100 in a situation where the casino-operator's room rate is $119 and the market rate is $144.35—the significant revenue opportunity available from the pricing recommendation stems from the casino-operator raising its pricing to match that of its competitors. 5-ER-741 (¶118). These recommendations are paired with many enforcement features, described more below, intended to ensure the supracompetitive prices are accepted at a high rate. *See, e.g.*, 5-ER-726–37; 5-ER-741–45 (¶¶92–105, 110–11, 118–124).

Specifically, since 2015, when Rainmaker acquired "RevCaster"—a so-called "rate shopping tool" that monitors competitor pricing—Rainmaker has used competitor pricing as an input to GuestRev's pricing recommendations. 5-ER-713–14; 5-ER-742; 5-ER-746; 5-ER-753–62 (¶¶68–70, 119, 125, 133–149). Rainmaker

---

[18] An Action Index score of "0" represents "no revenue loss"; a score of 100 "represents the highest revenue loss," i.e., the revenue lost if a revenue manager does not accept Rainmaker's price recommendation. *Id.*

allows a user to identify its competitors, then "shops" those competitors' rates in near real-time and allows a user to automatically factor those rates into its pricing suggestions, including by "detecting unexpected events or demand patterns" (5-ER-720; 5-ER-724–25; 5-ER-742–47) (¶¶80, 88–89, 119–26)):



Rainmaker has consistently marketed GuestRev as a means to automate pricing, selling it as a tool through which hotels can delegate their pricing decisions to Rainmaker's algorithm and increase their profits. 5-ER-706; 5-ER-709; 5-ER-720–48 (¶¶61, 63, 80–127). GuestRev is built to make accepting recommendations easy: recommendations can either (1) be uploaded to a hotel's PMS by clicking a single button, at which point they become the prices the hotel charges (5-ER-726–28) (¶¶91–94); or (2) set on "autopilot," such that recommended prices are directly accepted and uploaded into without any human review (5-ER-740 (¶117)).

Alongside these carrots, Rainmaker has also built many sticks—multiple layers of enforcement—into GuestRev to ensure its outputs are accepted. For example, GuestRev (1) generates "recommendation process summary reports" and "recommendation reports" that track how many GuestRev recommendations have been automatically approved and/or sent to a hotel's PMS (5-ER-743–44 (¶121)); as well as (2) the "Action Index" described above. 5-ER-741–47 (¶¶118, 121–26).

And while GuestRev users can "override" pricing recommendations, this "manual override" feature is described as reserved for "times of need and extreme circumstances" and can only be used by revenue managers with specific "override" permissions. 5-ER-737 (¶¶110–11). Rainmaker also provides "advisors" to its clients, and has described "tactical and strategic consultation" as an "integral part of every system implementation," which included "advis[ing] of recommended business process shifts" and helping clients "maximize the benefit of profit optimization." 5-ER-881–85 (¶¶315–21). According to a former Rainmaker employee, Rainmaker staff were "constantly in communication" with users about pricing recommendations, and some casino operators met with Rainmaker on a weekly basis. 5-ER-686, 881 (¶¶5, 315). Indeed, according to its former Vice President of Revenue Optimization, Rainmaker provided "fully managed pricing services" to its clients, and worked with Defendants Caesars Las Vegas and Hard

Rock. 5-ER-885 (¶321).

The fruit of these efforts is that Rainmaker—with the acquiescence of its clients—effectively sets room prices. Rainmaker advertises that GuestRev's pricing recommendations are accepted approximately "90%" of the time. 5-ER-716–17 (¶¶74–75). And it touts that GuestRev allows users to set room prices "independently of overall demand," contrary to how pricing functions in a competitive market—where pricing is (or should be) based on where the supply and demand curves meet (5-ER-717 (¶74)):



**GroupRev.** First introduced to the Las Vegas market in 2015, GroupRev is

an algorithm that focuses on pricing for group travel and recommends room rates for hotels to charge groups. 5-ER-749–53 (¶¶128–32). Like GuestRev, GroupRev provides "[g]ranular forecasts" of demand "by day and by group segment" (5-ER-750 (¶129)), includes "real-time rate shopping" (*id.*), and "dynamically adjust[s] rates based on actionable market data" that includes a hotel's "competitive set" and "real-time market conditions" (5-ER-751 (¶131)).

Rainmaker also supercharges its recommendations using machine learning. According to a confidential witness, Rainmaker used "data across all [its] customers for research"—i.e., it continually trains its algorithms with data collectively provided by Casino-Defendants. 5-ER-830 (¶258). And it uses machine learning to analyze this data and "perform complex computations that automatically evaluate market change as well as to incorporate predictive modeling mistakes." 5-ER-830–36 (¶¶259–65).

The result, according to a marketing publication "underwritten" by Rainmaker, is that "advanced revenue management systems" like Rainmaker's can leverage "a vast array of market intelligence and other data, from competitor rates data to booking trends data … to more accurately forecast demand and, as a result, increase hotel revenue and profitability in unprecedented ways." 5-ER-830–31 (¶259). Rainmaker even boasts that "AI-powered solutions sometimes produce

pricing decisions that revenue managers may view as overly aggressive, irrational, or just plain wrong," emphasizing that "[t]herein lies the power of big data and machine learning compared to the data processing and analytical capabilities of mere mortals"—and that "[e]ven the most experienced revenue managers report that they have sold rates recommended by AI-enabled solutions that they would not have published in the past." *Id*.

## III. Casino-Defendants use Rainmaker to short circuit the Strip market

Starting in 2015, with Rainmaker's integration of competitor pricing into its revenue management platform, Casino-Defendants began raising room prices in near lockstep to artificially high rates. Specifically, since 2015, Casino-Defendants' room prices (1) have moved closely in tandem (5-ER-824 (¶240)) and (2) rose significantly faster than that of a non-Defendant casino hotel on the Strip, the Venetian, that has never used Rainmaker (5-ER-811–12 (¶¶214–15)):



The Venetian is a meaningful comparator because it is subject to the same market forces as Casino-Defendants but lacks the advantage of Rainmaker's pricing tools. It thus did not have access to centralized pricing recommendations that incorporated competitor prices, nor was the Venetian encouraged repeatedly by Rainmaker to practice "retail management discipline." 5-ER-693, 822 (¶¶22, 238).

Further, starting in 2015, revenue per available room at all the Casino-Defendants for which there is publicly available data (including Wynn, Caesars, the Cosmopolitan, and Treasure Island) also generally outpaced that of the nationwide

Casino Hotel Index, which reflects the prices casino hotels charge for services and goods. 5-ER-813–15 (¶¶217–20). And more broadly, beginning in approximately 2015, room prices on the Las Vegas Strip (which are heavily weighted by the prices Casino-Defendants charge) rapidly outpaced both (1) room prices for the rest of Las Vegas and (2) the Casino Hotel Index—meaning that room prices accelerated rapidly in a way that prices for other hotel goods and services did not (5-ER-811, 815 (¶¶213, 222)):



At the same time, visitor traffic to Las Vegas was flat from 2015 to 2019, and then significantly lower (due to Covid) from 2020–2023. 5-ER-815, 837 (¶¶221, 269). Yet Casino-Defendants were able to raise rates despite this lack of rising demand.

Casino-Defendants have not concealed their satisfaction with these results. The employees of each have publicly touted their success with—and reliance on—Rainmaker's algorithms, including their ability to help them "deliver the most customized pricing" and "maximize revenue." 5-ER-689, 713, 764, 767, 769–77, 780–82, 839 (¶¶13, 69, 154, 158, 161, 163, 166, 171, 178–81, 274).

## SUMMARY OF ARGUMENT

The district court made two errors that warrant reversal.

*First*, it dismissed Plaintiffs' vertical agreement claim—in which Plaintiffs alleged that the license agreements between Rainmaker and Casino-Defendants harmed competition—because those agreements did not mandate that Casino-Defendants accept Rainmaker's "recommended" prices, reasoning that such agreements could not "restrain" trade. 1-ER-17–18. But blackletter law holds that every contractual agreement restrains trade; in a case involving undisputed contractual agreements, the relevant question is whether those agreements *unreasonably* restrained trade. Plaintiffs put forward extensive allegations—which the court made no attempt to evaluate—that the agreements here did because of the anticompetitive effects they produced.

*Second*, the court found Plaintiffs failed to plausibly allege that Casino-Defendants "tacitly agreed to fix prices" because they (1) were not required to accept

Rainmaker's recommendations; (2) did not directly exchange confidential information via Rainmaker's algorithms; and (3) began using Rainmaker's algorithms at different times. 1-ER-4–16. But this reasoning conflicts with longstanding precedent that prohibited "concerted action" exists where, as here, horizontal competitors "join[] together" their "separate decisionmak[ing]" and thus "deprive[] the marketplace of independent centers of decisionmaking."[19]

Left undisturbed, the court's order would effectively immunize algorithmic price fixing from antitrust scrutiny.

## ARGUMENT

### I. Standard of review

This Court reviews de novo a district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6).[20] This Court must accept all non-conclusory facts as true and draw all reasonable inferences in Plaintiffs' favor.[21]

### II. Plaintiffs plausibly allege that Casino-Defendants and Rainmaker entered vertical agreements that harmed competition

Plaintiffs have plausibly alleged that Casino-Defendants and Rainmaker entered a set of vertical agreements that, in the aggregate, unreasonably restrained

---

[19] *Am. Needle*, 560 U.S. at 195 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)).
[20] *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021).
[21] *ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005).

trade. The Ninth Circuit held in *Musical Instruments* that a "collection of purely vertical agreements" may unreasonably restrain trade.[22] Purely vertical agreements are analyzed under the rule of reason. To prove a violation under Section 1 of the Sherman Act under the rule of reason, plaintiffs must show (1) there was an agreement, conspiracy, or combination between two or more entities; that (2) unreasonably restrained trade.[23] Plaintiffs plausibly allege each.

## 1. Rainmaker and the Casino-Defendants entered into a set of a vertical agreements

The existence of express contractual agreements satisfies the first element of a Section 1 claim, regardless of whether the restraints are unreasonable under step two of the analysis.[24] This is because "antitrust law is clear that a [plaintiff] need not prove intent to control prices or destroy competition to demonstrate the element of "an agreement ... among two or more entities.""[25]

Based on statements from each Casino-Defendant's employees discussing their use of GuestRev, as well as public documents identifying each Casino-

---

[22] 798 F.3d at 1193 n.3.

[23] *Am. Ad Mgmt.*, 92 F.3d at 784.

[24] *Paladin*, 328 F.3d at 1153 (signed written contracts were "express agreements" that "satisfy the first element of a § 1 claim.").

[25] *Id.* at 1153–54; *see also William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009) (set of bilateral agreements may constitute a "contract, combination, or conspiracy" provided agreements have an "illegal effect on competition (when aggregated)[.]").

Defendant as a user of GuestRev and GroupRev from at least 2015 to 2021 (*see supra* p. 12, 21), Plaintiffs plausibly allege that Casino-Defendants and Rainmaker entered contractual agreements by which Rainmaker licensed its revenue management software to Casino-Defendants. Indeed, Defendants themselves have acknowledged that they entered into contractual agreements with Rainmaker to access its revenue management platform. For example, Treasure Island identified, in its initial disclosures, two contracts that it entered with Rainmaker, including a Master Services Agreement from February 24, 2010. 5-ER-778 (¶173). Shortly after the parties entered this agreement, Rainmaker announced that Treasure Island had "selected Rainmaker's" revenue management platform "to maximize profitability across its entire enterprise." 5-ER-777 (¶170).[26]

Despite crediting these allegations,[27] the court dismissed Plaintiffs' vertical agreement claim because Rainmaker does not require customers to accept its pricing recommendations, concluding that Casino-Defendants "have not agreed to restrain their ability to price their hotel rooms in any way" and that "[i]t cannot be that the

---

[26] Rainmaker used almost identical language when it announced that Wynn selected its revenue management services for usage at the Wynn hotel. *Compare id.* with 5-ER-770 (¶163) (press release stating that Wynn Las Vegas Resort had recently "implemented Rainmaker's revolutionSM Product Suite to maximize total customer profitability"). Rainmaker later rebranded Revolution as GuestREV, while touting near identical services. 5-ER-711–12 (¶¶65–66).

[27] *See* 1-ER-3 (crediting Plaintiffs' allegations that all Casino-Defendants "licensed and used" Rainmaker's products).

vertical agreements between [Rainmaker] and [Casino-Defendants] to license GuestRev and GroupRev restrain trade." 1-ER-18. The court ended its inquiry there and did not evaluate whether Plaintiffs plausibly alleged the agreements, in the aggregate, have anticompetitive effects.

This was error. The court's literal reading of the word "restraint" would gut the plain language of the Sherman Act and a century of Supreme Court precedent. As this Court explained, "[t]he Supreme Court's cases demonstrate that '*every* commercial agreement' is a 'restraint of trade,' … meaning that every commercial agreement … is 'an agreement among two or more entities.'"[28] The reason for this is simple: "'[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.'"[29]

Therefore, in cases brought under the rule of reason challenging an explicit commercial agreement, step 1 of the above test is met where plaintiffs allege the existence of a contractual agreement between two parties. The key question instead arises at step 2: did the commercial agreement or set of agreements at issue constitute "an illegal *unreasonable* restraint of trade"?[30] Consistent with this, a long line of

---

[28] *Paladin*, 328 F.3d at 1154 n.7(quoting *N'west Wholesale*, 472 U.S. at 289) (emphasis in original).
[29] *Id.* (quoting *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238 (1918)).
[30] *Id.* (emphasis in original).

cases holds that non-binding guidelines involving price or supply can constitute unreasonable restraints of trade, including pricing recommendations disseminated in non-contractual guidelines or handbooks. *See infra* pp. 58-59.[31]

The Ninth Circuit is clear on this. In *Paladin*, it found the existence of express contractual agreements satisfied the first element of a Section 1 claim, regardless of whether the restraints were "unreasonable," emphasizing that it was "clear … a [plaintiff] need not prove intent to control prices or destroy competition to demonstrate the element of 'an agreement ... among two or more entities.'"[32] Similarly, in *Epic Games, Inc. v. Apple, Inc.*, it held that the district court erred "when it held that a non-negotiated contract of adhesion … [fell] outside the scope of Section 1."[33] It explained that such a holding "plainly contradicts Section 1's text, which reaches '[e]very contract*, combination ... , or conspiracy' that unreasonably restrains trade,"[34] and cited cases in which contractual restraints of trade violated Section 1 even where "one party set terms and the other party reluctantly

---

[31] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 489 (1950) ("adherence to a price schedule … is itself illegal under the Sherman Act … and the fact that no penalties are imposed for deviations from the price schedule is not material"); *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 703–04 (1969) (pamphlet from manufacturer sent to customers); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–82 (1975) (county bar fee schedule).
[32] 328 F.3d at 1153.
[33] 67 F.4th 946, 982 (9th Cir. 2023).
[34] *Id.* (emphasis in original).

acquiesced."[35] Here, by contrast, Plaintiffs allege that each Casino-Defendant, without reluctance, entered into a vertical agreement with Rainmaker to utilize its revenue management platform and receive pricing recommendations.

In *Epic*, this Court held the district court's error was harmless because it properly applied the rule of reason to the agreements at issue.[36] Here, the court erred because it never applied the rule of reason to the vertical agreements at issue and instead found that express contractual agreements were not restraints of trade.

Under long-standing precedent, Plaintiffs plausibly alleged the first element of a rule of reason claim: restraints of trade in the form of contractual agreements between Rainmaker and Casino-Defendants.

### 2. The vertical agreements between Rainmaker and Casino-Defendants injure competition by facilitating horizontal collusion

Once the element of agreement has been satisfied, courts analyze rule of reason claims with a three-step burden-shifting framework. At the pleading stage, plaintiffs must only plausibly allege the first step: that a restraint has a substantial anticompetitive effect that harms consumers in the relevant market.[37] Plaintiffs "can establish a substantial anticompetitive effect" either "directly or indirectly."[38]

---

[35] *Id.*
[36] *Id.*
[37] *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022).
[38] *Id.* at 834 (internal citation and quotation omitted).

This Court has held that a "collection of purely vertical agreements" may unreasonably restrain trade,[39] and that "vertical agreements can … injure competition by facilitating horizontal collusion."[40] Further, in *Leegin*, the Supreme Court explained that whether a set of vertical agreements—for example, vertical price restraints fixing minimum retail prices—is anticompetitive under the rule of reason because it facilitates horizontal collusion is a separate and independent question from whether it is also evidence of the existence of a horizontal cartel.[41]

Plaintiffs' allegations fit this mold: the vertical agreements here facilitate horizontal collusion because each Casino-Defendant has delegated a portion of its pricing decision-making to a central organizer, Rainmaker, which then provides semi-automated pricing recommendations using a common algorithmic formula, GuestRev, that are based on dampening price competition. Indeed, GuestRev is specifically designed to produce coordinated pricing—it explicitly factors in competitor pricing and prioritizes pricing recommendations where competitors can

---

[39] *Musical Instruments*, 798 F.3d at 1193 n.3.
[40] *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (citing *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 897–98 (2007)).
[41] *Leegin*, 551 U.S. at 893 ("To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate [a horizontal cartel], it … would need to be held unlawful under the rule of reason. This type of agreement may also be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.").

realize "revenue opportunities" by raising prices to match their competitors. 5-ER-725–48 (¶¶90–127).

The district court failed to analyze whether the vertical agreements at issue had anticompetitive effects. As this Court has explained, although "we *may* affirm the district court's judgment on a different ground, we need not do so, and we usually do not."[42] In any case, the district court's judgment should not be affirmed on this alternative ground because Plaintiffs have plausibly alleged both direct and indirect evidence of substantial anticompetitive effects from the agreements here.

### a.    Plaintiffs allege direct evidence of harm to competition

To directly plead substantial anticompetitive effects, Plaintiffs must only provide plausible allegations "of actual detrimental effects [on competition] such as reduced output, increased prices, or decreased quality in the relevant market."[43] If they do so, "no 'inquir[y] into market definition or market power' is required."[44] The Ninth Circuit, applying recent Supreme Court precedent, has repeatedly held that

---

[42] *United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1022 (9th Cir. 2006) (cleaned up), *abrogated on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1127–29 (9th Cir. 2015) (*en banc*) (emphasis in original).

[43] *PLS.com,* 32 F.4th at 834.

[44] *Id*. (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)); *see also Shields v. World Aquatics*, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024) (plaintiffs raised triable dispute under rule of reason "[e]ven without a viable market definition" where they presented "direct evidence of anticompetitive effects").

- 29 -

"proof of actual detrimental effects on competition" includes "increased prices."[45]
Plaintiffs provide straightforward evidence of actual detrimental effects: mutually
corroboratory economic analyses plausibly demonstrating that Casino-Defendants
(1) charged higher prices that (2) stemmed from the restraint on competition
produced by the aggregate effect of the agreements.

**First**, Plaintiffs show that each Casino-Defendant that entered a vertical
agreement with Rainmaker had higher percentage-wise price increases in room
prices from 2015 to 2023 as compared to the Venetian, a casino-hotel on the Strip
that did not use Rainmaker's revenue management software. *See supra* pp. 18-19.

**Second**, beginning in 2015, revenue per available room at all the Casino-
Defendants for which there is publicly-available data (Wynn, Caesars, the
Cosmopolitan, and Treasure Island) generally outpaced that of the nationwide
Casino Hotel Index, which reflects the prices casino hotels charge for services and
goods (5-ER-813–15 (¶¶217–20)). At the same time, visitor traffic to Las Vegas was
flat from 2015–2019, then significantly lower (due to Covid) from 2020–2023. 5-
ER-815, 837 (¶¶221, 269). Yet Casino-Defendants were able to raise rates despite a
lack of rising demand, contrary to what economics would predict in a competitive

---

[45] *PLS.com*, 32 F.4th at 834 (emphasis added); *see also Shields*, 2024 WL 4211477,
at *3 (same); *Epic*, 67 F.4th at 983 (same).

market. *See supra* p. 20.

**Third**, Plaintiffs plausibly tie these higher prices (and this pronounced structural break) to allegations explaining how Rainmaker's algorithms facilitate horizontal collusion and increase prices. Plaintiffs detail how GuestRev, Rainmaker's core revenue management product, provides semi-automated pricing recommendations that (1) explicitly incorporate the pricing of competitors located not only in the same market but the same *street*; (2) prioritize raising Casino-Defendants' prices to match competitors' prices; and (3) derive from an algorithm that is continuously trained on the collective data provided by each Casino-Defendant and that, over time, steadily improves the profit-optimization recommendations it provides to each Casino-Defendant. *See supra* pp. 12-16.

In the aggregate, these vertical agreements have an adverse effect on competition because they result in multiple competitors each adopting the same pricing strategy, provided through Rainmaker, that is premised on (1) raising prices to match competitors and (2) effecting a "disciplined" shift to a new, Strip-wide business model premised on "maximizing rooms revenue as opposed to filling rooms" (5-ER-733 (¶104)).

### b. Plaintiffs allege indirect evidence of harm to competition

To plead substantial anticompetitive effects indirectly, Plaintiffs must plausibly allege that Casino-Defendants have market power and present "some evidence that the challenged restraint harms competition."[46] This evidence "need not always be extensive or highly technical."[47] Instead, it is sufficient that the alleged conduct "as a matter of economic theory, harms competition."[48]

In addition to the direct evidence above, Plaintiffs also plead such indirect evidence here.

### (1) Plaintiffs plausibly allege Casino-Defendants' market power in a relevant market

Market power and market definition are "essentially questions of fact" that should generally not be resolved at the motion to dismiss stage.[49] "An antitrust complaint … survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."[50]

### i. Casino Hotel Rooms on the Strip are a relevant antitrust market

---

[46] *Epic*, 67 F.4th at 983.
[47] *Id.*
[48] *Id.*
[49] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988); *see also Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).
[50] *Newcal*, 513 F.3d at 1045.

The relevant market is "the area of effective competition."[51] Here, that market is the one for casino hotel guest rooms on the Las Vegas Strip. 5-ER-893–94 (¶¶345–50).

The Strip is a natural geographic market, supported both by public perception and economic analysis. 5-ER-811; 5-ER-893–94 (¶¶213, 346, 349). It is well-recognized that casino hotels constitute a relevant product market separate from traditional hotels because they combine lodging with casino-specific amenities and attractions (notably gambling). 5-ER-893–94 (¶¶346–49). And the Strip—thanks to its iconic status and unique concentration of casinos, concerts, events, and shopping—is recognized as a distinct product market within Las Vegas itself. *Id.*

Plaintiffs also allege that Casino-Defendants and conspirators collectively have market shares of approximately 80%. 5-ER-894 (¶350). Casino-Defendants themselves have market shares of between 35–40%, which is itself sufficient to show market power.[52] In *Rebel Oil*, for example, this Court found that a 44% market share was "sufficient as a matter of law to support a finding of market power, if entry

---

[51] *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).

[52] *See, e.g.*, *Twin City Sportservice, Inc. v. Charles Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) (Section 1 liability where defendant controlled 24% of relevant market); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) ("the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%").

barriers are high and competitors are unable to expand their output in response to supracompetitive pricing."[53]

### (2)    Plaintiffs allege indirect evidence of harm to competition

Plaintiffs also plausibly allege indirect evidence that the vertical agreements here harm competition. Indirect evidence of anticompetitive effects "need not be highly technical," and it is sufficient that the plaintiff prove defendants' conduct harms competition "as a matter of economic theory[.]"[54]

Plaintiffs provide extensive allegations, based on economic theory and academic analysis, that competition is harmed where multiple competitors in a market use the same pricing algorithm, including empirical studies that elevated prices are only observed when multiple competitors use the same algorithm. 5-ER-816–821 (¶¶223–35). One such study finds that competing firms, using AI-powered algorithmic pricing, will eventually settle into an equilibrium model where each firm charges supracompetitive prices. 5-ER-818 (¶228). Another study finds that algorithmic pricing raised gas stations' margins by approximately 9%, but only in places where competitors adopted algorithms jointly—leading the study's authors to

---

[53] 51 F.3d at 1438.
[54] *Epic*, 67 F.4th at 983–84.

conclude that "algorithmic pricing software adoption raises margins *only through its effects on competition.*" 5-ER-818 (¶229) (emphasis added).

Consistent with this, academics and regulators have issued urgent warnings that competitors' use of a shared pricing algorithm produces the same types of anticompetitive effects alleged here. Doha Mekkhi, Principal Deputy Assistant Attorney General of the DOJ's Antitrust Division, recently summarized: "where competitors adopt the same pricing algorithms, our concern is only heightened. Several studies have shown that these algorithms can lead to tacit or express collusion in the marketplace, potentially resulting in higher prices, or at minimum a softening of competition." 5-ER-820 (¶233). One professor has warned: "[C]ombining algorithmic collusion with personalized pricing can create a large enough joint surplus to remove the incentive for participants to defect from the platform—that is, to cheat on the cartel. ... [I]ncreasingly perfect price discrimination via a platform that acts as a hub for multiple firms … can literally be a game-changer for assumptions about cartel behavior." 5-ER-817 (¶227). Another pair of academics has described how "[a]n industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due

to the use of a similar 'brain' to determine their price strategy." 5-ER-816–17 (¶¶225, 227).

This extensive evidence is sufficient to plead that the vertical agreements between Casino-Defendants and Rainmaker unreasonably restrain trade under the rule of reason.

## III. Plaintiffs plausibly alleged a conspiracy based on concerted action between Casino-Defendants

Plaintiffs also allege that Rainmaker and Casino-Defendants formed a "hub and spoke" conspiracy consisting of the hub (here, Rainmaker), the spokes (Casino-Defendants), and (3) the rim (Casino-Defendants' common use of Rainmaker).[55] As noted above, a Section 1 claim requires proof of (1) a "contract, combination, or conspiracy" that (2) "unreasonably restrains trade."[56] On the first element, a plaintiff must allege some form of "concerted" rather than "independent" action.[57] Plaintiffs have alleged that Casino-Defendants engaged in concerted action by delegating their pricing to Rainmaker with knowledge that their horizontal competitors were doing the same.

---

[55] *See Musical Instruments*, 798 F.3d at 1192.
[56] *Am. Needle,* 560 U.S. at 186.
[57] *Id.* at 190.

As this Court recently summarized, the "central evil" addressed by Section 1 of the Sherman Act is "the elimination of competition that would otherwise exist."[58] And because "[c]oncerted activity inherently is fraught with anticompetitive risk," Congress intentionally defined concerted action broadly to include contracts, combinations, and conspiracies.[59] The Supreme Court has therefore emphasized that that "machinery employed by a combination for price fixing is immaterial"[60]—and that instead, the "key" question in assessing whether plaintiffs plead concerted action is whether a contract, combination, or conspiracy "joins together separate decisionmakers," i.e., "separate economic actors pursuing separate economic interests," such that it "deprives the marketplace of independent centers of decisionmaking … and thus of actual or potential competition."[61]

---

[58] *PLS.com*, 32 F.4th at 833.
[59] *Id.* at 190, 195; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).
[60] *Socony-Vacuum*, 310 U.S. at 223.
[61] *Am. Needle*, 560 U.S. at 195.

The joint delegation of competitive decisions constitutes thus concerted action under Section 1,[62] and a "combination" exists when there is an implied (or express) "understanding that the participants will jointly give up their trade freedom."[63]

Further, the relevant inquiry under Section 1 is whether a challenged price-fixing scheme disrupted the competitive process—regardless of whether a group of defendants agreed to set specific prices, actually adhered to "fixed" prices, or even succeeded in their scheme.[64] This is because "antitrust law is concerned with influences that corrupt market conditions,"[65] and thus condemns "[a]ny combination which tampers with price structures," i.e., "directly interfer[es] with the free play of market forces."[66] Indeed, in pleading concerted action, "[n]o formal agreement is

---

[62] *See, e.g.*, *id.* at 204 ("decisions by [a joint licensing agent] regarding the [NFL] teams' separately owned intellectual property constitute[d] concerted action" by the teams); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 309 (2d Cir. 2023) (allegations that competing entities had "surrendered [their] freedom of action ... and agreed to abide by the will of the association[]" were "enough" for concerted action).

[63] *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–37 (1961).

[64] *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002); *Plymouth Dealers*, 279 F.2d at 132–33.

[65] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 774 (2d Cir. 2016).

[66] *Socony-Vacuum*, 310 U.S. at 221.

- 38 -

necessary" under Section 1.[67] Instead, Section 1 "is broad enough … to encompass a purely tacit agreement to fix prices."[68]

Concerted action can also be pled in two different ways. *First*, a "combination" of competitors joining together their decisionmaking can be inferred from their competitive actions—generally by asking whether there is (1) an invitation contemplating concerted action, e.g., an invitation to delegate pricing to a third party; and (2) competitors' responsive actions demonstrating acceptance of that invitation. These criteria are met where Plaintiffs plausibly allege that defendants have delegated their pricing to a third party agent with the knowledge that their horizontal competitors are doing (or have done) the same.[69]

*Second*, concerted action may be inferred from a combination of parallel conduct by competitors, together with certain "plus factors," which indicate that conduct is a product of concerted rather than independent action.[70]

Under either approach, Plaintiffs plausibly allege concerted action between Rainmaker and Casino-Defendants.

---

[67] *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).
[68] *High Fructose*, 295 F.3d at 654; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).
[69] *See Interstate Cir. v. United States*, 306 U.S. 208 (1939); *Masonite*, 316 U.S. 265; *PLS.com*, 32 F.4th 824.
[70] *See Twombly*, 550 U.S. at 557, 560; *Musical Instruments*, 798 F.3d at 1194.

### A. Plaintiffs allege that Casino-Defendants delegated their pricing to Rainmaker with knowledge that their horizontal competitors did so as well

In *Interstate Circuit*, two movie theater companies sent letters to film distributors asking them to impose restrictions on runs of certain films, and noting that the same letter was being sent to each. The distributors imposed those restrictions, and were subsequently found liable for violating the Sherman Act: by giving their adherence to the conspiracy and agreeing to participate in it, both the theater owner (the hub) and the distributors (the spokes) formed a conspiracy.[71]

The Supreme Court concluded that, even absent direct evidence that the distributors "entered into any agreement with each other," their common assent to the scheme was sufficient to establish concerted action, i.e., the "rim" of the conspiracy—emphasizing that "an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."[72] The Court focused on the nature of companies' invitation (specifically, whether it contemplated concerted action) and whether the distributors' responsive actions demonstrated acceptance of the invitation—explaining that "acceptance by competitors, without previous agreement, of an invitation to participate in a plan …

---

[71] *Interstate*, 306 U.S. at 215–221.
[72] *Id.* at 226–227.

is sufficient to establish an unlawful conspiracy," and that "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."[73]

Three years later, in *Masonite*, the Court expanded on this approach, holding that neither (a) a motive for joint action nor (b) interdependence are necessary prerequisites for finding concerted action. Masonite, a hardboard manufacturer, entered substantially identical "agency" agreements with various other defendants—who also manufactured hardboard—over several years; these agreements specified the minimum and maximum prices at which the defendants could resell Masonite's products. In making each agreement, Masonite "informed the other party of the existence and terms of each of the agreements which Masonite had previously made with the others," and sent copies of new contracts to the companies that "had previously executed similar contracts."[74] But save for this awareness, the companies otherwise acted independently in entering their contracts with Masonite.

The Court found that this constituted horizontal price fixing by Masonite (the hub) and the manufacturer-defendants (the spokes) with which it contracted—concerted action—even absent any communication between or agreement among

---

[73] *Id.*
[74] *Masonite*, 316 U.S. at 268–69.

the manufacturer defendants. In relevant part, the Court held that the "circumstances surrounding the making of [bilateral agreements]," including that each competitor was "aware" that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" sufficient to establish concerted action.[75] What mattered was the result: Masonite's product was sold by each horizontal competitor at prices fixed by Masonite.

Critically, the *Masonite* court held that the manufacturer defendants were not absolved from liability even though, "in negotiating and entering into the first agreements [they] ... acted independently of the others, negotiated only with [Masonite], desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that [the hub defendant] make such an agreement with any of the others, and had no discussions with any of the others;" it was sufficient that "as the arrangement continued each [manufacturer defendant] became familiar with its purpose and scope."[76]

Rejecting defendants' protest that "they did not intend to join a combination or to fix prices," the Court explained that they "must be held to have intended the

---

[75] *Id.* at 275.
[76] *Id.* at 274–75 (internal citations omitted).

011141-11/2833890 V1

necessary and direct consequences of their acts."[77] The Court also rejected the idea that manufacturer defendants could not be liable because "Masonite alone fixed the prices" or because they had "business reasons which made the arrangements desirable to [them]," explaining that "[p]rices are fixed when they are agreed upon" and that "[t]he fixing of prices by one member of a group pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action."[78]

Together, *Interstate* and *Masonite* establish—consistent with the Sherman Act's animating prohibition on joining together separate decisionmakers—that the (1) delegation of one's decisionmaking on price to a third party, with (2) knowledge that its competitors have done the same, suffices to show concerted action.

This Court has continued to apply these precedents in evaluating whether concerted action is sufficiently pled. In *PLS.com*, for instance, it recently concluded that the plaintiffs adequately alleged collusion without parallel conduct and plus factor analysis, explaining that "[a]ll [the plaintiff] must allege is that [the defendant] adhered to a common scheme."[79] Other courts have as well. For example, the D.C. Circuit recently found—consistent with *Masonite*—that the plaintiff plausibly

---

[77] *Id.* at 275.
[78] *Id.* at 275–76.
[79] *PLS.com*, 32 F.4th at 843.

alleged "concerted action" where Amazon and third party merchants entered written agreements with merchants that restricted merchants' ability to freely set prices.[80] Similarly, in *Meyer v. Kalanick*, the court relied on *Interstate Circuit* to deny Uber's motion to dismiss claims that it orchestrated a horizontal price-fixing agreement with its drivers where plaintiffs alleged that drivers "agree[d] with Uber to charge certain fares with the clear understanding that all other Uber drivers are agreeing to charge the same fares."[81]

Plaintiffs' complaint includes allegations of concerted action that fit within the framework articulated in these cases—specifically, allegations that Casino-Defendants delegated their decisionmaking on price to a single entity, Rainmaker, with knowledge that their competitors were doing so as well. Plaintiffs allege:

**An invitation to jointly delegate pricing.** Rainmaker "contemplated" and "invited" concerted action. As in *Interstate*, Rainmaker proposed "a radical departure from the previous business practice of the [casino-hotel] industry" that entailed "a drastic increase in prices"[82]: a "shift [in] focus from occupancy and rate to profitability" (5-ER-699–704 (¶¶48–55)) based on the ability to price "independently of overall demand" (5-ER-716 (¶74)).

---

[80] *D.C. v. Amazon.com, Inc.*, 2024 WL 3893698, at *3 n.4. (D.C. Aug. 22, 2024).
[81] 174 F. Supp. 3d at 824–25.
[82] *Interstate*, 306 U.S. at 222.

- 44 -

This was (and is) contrary to how a competitive market works, and would be an irrational strategy for a hotel-casino on the Strip to pursue in isolation. Consistent with this, Rainmaker accompanied these promises with exhortations to exercise "revenue management discipline" and embrace "a disciplined group revenue solution" (5-ER-702, 792 (¶¶53, 197)), i.e., by using buzzwords that other courts have held constitute direct evidence of price fixing.[83] In effect, Rainmaker invited Casino-Defendants to eliminate their historical practice of (in Rainmaker's words) "over-discounting and comping rooms" and replacing it with "dynamic pricing" that would lead to higher prices. 5-ER-703 (¶54).

Similarly, as in *Masonite*, Rainmaker proposed to supplant Casino-Defendants' individual decision-making on price with a single brain—Rainmaker's. In exchange for Casino-Defendants "[en]trust[ing] their profitability" to it (as "the established market leader") (5-ER-775 (¶166)), Rainmaker would use its algorithms to "supercharge profit" (5-ER-716 (¶73)) and "make it rain" (5-ER-761 (¶146); *see* 5-ER-715, 719, 749–51 (¶¶73, 77, 128, 130)). Interwoven with these promises was also advertising explaining *why* Rainmaker's algorithms were effective: Rainmaker states that it uses a casino-hotel's real time data, as well as "real-time" competitor

---

[83] *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 66–67 (D.D.C. 2016) (finding defendants' advocacy of exercising "capacity discipline" constituted direct evidence of price fixing).

rate data, to "understand[] what's going on in your market" and "forecast demand accurately at the finest level of granularity"—in other words, to effectively eliminate market uncertainty through a centralized approach to pricing. 5-ER-715, 717, 750–71 (¶¶71–72, 75, 129, 131).

**Adherence.** By 2015, all named Casino-Defendants were using GuestRev and GroupRev. 5-ER-763–810 (¶¶150–211). And while the specific rate at which each Casino-Defendant accepted Rainmaker's recommendations is not publicly available, Plaintiffs plausibly allege that Defendants accepted these recommendations them at a sufficient rate to "give up their trade freedom"[84] and thus "corrupt market conditions"[85] by "tamper[ing] with price structures."[86] Specifically:

- Casino-Defendants continue to pay for GuestRev and GroupRev, whose primary function is to make pricing recommendations based on competitor prices—leading to the inference that they intend to abide by those recommendations. 5-ER-763–810 (¶¶150–211);

- each Casino-Defendant's employees, including senior executives, have touted their success with—and reliance on—the GuestRev pricing algorithm (*see supra* p. 21);

---

[84] *Motor Freight*, 365 U.S. at 136–37.
[85] *Gelboim*, 823 F.3d at 774.
[86] *Socony-Vacuum*, 310 U.S. at 221.

- Rainmaker makes automation a core tenant of its products' function, actively dissuades users from overriding price recommendations, and provides "advisors" to its clients who offer "tactical and strategic consultation" regarding the use of Rainmaker's products (*see supra* pp. 14-16);

- Rainmaker and Cendyn have long touted that, across their customers, GuestRev's pricing recommendations are accepted approximately 90% of the time. 5-ER-716–17 (¶¶74–75).

**Knowledge.** As in *Masonite*, Plaintiffs allege that (1) by at least 2015, each Casino-Defendant knew its agreement with Rainmaker to use GuestRev and GroupRev was "not an isolated transaction but part of a larger arrangement" and (2) there was "no room for doubt that all had an awareness of the general scope and purpose of the undertaking," i.e., the fact that Casino-Defendants were collectively using GuestRev and GroupRev to set prices for their hotel rooms. As discussed above, Rainmaker not only marketed its revenue management software by touting the fact that Casino-Defendants use it, but organized scores of events for (and formed tight connections with) Casino-Defendants. *See supra* pp. 9-11.

*

Rainmaker proposed a scheme of concerted action to Casino-Defendants premised on joint adoption of a common pricing strategy, who were each aware that their competitors were also participating. Then, Casino-Defendants adhered to it—leading to a common understanding among competitors that they would, and in fact did, increase prices by using the centralized pricing formula provided by Rainmaker. This is concerted action within the meaning of *Interstate*, *Masonite*, and *PLS*.

### B. Plaintiffs have alleged a conspiracy based on parallel conduct and plus factors

A Section 1 violation can also be inferred, in the alternative, from parallel conduct and so-called "plus factors." Parallel behavior, i.e., competitors following the same course of conduct, can be circumstantial evidence of an agreement not to compete;[87] however, "simultaneous action is not a requirement to demonstrate parallel conduct."[88] Plus factors are additional facts that "tend[] to exclude the possibility of independent action."[89] In assessing an alleged conspiracy, a court must consider plaintiffs' allegations holistically and evaluate plus factors "cumulatively to determine whether [the plaintiff] has alleged nonconclusory facts sufficient to

---

[87] *Twombly*, 550 U.S. at 553.
[88] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791–92 (N.D. Ill. 2017) (collecting cases).
[89] *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

state a claim under § 1."[90]

Analyzed through this lens, Plaintiffs' allegations together raise an inference of coordination between Casino-Defendants. In *In re RealPage, Inc., Rental Software Antitrust Litig.* ("*RealPage*"), for example, the court recently employed this mode of analysis, while also drawing centrally on *Masonite* and *Interstate*, to find that plaintiffs plausibly alleged an agreement by landlords to use RealPage's algorithmic pricing software—which, like the software at issue here, generates pricing "recommendations"—to artificially raise rents throughout the United States.[91]

**Parallel conduct.** Plaintiffs allege that, by 2015, all Casino-Defendants were using GuestRev and GroupRev—that is, all were engaged in the knowing use and implementation of a new, shared pricing strategy that entailed a break from a past practice (the prioritization of occupancy) to a new one (the prioritization of profit). Plaintiffs allege, in detail, parallel conduct by Defendants from at least 2015 through 2021 in the form of each Casino-Defendant's usage of Rainmaker's revenue

---

[90] *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *2 (9th Cir. July 21, 2023); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (instructing that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").
[91] *See RealPage*, 2023 WL 9004806, at *4.

management algorithms. 5-ER-763–97, 5-ER-900–32 (¶¶150–205 & Appendices A–B)

Plaintiffs also allege parallel price increases beginning in at least 2015, which was when (a) Rainmaker integrated competitor prices from RevCaster into GuestRev's pricing recommendations—i.e., allowed Casino-Defendants to directly factor competitor prices into Rainmaker's pricing recommendations—and (b) Rainmaker launched GroupRev in the Las Vegas market. Economic analyses demonstrate that this date corresponds almost exactly with when Casino-Defendants' prices began to increase significantly faster than both a competitive benchmark (the Venetian) that has never used Rainmaker and the Casino Hotel Index—facts that indicate Defendants were not merely engaged in "consciously parallel" conduct when they raised their prices. *See supra* pp. 18-21.

**Plus factors.** Plaintiffs' complaint details many plus factors that courts recognize as supporting an inference of an agreement.[92] Evaluated holistically, these plus factors support the inference that Casino-Defendants engaged in concerted action.

***Motive to conspire.*** This factor provides "evidence that the structure of the market was such as to make ... price-fixing feasible" in light of (a) incentives to

---

[92] *See, e.g.*, *Flextronics*, 2023 WL 4677017, at *1.

collude and (b) the market's structural features.[93] Here, Plaintiffs allege specific "facts … suggesting that the defendants had an incentive to manipulate prices"[94]— specifically, the combination of (a) the Great Recession, which had deep and lasting effects on Strip revenues lasting well into the 2010s, together with (b) a decline in gaming revenue, which in turn meant that non-gaming revenue became increasingly central to casino-hotels' profitability. *See supra* p. 8.

*Market structure.* Plaintiffs allege that the Las Vegas Strip market has features that make it ripe for collusion: the market is highly concentrated (5-ER-828 (¶254)); properties cost more than a billion dollars to acquire or open (5-ER-828 (¶253)); Casino-Defendants control between 35–40% of the hotel rooms on the Strip (5-ER-894 (¶350)); and demand for hotel rooms is inelastic (5-ER-829 (¶255)). These aspects of the market make "the inference of conspiracy" "more plausible"[95] because they "make an industry conducive to conspiracy."[96]

*Action against self-interest.* "Where the conduct of an alleged co-conspirator is in its own economic self-interest *only if* the other alleged co-conspirators follow

---

[93] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (quoting *High Fructose*, 295 F.3d at 655).

[94] *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).

[95] *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("[T]he possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

[96] *Flextronics*, 2023 WL 4677017, at *4; *see also Standard Iron Works v. Arcelor Mittal*, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009).

suit, there is strong circumstantial evidence of a conspiracy."[97]

It would not make sense absent agreement for Casino-Defendants to unilaterally raise room prices above market rates and sacrifice the maximization of occupancy—in the process veering away from a business practice long embraced by casino hotels (due in part to their unique economics). But by delegating their pricing to a single, common pricing algorithm that (a) sets prices based on competitors' real time rates and (b) is continuously trained on Casino-Defendants' data (including their confidential pricing strategies), Casino-Defendants were able to inflate room prices without fear such a pricing strategy would be undercut by competitors. Courts regularly find that such fundamental shifts in business strategy are indicative of concerted action.[98]

The plausibility of these allegations is underscored by the carrots and sticks Rainmaker employed to ensure the effectiveness of its scheme. On one hand, Rainmaker exhorted its clients that they could generate greater revenues by

---

[97] *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 823 (9th Cir. 2023) (emphasis in original); *see also Meyer*, 174 F. Supp. 3d at 823–24 (horizontal agreement plausible where "drivers' agreements with Uber [to use its pricing algorithm] would be against their own interests were they acting independently").

[98] *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 202 (D.D.C. 2023) (crediting allegations of industry's "marked change from past practice" to new strategy of "capacity discipline" as evidence of concerted action); *Broiler Chicken*, 290 F. Supp. 3d at 798 (break from past practice indicative of anticompetitive conduct).

prioritizing "discipline" and revenue over occupancy, which closely mirror allegations that other courts have found constitute direct evidence of price fixing[99] and are "plausibly understood as invitations to collude in a price-fixing conspiracy."[100] On the other, Rainmaker built a variety of enforcement mechanisms into its product to ensure that its recommendations were accepted and that Casino-Defendants adopted its proposed pricing strategy, including compliance reports, "action index" scores, manual override "permissions," and client advisors who provided "fully managed pricing services" across Casino-Defendants, i.e., provided pricing services to multiple horizontal competitors. *See supra* pp. 13-16.[101]

Plaintiffs also include specific allegations, based on confidential witness testimony, that "Rainmaker engaged in a 'never-ending battle' to convince clients not to override its pricing recommendations." 5-ER-687 (¶8). This "battle" was part and parcel of a multifaceted scheme that required Casino-Defendants to act against their self-interest and abandon a long held business model (the prioritization of occupancy) in favor of "maximizing profit." It is no surprise that this unnatural, counterintuitive shift against each Casino-Defendants self-interest required

---

[99] *See, e.g.*, *Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 66–67.
[100] *Flextronics*, 2023 WL 4677017, at *2.
[101] *See RealPage*, 2023 WL 9004806, at *15–16 (similar use of pricing advisors and enforcement mechanisms by RealPage "touch[ed] on multiple plus factors").

vigilance to maintain.

The district court found that these allegations undercut the inference that Casino-Defendants accept Rainmaker's recommendations at a sufficient rate to disrupt the competitive process or that they could have "entered into a tacit agreement to a accept" Rainmaker's pricing recommendations. 1-ER-15–16. But what the court failed acknowledge (or credit) was that effectuating this scheme required a "battle" not because Casino-Defendants were unwilling participants, but instead because the new, anticompetitive approach to pricing Rainmaker implemented represented an action against the competitive self-interest that had previously prevailed.[102] This break was so counterintuitive that it sometimes made Casino-Defendants' employees balk—presumably because (according to Rainmaker's own promotional materials) Rainmaker's algorithmically-drive recommendations to charge inflated prices appear to traditional revenue managers as "aggressive, irrational, or just plain wrong." 5-ER-831 (¶259)).

---

[102] This evidence of enforcement includes not only repeated exhortations to "discipline"—allegations the court ignored—but also an elaborate monitoring system made up compliance reports, "action index" scores, manual override "permissions," and client advisors who provided "fully managed pricing services" across multiple Casino-Defendants (i.e., horizontal competitors). *See supra* pp. 15-16.

Consistent with this, in *RealPage*, the court found nearly identical allegations of a "robust multi-layered monitoring system," including allegations that RealPage pricing advisors spent "considerable time" convincing clients to accept recommendations and aggressively "challenge[d] … deviations", "bolstered"— rather than detracted from—the plaintiffs' allegations because they were evidence RealPage "enforced adherence" to its scheme.[103]

Thus, these allegations support the plus factor of actions against self-interest.

*Information exchange.* Plaintiffs allege that each Casino-Defendant (a) provided confidential information on pricing strategy to Rainmaker; and (b) that data was used, with the aid of machine learning, to continuously train Rainmaker's pricing algorithm. *See* 5-ER-829–36 (¶¶257–65). As a former Rainmaker executive explained, "we used data across all our customers for research." 5-ER-830 (¶258). One senior data scientist for Rainmaker has explained:

> The most effective and reliable revenue management system is one that constantly and relentlessly crunches numbers to ensure that the segmentation is always optimal. As time goes by and more historical data are available, the segmentation becomes even more precise as the revenue management system finds new patterns and refines existing ones. And all this is done based on data, flawlessly and dynamically, without human intervention or guesswork.

5-ER-835 (¶263). The practical implication of these allegations is that, while

---

[103] *RealPage*, 2023 WL 9004806, at **3–4, 15–16.

Rainmaker may not directly facilitate the exchange of confidential information across Casino-Defendants, Rainmaker's algorithms—its "brain"—were improved by training on the confidential information collectively provided by Casino-Defendants.

**Opportunities to conspire.** Although "mere participation in trade association meetings"[104] may not support an inference of conspiracy, Plaintiffs allege more. Plaintiffs' complaint includes more than 50 pages of allegations detailing years of Rainmaker-sponsored user conferences, golf invitations, events, and trade meetings, that were (a) attended by Casino-Defendants' employees and frequently based in Las Vegas (b) included specific discussions of Rainmaker use and (c) were also accompanied by statements by Rainmaker employees urging "discipline" and a change in business strategy, i.e., a shift in "focus from occupancy and rate to profitability." *See* 5-ER-702, 791–93, 838–885 (¶¶53, 192–98, 270–321).[105]

As discussed above, many of these (e.g., Rainmaker's "operator think tanks" and placement of Casino-Defendants' employees on its "customer advisory board") expressly concerned Casino-Defendants' use of the platform and featured

---

[104] *Musical Instruments*, 798 F.3d at 1196.
[105] *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (defendants met as part of "leadership council" that urged members "to substitute 'co-opetition' for competition.").

011141-11/2833890 V1

Rainmaker's hands-on assistance (*see supra* pp. 9-10), while others took the form of bilateral meetings between Rainmaker and Casino-Defendants related to the platform's operation and best pricing practices. *See, e.g.*, 5-ER-881–85 (¶¶315–21). Others, like annual the G&L "Roundtable," were a "private" and "invitation-only" forum where Casino-Defendants could "exchange information and collect relevant information." 5-ER-845, 855–58 (¶¶281, 287–89).

These particularized allegations "demonstrat[e] Defendants' opportunity to meet and collude."[106]

\*

Plaintiffs' plus factors, considered together, provide the further factual enhancement necessary to state a claim.

### C. The district court erred in dismissing Plaintiffs' hub-and-spoke claim

As noted above, the court dismissed Plaintiffs' horizontal conspiracy claim because it found that three facts, together, made it "implausible to infer that [Casino-Defendants] … entered into a tacit agreement to … fix prices:" Casino-Defendants (1) were not required to accept Rainmaker's pricing recommendations; (2) did not

---

[106] *In re Automotive Parts Antitrust Litig.*, 2014 WL 1746579, at \*5 (E.D. Mich. Apr. 30, 2014).

directly exchange confidential information via Rainmaker's algorithms; and (3) began using Rainmaker's algorithms at different times. 1-ER-16.

In reaching this result, the court drew inferences against Plaintiffs, ignored well-established caselaw, and embraced reasoning that would effectively immunize algorithmic price fixing from liability. Plaintiffs address each of these three focuses of the court's order below.

### 1. Casino-Defendants need not accept Rainmaker's recommendations 100% of the time to engage in concerted action

The court first held that Plaintiffs' allegations failed because Rainmaker recommends, rather than mandates, prices, concluding that a plaintiff "cannot make out a Sherman Act violation without alleging that [Casino-Defendants] are *required* to accept the pricing recommendations made by" Rainmaker. 1-ER-14–15 (emphasis added). The court's order suggests that concerted action is plausibly alleged only where competitors fully surrender their price-setting setting authority and lack any discretion to deviate from fixed prices. 1-ER-15.

This analysis was erroneous. The law is clear on this point. In *Plymouth Dealers' Ass'n*, this Court held that competitors are still liable for price fixing even where they frequently depart from a "fixed list price," explaining that the use of such a fixed price as "only a starting point[]" is "of no consequence" because "[t]he test is not what the actual effect is on price, but whether such agreements interfere with

the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."[107] Other courts have reached similar results, explaining that horizontal price fixing is illegal even if fixed prices are non-mandatory, and even if a scheme does not actually succeed in raising prices.[108]

Indeed, if price fixing schemes were only actionable where (a) the hub employs a binding enforcement mechanism or (b) defendants must meet a minimum rate of adherence, this would immunize swathes of conduct from liability and allow defendants to avoid liability with simple tricks (e.g., by inviting members who tended to deviate from recommended prices, agreeing that some deviation was allowed, or simply ensuring that the prices generated by a third party agent were always styled "suggestions" or "recommendations"). Section 1 does not contain such loopholes. Instead, at its core is a prohibition on action that deprives the market of "independent centers" of decisionmaking, however achieved.

Most recently, the *RealPage* court sustained plaintiffs' nearly identical Section 1 claim, even though landlords were alleged to accept RealPage's

---

[107] 279 F.2d at 132 (internal quotation omitted).
[108] *High Fructose*, 295 F.3d at 656 (price-fixing conspiracy exists even where "many of [defendants'] actual sales" occurred below fixed list prices because "even if most or for that matter all transactions occur at lower prices … sellers would not bother to fix list prices if they thought there would be no effect on transaction prices."); *Gelboim*, 823 F.3d at 775–777 ("even if none of the appellants' financial instruments paid interest at [the fixed] LIBOR [rate]," plaintiffs can bring "an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices.").

- 59 -

comparable "recommendations" between 80–90% of the time.[109] Rejecting the argument defendants must "accept[] RealPage's price recommendations 100% of the time," the court reasoned (1) that landlord defendants' payment of fees to RealPage for pricing recommendations "le[d] to the inference that [they] intended to abide by those recommendations;" and (2) it was "baseless" to assume—as defendants urged—that "when [a] [RealPage client] departed from [a] recommended price, it adopted a price consistent with ordinary market conditions."[110]

In contrast with *RealPage*, the court here rejected any analogy with *Interstate* and *Masonite*, concluding that because Casino-Defendants were not required to accept Rainmaker's pricing recommendations, "it would thus be too implausible to infer that each [Casino-Defendant] was signing up for a price fixing conspiracy when it agreed to license and use GuestRev and GroupRev." 1-ER-7. But *Masonite* rejects the proposition that a defendant must know that it is "signing up for a price fixing conspiracy" for it to engage in concerted action; instead, it creates liability where a company delegates its pricing authority to a third party either with knowledge that its horizontal competitors are doing the same *or* continues to do so after acquiring that knowledge. *Masonite* also specifically rejects the idea—which appears to have

---

[109] *RealPage*, 2023 WL 9004806, at **2, 24.
[110] *Id.* at *16, *35 & n.26.

largely driven the district court's reasoning—that defendants can escape liability if "they did not intend to join a combination or to fix prices," "desired the agreement regardless of the action that might be taken by any of the others," and/or "did not require as a condition of [their] acceptance that [the hub defendant] make such an agreement with any of the others"—concluding instead that they "must be held to have intended the necessary and direct consequences of their acts."[111]

Rainmaker's power to distort "ordinary market conditions" (prices) is remarkable: even if its recommendations are not accepted 100% of the time, *virtually every price for every room* sold by Casino-Defendants is set in relation to a recommended price that Rainmaker generates as a starting point. And as in *RealPage*, (1) Rainmaker builds numerous features into its product to ensure high acceptance rates (which it advertises as approximately 90%); (2) Casino-Defendants continue to pay for (and publicly tout their success with) GroupRev and GuestRev, whose core purpose is to generate recommendations; and (3) preliminary economic analysis shows that, coinciding almost precisely with the release of RevCaster and

---

[111] *Masonite*, 316 U.S. at 274–75; *see also United States v. Apple, Inc.*, 791 F.3d 290, 317 (2d Cir. 2015) ("[a]ntitrust law has never required identical motives among conspirators when their independent reasons for joining together lead to collusive action.").

GroupRev—and despite a lack of rising demand—Casino-Defendants began raising rates. *See supra* pp. 12-21.

These facts give rise to the plausible inference that Casino-Defendants subscribed to Rainmaker with (a) the intention of relying on its recommendations; then (b) did so at a high enough rate that they were able to charge supracompetitive prices and disrupt the competitive process by collectively substituting Rainmaker's centralized brain for their independent decisionmaking.

### 2. Casino-Defendants need not directly exchange confidential information to engage in concerted action

Next, the court found that Plaintiffs' allegations of concerted action were undercut by their "failure to plausibly allege the exchange of confidential information from" one Casino-Defendant to another "through Rainmaker's algorithm," concluding that "consulting public sources to see your competitors' rates in reaching decisions about how to price hotel rooms does not violate the Sherman Act" (1-ER-8–10) and that, to the extent Casino-Defendants "get[] public data about other [Casino-Defendants] by using GuestRev or GroupRev, … that does not suggest collusion." 1-ER-10.

But as the Supreme Court made clear in *American Needle*, the central inquiry for whether a contract, combination, or conspiracy has been formed is whether

independent centers of economic decisionmaking have been joined.[112] This can occur whether or not competitors share confidential information.

Here, Casino-Defendants' once-independent centers of economic decisionmaking were joined because they (1) communicate their pricing strategy to Rainmaker, which (2) has access to each Casino-Defendant's confidential price strategy information as well as near-real time competitor pricing data, and thus (3) is able to program its algorithm to maximize Casino-Defendants' revenues. Then, Rainmaker allows Casino-Defendants to (1) choose the competitors whose pricing is used to impact their own, as well as the "magnitude" of the change each should have on pricing (5-ER-734–36, 741–43, 746–48, 755–56 (¶¶105–08, 118–20, 125–26, 137–38)); (2) receive competitor pricing information that is updated at least daily (5-ER-743, 761 (¶¶120, 147)); and (3) repeatedly broadcasts who among Casino-Defendants' competitors are also Rainmaker clients (*see supra* p. 11). It also utilizes machine learning to train its algorithm with voluminous non-public data collectively provided by Casino-Defendants—data that makes it "progressively smarter" in "perform[ing] complex computations that automatically evaluate market change" and thus better able to facilitate collusive pricing. 5-ER-829–36 (¶259; ¶¶257–65). And it pairs all this with appeals to its clients that they exercise "discipline" in

---

[112] *Am. Needle*, 560 U.S. at 190.

pivoting to a fundamentally new business model and defer to the "aggressive," seemingly "irrational" centralized outputs generated by its algorithms. *See supra* pp. 11, 17-18.

This type of delegation—which eliminated separate pricing decisions by horizontal competitors—is exactly the type of "concerted action" the Sherman Act was created to police.[113] And as in *Masonite*, Casino-Defendants use Rainmaker with the knowledge that it works in precisely this way, that their competitors are also using the same "brain," and that the fundamental purpose of Rainmaker's algorithms is to "drive higher profits" (5-ER-713 (¶69)) by enforcing a "disciplined" new approach to pricing.

Further, if the exchange of confidential information were a necessary precondition for defendants' liability in an algorithmic price fixing case—as the court's order suggests—this would arbitrarily exclude a vast array of harmful conduct from scrutiny. Empirical research demonstrates that, in markets like the Las Vegas Strip, where real-time price information is readily available, an algorithmic pricing agent need not have access to confidential information in order to break the competitive machinery of the market, i.e., allow cartel members to charge

---

[113] *Am. Needle*, 560 U.S. at 195.

supracompetitive prices.[114] Indeed, as academics have explained, the "industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes" is problematic not because the algorithm exists as a conduit for information exchange, but instead because "the market behavior of the competitors aligns due to the use of a similar 'brain' to determine their price strategy." 5-ER-816 (¶225).

Rather than credit Plaintiffs' allegations, the court reasoned instead that "consulting your competitors' public rates to determine how to price" cannot—categorically—"unreasonabl[y] restrain[] trade" and thus "violate the Sherman Act." 1-ER-10. But Plaintiffs have not alleged that Casino-Defendants simply observe each other's public prices independently and then make their own pricing decisions based on that information. Instead, Plaintiffs allege that Casino-Defendants knowingly delegate their pricing decisions to a single, centralized entity that then provides recommendations based on each competitor's prices—with the explicit goal of (1) maximizing profit across a group of horizontal competitors by, among

---

[114] In Germany, where the gasoline retail market is subject to "price disclosure regulations and near perfect price transparency," the use of algorithmic pricing software by competing gas stations based only on public information nevertheless increased margins by 9% "only through its effect on competition." Stephanie Assad et al., *Autonomous algorithmic collusion* at 12, 15 (Toulouse School of Economics Working Paper No. 1210, 2021), https://tinyurl.com/4z6tpb6b (cited at 5-ER-818 (¶229)).

other things, (2) eliminating their traditional focus on maximizing occupancy. This is actionable under the Sherman Act.

### 3. Casino-Defendants need not have joined the conspiracy at the same time to engage in concerted action

Finally, the court found that Plaintiffs' allegations of concerted action were rendered "implausible" by the approximately ten year "gap[] in time" between when certain Casino-Defendants began using Rainmaker's algorithms. 1-ER-8. Despite recognizing that Casino-Defendants may have first begun using Rainmaker's products "in response to [its] marketing materials listing all their customers" or because of "the golf outings and open bars [it] hosts"—i.e., in response to learning that their competitors were doing the same—the court nevertheless reasoned that their joint adoption over this period "merely suggest[ed] … conscious parallelism." 1-ER-8.

But well-established law rejects the court's approach and finds that the same type of conduct alleged here is sufficient to plead concerted action under analogous circumstances. In *RealPage*, for instance, the court found plaintiffs "need not allege that the defendants"—landlords who began using RealPage's software at different points in time—"simultaneously adopted" an analogous "new pricing strategy"[115] to

---

[115] *RealPage*, 2023 WL 9004806, at *13 (citing *Interstate*, 306 U.S. at 227); *see id.* at *11.

state a claim, concluding that the defendants engaged in concerted action where (1) they "each became RealPage RMS clients and began prioritizing raising rent prices over decreasing vacancy rates,"[116] and (2) "every year, each [defendant] Lessor renews its license with RealPage, re-affirming its commitment."[117] In reaching this result, the court relied on *Masonite*'s holding that concerted action can be pled when some conspirators act independently of others, deal only with the hub, and do not condition their participation on the involvement of coordination with others.[118]

The same is true here. Casino-Defendants make parallel decisions every year to share information with, and delegate decision making on price to, an algorithm that they know is designed to enable supracompetitive pricing by "maximizing profits" rather than "chasing after occupancy growth." 5-ER-685, 699–705, 710 (¶¶4, 48–58, 64). Regardless of when each Casino-Defendant began using Rainmaker's products, what matters—as in *Masonite*—is their decision to begin *or* continue using them once they acquired knowledge that their use of GuestRev and GroupRev was "part of a larger arrangement" that entailed a "disciplined" (and fundamental) shift away from Casino-Defendants' previous business model. 5-ER-700–02 (¶¶50–53).

---

[116] *Id.* at *13.
[117] *Id.* at *19.
[118] *Id.* at *13 (citing *Masonite*, 316 U.S. at 274–75).

## CONCLUSION

For the foregoing reasons, the district court's dismissal of Plaintiffs' complaint should be reversed with directions to deny Defendants' motion.

Dated: September 26, 2024     Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
*Email: steve@hbsslaw.com*

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
*Email: riop@hbsslaw.com*

*Attorneys for Plaintiffs-Appellants*

011141-11/2833890 V1

## CERTIFICATE OF COMPLIANCE

This brief contains 13,985 words, including 282 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). This brief complies with typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point size Times New Roman font.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/2833890 V1

## STATEMENT OF RELATED CASES

In accordance with Circuit Rule 28-2.6, the undersigned certifies that there are no related cases.

_s/ Steve W. Berman_
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/2833890 V1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 26, 2024.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/2833890 V1