**Docket No. 24-3576**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

RICHARD GIBSON, et al.,

*Plaintiffs-Appellants,*

v.

CENDYN GROUP, LLC, et al.,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the District of Nevada,*
*No. 2:23-cv-00140-MMD-DJA · Honorable Miranda M. Du*

## ANSWERING BRIEF FOR APPELLEES

<table>
<tr><td>

SADIK HUSENY
BRENDAN MCSHANE
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111

MELISSA ARBUS SHERRY
ANNA M. RATHBUN
CHRISTOPHER J. BROWN
GRAHAM HAVILAND
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, District of Columbia 20004

*Counsel for Defendant-Appellee*
*Cendyn Group, LLC*

</td><td>

BORIS BERSHTEYN
*Counsel of Record*
KEN SCHWARTZ
MICHAEL MENITOVE
SAM AULD
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000 Telephone

*Counsel for Defendant-Appellee*
*Caesars Entertainment, Inc.*

</td></tr>
</table>

*Additional Counsel Listed on Inside Cover*

 COUNSEL PRESS · (213) 680-2300    PRINTED ON RECYCLED PAPER 

MATTHEW L. MCGINNIS
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199

*Counsel for Defendants-Appellees*
*Blackstone Inc. and Blackstone Real*
*Estate Partners VII L.P.*

ARMAN ORUC
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, District of Columbia 20036-1612
(202) 346-4000 Telephone
(202) 346-4444 Facsimile
AOruc@goodwinlaw.com

ALICIA RUBIO-SPRING
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02110
(617) 570-1000 Telephone
(617) 523-1231 Facsimile
ARubio-Spring@goodwinlaw.com

*Counsel for Defendant-Appellee*
*The Rainmaker Group Unlimited, Inc.*

MARK HOLSCHER
TAMMY TSOUMAS
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
(310) 552-4200 Telephone
(310) 552-5900 Facsimile
ttsoumas@kirkland.com
mholscher@kirkland.com

*Counsel for Defendant-Appellee*
*Wynn Resorts Holdings, LLC*

PATRICK J. REILLY
ARTHUR A. ZORIO
EMILY GARNETT
ERIC D. WALTHER
BROWNSTEIN HYATT
FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
(702) 382-2101 Telephone
preilly@bhfs.com
azorio@bhfs.com
egarnett@bhfs.com
ewalther@bhfs.com

*Counsel for Defendant-Appellee*
*Treasure Island, LLC*

NICHOLAS J. SANTORO
SPENCER FANE, LLP
300 South 4th Street, Suite 1600
Las Vegas, NV 89101
(702) 408-3400 Telephone

*Counsel for Defendant-Appellee*
*The Rainmaker Group Unlimited, Inc.*

KASEY J. CURTIS
CHARLES P. HYUN
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071
(213) 457-8089 Telephone
(213) 457-8080 Facsimile
kcurtis@reedsmith.com
chyun@reedsmith.com

*Counsel for Defendant-Appellee*
*JC Hospitality, LLC*

## DISCLOSURE STATEMENTS

Defendants-Appellees Blackstone Inc. and Blackstone Real Estate Partners VII L.P., state that Blackstone Inc. is a publicly traded company that has no parent corporation and, to the best of its knowledge, no publicly held corporation owns 10% or more of its stock. Blackstone Real Estate Partners VII L.P. is an affiliate of Blackstone Inc.

Defendant-Appellee Caesars Entertainment, Inc. is a publicly traded company that has no parent corporation. No publicly held corporation owns 10% or more of its stock.

Defendant-Appellee Cendyn Group, LLC is a private company owned by Cendyn Parent, Inc. Cendyn Parent, Inc. is 100% owned by Cendyn Group Holdings LLC, a portfolio company of Accel-KKR. No publicly held corporation holds 10% or more of Cendyn Group, LLC's stock.

Defendant-Appellee JC Hospitality, LLC states that its sole member is JC Vegas Mezz Co., LLC. No publicly held corporation owns 10% or more of JC Hospitality, LLC or JC Vegas Mezz Co., LLC's stock.

Defendant-Appellee The Rainmaker Group Unlimited, Inc. has no corporate parent, and no publicly held corporation holds 10% of any stock it might issue.

- i -

Defendant-Appellee Treasure Island, LLC, is a private company in which the following entities have a direct pecuniary interest: Ruffin Acquisition, LLC, Phillip G. Ruffin Nevada Gaming Trust, and Phillip G. Ruffin.

Defendant-Appellee Wynn Resorts Holdings, LLC has one parent corporation: Wynn Resorts, Limited. Wynn Resorts, Limited is a publicly traded corporation, has no parent companies, and no entity owns 10% or more of Wynn Resorts Limited's stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS..............................................................i

TABLE OF AUTHORITIES...............................................................vi

INTRODUCTION ...........................................................................1

STATEMENT OF ISSUES ................................................................4

    A.    Factual Background ...........................................................5

        1.    Rainmaker's revenue management products.....................5

        2.    The Hotel Defendants and the Las Vegas Strip..................9

        3.    Hotel Defendants licensed the Revenue Management
            Products at various times between 2004 and 2014............10

        4.    The Revenue Management Products' recommended prices
            were not based on competitors' non-public data..............11

    B.    Procedural Background .....................................................12

        1.    The district court dismisses plaintiffs' first complaint
            without prejudice.....................................................12

        2.    The district court dismisses plaintiffs' amended
            complaint with prejudice .........................................13

        3.    A district court in New Jersey dismisses a materially
            identical complaint .................................................17

SUMMARY OF ARGUMENT ...........................................................18

ARGUMENT.................................................................................21

I.    THE DISTRICT COURT CORRECTLY DISMISSED COUNT I's
    HUB-AND-SPOKE CLAIM.......................................................21

## TABLE OF CONTENTS
(continued)

Page

A. Hotel Defendants' Allegedly "Parallel" Conduct Is Far Less Suggestive of a Conspiracy Than *Musical Instruments* ...............23

    1. Licensing the Revenue Management Products across a decade is not parallel conduct.............................................24

    2. Plaintiffs' statistics do not suggest a conspiracy ...............26

B. Plaintiffs' "Plus Factors" Are Weaker Than the Plus Factors This Court Rejected in *Musical Instruments* and *DRAM*......................31

C. Plaintiffs' Efforts to Escape *Musical Instruments* Fail .................44

    1. Plaintiffs cannot satisfy *Interstate Circuit* ............................44

    2. *United States v. Masonite* lends no support .........................46

D. DOJ's Amicus Brief Supports Affirming the District Court's Order Because It Is Based on Imaginary Allegations ................52

II. THE DISTRICT COURT PROPERLY DISMISSED COUNT II's VERTICAL AGREEMENT CLAIM..........................................................55

A. The District Court Applied Blackletter Law to Hold That Plaintiffs Failed to Plead a Vertical Restraint...............................56

    1. The district court rejected plaintiffs' alleged restraint......57

    2. Rainmaker's software licenses do not restrain Hotel Defendants' decisionmaking.................................................58

    3. Identifying a contract does not plead a restraint of trade ....................................................................................61

B. Plaintiffs Also Fail to Allege Harm to Competition....................64

    1. Conclusory allegations and statistics disconnected from the software licenses are not direct evidence....................65

**TABLE OF CONTENTS**
(continued)

**Page**

2. Plaintiffs fail to plausibly allege indirect evidence ...........68

CONCLUSION .....................................................................................71

CERTIFICATE OF COMPLIANCE ...................................................73

CERTIFICATE OF SERVICE ..............................................................74

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*49er Chevrolet, Inc. v. General Motors Corp.*,
   803 F.2d 1463 (9th Cir. 1986)........................................................59

*Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*,
   141 F.3d 947 (9th Cir. 1998)........................................................41

*Alaska v. Federal Subsistence Board*,
   544 F.3d 1089 (9th Cir. 2008)......................................................52

*American Ad Management v. GTE Corp.*,
   92 F.3d 781 (9th Cir. 1996)..........................................................61

*Barry v. Blue Cross of California*,
   805 F.2d 866 (9th Cir. 1986)..........................................19, 45, 48

*Bell Atlantic Co. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................21

*Betaseed, Inc. v. U & I Inc.*,
   681 F.2d 1203 (9th Cir. 1982)......................................................45

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
   691 F. App'x 389 (9th Cir. 2017) ................................................31

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012)......................................................65

*Buffalo Broadcasting Co. v. ASCAP*,
   744 F.2d 917 (2d Cir. 1984)..........................................................60

*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011).......................................................44

*Cornish-Adebiyi v. Caesars*,
   2024 WL 4356188 (D.N.J. Sept. 30, 2024).....................17-18, 32-33, 49-50

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*District of Columbia v. RealPage*,
    No. 2023 CAB 6762 (D.C. Super. Ct. July 2, 2024) .................................33

*Duffy v. Yardi Systems, Inc.*,
    2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ..........................................34

*In re Dynamic Random Access Memory (DRAM) Indirect
    Purchaser Antitrust Litigation*,
    28 F.4th 42 (9th Cir. 2022)................................ 21, 28-29, 31, 37, 39, 40, 43

*Ecological Rights Foundation v. Pacific Gas & Electric Co.*,
    713 F.3d 502 (9th Cir. 2013)..........................................................36

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .................................................61, 64

*Filco v. Amana Refrigeration, Inc.*,
    709 F.2d 1257 (9th Cir. 1983)..........................................26, 48, 54

*Flextronics International USA, Inc. v. Panasonic Holdings Corp.*,
    2023 WL 4677017 (9th Cir. July 21, 2023)................................26

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)...........................................................68

*In re German Automotive Manufacturers Antitrust Litigation*,
    2021 WL 4958987 (9th Cir. Oct. 26, 2021)..........................................30, 37

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975) ....................................................................62

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)............................................................41, 43

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651 (7th Cir. 2002)............................................................63

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ..........................................................43

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010) ............................................................45, 46

*Intel Corp. v. Fortress Investment Group*,
    2022 WL 16756365 (9th Cir. 2022) ......................................................67

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) .......................................................................44, 45

*K-91, Inc. v. Gershwin Publishing Corp.*,
    372 F.2d 1 (9th Cir. 1967)....................................................................60

*Mach v. Yardi Systems, Inc.*,
    2024 WL 4443986 (Cal. Super. Ct. Aug. 19, 2024).................................34

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020) ............................................................27, 30

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)...............................................................27

*Moore v. Mars Petcare US, Inc.*,
    820 F. App'x 573 (9th Cir. 2020) ..........................................................39

*Mularkey v. Holsum Bakery, Inc.*,
    146 F.3d 1064 (9th Cir. 1998)....................................................58, 59, 60

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015)........................................................*passim*

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987)....................................................16, 56, 59

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Nexium (Esomeprazole) Antitrust Litigation*,
  842 F.3d 34 (1st Cir. 2016) ............................................................ 19, 47-48

*Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*,
  394 U.S. 700 (1969) ...................................................................................62

*Ohio v. Amex*,
  585 U.S. 529 (2018) .................................................................64, 68, 69, 70

*Paladin Associates, Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003)......................................................................61

*PLS.Com, LLC v. National Association of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ................................................................ 48-49

*Plymouth Dealers' Association of Northern California v. United States*,
  279 F.2d 128 (9th Cir. 1960)............................................................ 54, 62-63

*Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
  92 F.4th 381 (2d Cir. 2024)............................................................27, 29, 30

*Ralph C. Wilson Industries, Inc. v. American Broadcasting Cos.*,
  598 F. Supp. 694 (N.D. Cal. 1984)..............................................................69

*In re RealPage, Inc., Rental Software Antitrust Litigation*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023)........................................ 33-34, 44

*Rebel Oil v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)............................................... 42, 65, 66, 69-70

*St. Luke's Hospital v. ProMedica Health Systems, Inc.*,
  8 F.4th 479 (6th Cir. 2021)............................................................................60

*Schachar v. American Academy of Ophthalmology, Inc.*,
  870 F.2d 397 (7th Cir. 1989)........................................................................58

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*SmileDirectClub, LLC v. Tippins,*
   31 F.4th 1110 (9th Cir. 2022) ........................................................56

*Stanislaus Food Products Co. v. USS-POSCO Industries,*
   803 F.3d 1084 (9th Cir. 2015)......................................................43

*Twin City Sportservice, Inc. v. Charles Finley & Co.,*
   676 F.2d 1291 (9th Cir. 1982)......................................................43

*United States v. Masonite Corp.,*
   316 U.S. 265 (1942) ........................................................19, 44, 47

*United States v. National Association of Real Estate Boards,*
   339 U.S. 485 (1950) ........................................................................62

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940) ........................................................................48

*William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.,*
   588 F.3d 659 (9th Cir. 2009)..................................................41, 69

**STATUTE**

15 U.S.C. § 1.............................................................................................56

**OTHER AUTHORITY**

6 Areeda & Hovenkamp, ANTITRUST LAW (5th ed. 2023).........47-48, 58-59

# INTRODUCTION

The use of commercially available "algorithmic" revenue management software to analyze data and offer pricing recommendations sounds novel and complex. Fortunately, applying antitrust law to that software in this case is straightforward—and controlled by this Court's directly applicable authority. The district court applied that authority to conclude plaintiffs failed to state a claim under Section 1 of the Sherman Act by distinguishing plaintiffs' factual pleadings from their conclusory and misleading characterizations to identify what plaintiffs have—and have not—alleged:

- Plaintiffs allege that Defendant Cendyn's software bases pricing recommendations to a Hotel Defendant on that defendant's own information and on publicly available information. Plaintiffs <u>do not</u> plead that Cendyn's software uses confidential information of one Hotel Defendant to make pricing recommendations for another.[1]

- Plaintiffs <u>do not</u> plead that any Hotel Defendant agreed to accept the software's recommendations all the time or even any portion of the time. And there are no allegations that, in practice, they adopted the software's recommendations with any particular frequency.

- Plaintiffs <u>do not</u> plead that Hotel Defendants coordinated their decision to license the software. Instead, plaintiffs allege these decisions happened over a decade apart.

---

[1] Hotel Defendants are: Caesars Entertainment, Inc. ("Caesars"), Treasure Island, LLC ("Treasure Island"), Wynn Resorts Holdings, LLC ("Wynn"), JC Hospitality LLC, and Blackstone Inc. and Blackstone Real Estate Partners VII L.P., (collectively, the "Blackstone Entities").

These allegations (and lack of allegations) prevent plaintiffs from stating a claim for a hub-and-spoke conspiracy among Hotel Defendants (Count I) or for unlawful vertical agreements (Count II) under this Court's decisions. Plaintiffs' appeal asks this Court to rewrite its precedents to hold that licensing software by more than one hotel in the same market is sufficient to state an antitrust claim. That would upend settled antitrust law. This Court should affirm the district court's refusal to do so.

**First**, the district court correctly dismissed Count I. The court applied *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015), to conclude that plaintiffs failed to allege a hub-and-spoke conspiracy in which the alleged spokes (Hotel Defendants) agreed with each other to adopt room rates recommended by the alleged hub (Rainmaker software).[2] Like *Musical Instruments*—where the plaintiffs also tried to allege a conspiracy in which the spokes agreed to adopt the hub's prices—plaintiffs try to infer an agreement among Hotel Defendants through parallel conduct and "plus factors." But Hotel Defendants' alleged conduct—licensing

---

[2] All internal brackets, citations, quotations, and emphases added are omitted unless noted.

Rainmaker's software at different times over a decade—is much <u>less</u> parallel than the conduct *Musical Instruments* declared <u>insufficient</u>. *Id*. at 1193.

Plaintiffs' failure to plead parallel conduct renders their alleged "plus factors" irrelevant. But even if the Court considered them, those "plus factors" also do not suggest a conspiracy. In fact, plaintiffs lack the well-pleaded plus factor that is necessary here: that pricing suggestions Rainmaker provided to a Hotel Defendant were based on other Hotel Defendants' confidential information. Indeed, plaintiffs concede the opposite: Rainmaker's pricing suggestions were <u>not</u> based on other Hotel Defendants' confidential information.

Plaintiffs argue Hotel Defendants "delegated" their pricing to Rainmaker's software, but that is conclusory and unsupported, as the district court held after analyzing plaintiffs' complaints. Plaintiffs' argument is also contradicted by their allegations that each Hotel Defendant exercised its own authority to set room rates, including by rejecting Rainmaker's pricing suggestions so often that Rainmaker battled fruitlessly against rejection. These allegations are the <u>antithesis</u> of "delegating" pricing authority.

**<u>Second</u>**, the district court correctly dismissed Count II's challenge to each vertical software license between a Hotel Defendant and Rainmaker

because those licenses do not restrain Hotel Defendants' pricing freedom. Plaintiffs try to conceal that basic flaw by advocating for another dangerously overbroad principle: that the existence of <u>any</u> contract, coupled with purportedly higher prices, states a § 1 claim. But, as the district court correctly concluded, this Court's settled precedent holds otherwise: a plaintiff cannot state a § 1 claim without alleging an agreement that restrains a party's decisionmaking.

Even if the individual software licenses here were somehow deemed "restraints of trade," Count II would still fail because plaintiffs allege no facts showing <u>how</u> those licenses could lead to anticompetitive effects. Plaintiffs' refrain of "higher prices" beginning in 2015 is not supported by their allegations and lacks any well-pleaded connection to the software licenses. Finally, plaintiffs fail to plausibly allege either a viable relevant market or any Hotel Defendant's market power—both of which are necessary to allege that any challenged software license harmed competition.

## STATEMENT OF ISSUES

1. Whether plaintiffs have plausibly alleged a per se hub-and-spoke conspiracy to fix prices through Hotel Defendants' licensing software when the Hotel Defendants (a) did not receive price recommendations based

- 4 -

on each other's confidential information, (b) did not accept the software's recommendations with any frequency, (c) started licensing the software at varying times up to a decade apart, and (d) are among thousands of non-defendant hotels that also license the software, which provides many utilities to subscribers.

2. Whether plaintiffs have plausibly alleged anticompetitive vertical agreements when they (a) identify nothing about the software licenses that restrains Hotel Defendants' freedom to set prices and (b) fail to plead that the software licenses increased prices above the competitive level or that any Hotel Defendant has market power in a relevant market.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Rainmaker's revenue management products

Rainmaker—and Cendyn after it acquired Rainmaker, 5-ER-685 ¶3 & n.4—provides revenue management software to "5,500 hotels in 110 countries," including casino-hotels, 5-ER-789 ¶191. Managing revenue at hotels includes predicting demand and the revenue that guests will generate,

which is "complex" for casino-hotels because they must "consider[] a guest's theoretical future gaming value." 5-ER-701 ¶51, 5-ER-708 ¶62.[3]

Rainmaker marketed its revenue management software as giving hotels a "compass," 5-ER-706 ¶60, to forecast demand and make more informed revenue decisions, 5-ER-715 ¶71, 5-ER-761–62 ¶¶147–48. The Rainmaker software is a suite of customizable solutions that enables a subscriber to harness its own data to analyze "the total value of each segment and individual customer, based on all available revenue streams." 5-ER-880 ¶314. This "total revenue management approach" allows "revenue managers . . . to strategically price and protect room inventory for the property's most valuable guests." 5-ER-791–92 ¶195.

Plaintiffs focus on three software products offered by Rainmaker: GuestRev, RevCaster, and GroupRev (collectively, the "Revenue Management Products").

**GuestRev**. Rainmaker introduced GuestRev in 2001, 5-ER-711 ¶65, and it optimizes a subscriber's own data to give it an "in-depth understanding of demand by each customer segment," 5-ER-775 ¶166. While plaintiffs

---

[3] Defendants accept plaintiffs' allegations as true only for purposes of this appeal because it arises from a dismissal under Rule 12(b)(6).

focus on its pricing algorithm, GuestRev offers subscribers various tools, including:

- The "ability to create custom personalized dashboards that display market data in any format," 5-ER-751 ¶129;

- Demand booking "curves," 5-ER-768 ¶159;

- "A number of available metrics on a day-by-day basis, including . . . total remaining demand," 5-ER-728 ¶94;

- "[D]ump[s] of data" that "clients loved," 5-ER-720 ¶81; and

- Demand forecasts "at the finest level of granularity," 5-ER-715 ¶71.

Subscribers can "customize" these features to suit their preferences. 5-ER-743 ¶121. For instance, a subscriber can "control" GuestRev, 5-ER-744 ¶121, by "edit[ing]" the "criteria" the algorithm uses across that subscriber's data to "formulat[e] its pricing recommendations," 5-ER-736 ¶108.

**RevCaster**. Another feature integrated into GuestRev is the public data collected by RevCaster, which Rainmaker acquired in March 2015. 5-ER-753 ¶133. RevCaster "collect[s] public pricing information" from sources like Expedia, 5-ER-724 ¶86, and provides customizable "competitor rate information" from those public sources, 5-ER-688 ¶11. Subscribers customize which (if any) "public pricing information" collected by RevCaster, 5-ER-724

¶86, "influence[s]" room rate suggestions for their individual hotel property, 5-ER-734 ¶105.

**GroupRev**.  Rainmaker introduced GroupRev in 2013, 5-ER-749 ¶128, to provide demand "forecast[s]" from large groups and "recommend the best pricing for group business," 5-ER-784 ¶186.  GroupRev also allows subscribers to "create custom personalized dashboards that display market data" and forecast demand for "meeting space."  5-ER-750–52 ¶¶129–31.

Plaintiffs allege that, when considering the "thousands of hotels and resorts" subscribing to the Revenue Management Products, 5-ER-801 ¶211, the average adoption of pricing recommendations is 90%, 5-ER-716 ¶74.  Plaintiffs do not identify any Hotel Defendant's adoption rate.  Nor do plaintiffs allege that any subscriber is required to adopt any price suggested by a Revenue Management Product.  The Revenue Management Products instead permit subscribers to accept pricing recommendations "as much or as little as [they] want."  5-ER-720 ¶80.  In practice, plaintiffs allege that subscribers overrode Rainmaker's pricing recommendations so often that Rainmaker purportedly "engaged in a never-ending battle" to try to "convince" them to stop.  5-ER-687 ¶8.

- 8 -

### 2. The Hotel Defendants and the Las Vegas Strip

During the class period, Hotel Defendants managed casino-hotels on the Las Vegas Strip—Caesars operated eight, Wynn operated two, and Treasure Island, the Blackstone Entities (The Cosmopolitan of Las Vegas), and JC Hospitality, LLC (Hard Rock Hotel & Casino Las Vegas) had one each. 5-ER-695–97 ¶¶30-34. Hotel Defendants operated about "35-40% of the rooms" on the Las Vegas Strip. 5-ER-894 ¶350.

Plaintiffs allege hotels compete with other hotels in the same "class[] of properties" on the Strip, 5-ER-829 ¶256, but do not define those classes or which hotels belong to them. The hotels purportedly run by Hotel Defendants are not all within the same class because "a hotel room at Treasure Island appeals to a different kind of customer than a hotel room at the Wynn." *Id*.

There are two other hotel chains on the Strip that plaintiffs highlight: MGM and the Venetian. "MGM is one of the . . . largest players on the Las Vegas Strip in terms of hotel ownership." 6-ER-1067. Plaintiffs' first complaint named MGM as a defendant, but the court dismissed MGM because plaintiffs could not allege that "any MGM hotels [on] the Las Vegas Strip use the Rainmaker software." 6-ER-1066. Plaintiffs identify the Venetian as

another casino-hotel on the Strip that did not license the Revenue Management Products.  5-ER-690 ¶15.

### 3. Hotel Defendants licensed the Revenue Management Products at various times between 2004 and 2014

Hotel Defendants licensed the Revenue Management Products at different times across a decade, bookended by Caesars subscribing in 2004 and The Cosmopolitan subscribing in 2014.  5-ER-763 ¶151, 5-ER-780 ¶178.  Hotel Defendants also used different tools offered by the Revenue Management Products.  According to plaintiffs, Caesars "[o]ptimized revenue . . . using Rainmaker's . . . [booking] curves," 5-ER-768 ¶159, while Wynn used the Revenue Management Products "to apply different forecasting models for . . . demand," 5-ER-770 ¶163.

Plaintiffs do not allege that Caesars, Wynn, or The Cosmopolitan ever adopted the room rates suggested by the Revenue Management Products.  Plaintiffs instead allege only that "Hard Rock automatically accepted Rainmaker's pricing recommendations in some circumstances" and "overrode the[m] . . . in other cases."  5-ER-779 ¶175.

### 4. The Revenue Management Products' recommended prices were not based on competitors' non-public data

Plaintiffs do not allege that any pricing recommendation provided to any Hotel Defendant was based on competitors' non-public data. Instead, the only competitor information used to suggest prices to a Hotel Defendant is "public pricing information." 5-ER-724 ¶86. Plaintiffs also concede that Hotel Defendants "have not directly exchanged information with each other," and instead allege Revenue Management Products used "machine learning" "derived" from Rainmaker's clients' "collective data." 5-ER-836 ¶265. Plaintiffs do not allege that any "machine learning" is done through any competitively sensitive "collective" data.

Plaintiffs do not identify any room rate or occupancy level at any hotel. Instead, plaintiffs include "statistics" purportedly comparing average room rates on the Strip to: (i) a nationwide index measuring all prices for all goods and services offered by casino-hotels (i.e., not just room rates), (ii) room prices at hotels in another part of Las Vegas (downtown), and (iii) quarterly room rates at the Venetian and MGM. Opening Br. ("OB") at 19-20.

Despite neither MGM nor the Venetian licensing the Revenue Management Products, plaintiffs' statistics show that MGM's room rates increased

more than every Hotel Defendant's, while the Venetian's rates supposedly increased less. *Id*. at 19. Room rates decreased at the Venetian because half of it was closed in 2020, and plaintiffs' calculations assumed that the Venetian rented the rooms in the hotel's closed-half for $0. 3-ER-457.

### B. Procedural Background

#### 1. The district court dismisses plaintiffs' first complaint without prejudice

On January 25, 2023, plaintiffs sued Caesars, MGM, Treasure Island, Wynn, Cendyn, and Rainmaker. Plaintiffs' claim was that the casino-hotel defendants agreed to "use pricing algorithms provided" by Rainmaker. 6-ER-1177 ¶88. Defendants moved to dismiss, and the district court held argument.[4] Plaintiffs asked that any dismissal be without prejudice because "this is a novel . . . factual area." SER-57 at 40:3–4.

On October 24, 2023, the court granted defendants' motions, identifying many defects in plaintiffs' attempt to plead an agreement among casino-

---

[4] While defendants awaited a hearing on their motion, the magistrate judge ordered defendants to answer interrogatories about how they use the software: Wynn's "Las Vegas hotels . . . have a general practice of not using the recommendations generated by Rainmaker's algorithms," SER-59 at 42:7–10; Caesars "does not have a practice of using prices recommended by Rainmaker," *id.* at 42:10–12; and, Treasure Island "does not use Rainmaker's rates[]," 4-ER-626.

hotel defendants, including plaintiffs' failure to "answer the basic questions: who, did what, to whom (or with whom) . . . and when?"  SER-7.

The court also concluded that plaintiffs failed to allege an agreement through direct or circumstantial evidence.  Recognizing that plaintiffs staked their claim on alleging "the exchange of nonpublic information between competitors through the algorithm," SER-12, the court concluded that plaintiffs do not "say that one Hotel Operator ever receives confidential information belonging to another Hotel Operator" from Rainmaker's algorithms, SER-13.

Separately, the court dismissed MGM because the complaint "does not contain allegations that any MGM hotels within . . . the Las Vegas Strip" license the Revenue Management Products.  6-ER-1066.

## 2. The district court dismisses plaintiffs' amended complaint with prejudice

Plaintiffs filed their first amended complaint ("FAC") on November 27, 2023, dropping MGM as a defendant, while adding the Blackstone Entities and JC Hospitality as defendants.  Although they inserted "many paragraphs of allegations," the district court recognized that "[t]he broad contours" of plaintiffs' case remained unchanged.  1-ER-3.

In Count I, plaintiffs assert that, "[s]ince at least 2015," defendants reached a "continuing agreement . . . to use pricing algorithms provided by Rainmaker." 5-ER-895 ¶¶352–53, 5-ER-896 ¶360. Plaintiffs identify 2015 as the "key year" when the alleged conspiracy began because GuestRev began offering the option for subscribers to consider competitors' publicly posted prices when calculating pricing recommendations. 5-ER-712–13 ¶¶67-68.

Plaintiffs also added Count II, alleging Cendyn's separate vertical licenses with each Hotel Defendant unlawfully restrained trade:

> The contract, combination, or conspiracy alleged herein has consisted of a set of vertical agreements between each Defendant and Rainmaker for each Defendant <u>to use Rainmaker's revenue management system to set prices</u> for hotel rooms in the Las Vegas Strip Market.

> . . . . In particular, as a result of these vertical agreements, competitor Defendant Hotel Operators each <u>delegated pricing</u> to a centralized third party, Rainmaker, with the understanding that the Rainmaker revenue management software would inflate the rents that they collectively charged.

5-ER-897 ¶¶365, 367.

Defendants again moved to dismiss. During oral argument, plaintiffs admitted that the Revenue Management Products' pricing recommendations to one Hotel Defendant <u>are not based on</u> confidential information from any other Hotel Defendant:

THE COURT: I want to find out if plaintiffs agree that <u>what is input into the algorithm is only information of the particular client</u>. . . . So as Caesars' counsel argues, only Caesars' confidential information is input into the program. And then the pricing recommendations are based on information that Caesars put in.

[Plaintiffs' counsel]: [J]ust candidly, Your Honor, I think -- <u>we would agree</u> that based on what we have identified that Caesars <u>doesn't get confidential information back out of the algorithm</u> from Wynn.

2-ER-74 at 54:4–15. On May 8, 2024, the court dismissed the FAC with prejudice "because [p]laintiffs have not plausibly alleged a tacit agreement between Defendants or a restraint on trade." 1-ER-3. The court concluded that Count I has "three key deficiencies," showing "why Plaintiffs have not plausibly alleged a tacit agreement" among Hotel Defendants. 1-ER-6.

**Far different timing in subscribing.** Applying *Musical Instruments*, the district court concluded that "the allegations . . . that Hotel Defendants agreed to license GuestRev and GroupRev—perhaps . . . because GuestRev has various useful features—over the course of some 10 years" do not suggest an agreement. 1-ER-8.

**Recommended prices were not based on pooled confidential data.** The court held that plaintiffs' "failure to plausibly allege the exchange of confidential information from one . . . spoke[] to the other [spokes] through the hub's algorithms is another fatal defect." 1-ER-10. The court recognized

that plaintiffs' "counsel conceded at the Hearing that, to the extent the [FAC] alleges anything about the exchange of confidential information, those allegations are based on their 'machine learning' theory." 1-ER-12. The court held, however, that plaintiffs' "machine learning" allegations "merely suggest[] GuestRev or GroupRev might be compelling to a Hotel Defendant because it offers better pricing recommendations than it used to." *Id.*

**Hotel Defendants did not delegate pricing authority.** The court then analyzed plaintiffs' argument that an agreement could be inferred "based on Hotel Defendants . . . allegedly delegat[ing] their decisionmaking on price to Cendyn." *Id.* The district court pointed out that this theory lacked support because "[p]laintiffs have not actually alleged such a delegation." *Id*.

After exhaustively addressing Count I, the court analyzed Count II, assessing whether plaintiffs pleaded facts supporting their claim that the software licenses between each Hotel Defendant and Rainmaker restrained Hotel Defendants by "delegating" their pricing to Rainmaker. The court recognized that "[i]t is axiomatic that '[t]o constitute a Section 1 violation, the contract . . . must be in restraint of trade.'" 1-ER-18 (quoting *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987)). Referring to its earlier analysis, the court concluded Count II failed because "Hotel Defendants

have not agreed to restrain their ability to price their hotel rooms in any way by licensing" the Revenue Management Products. *Id*.

### 3. A district court in New Jersey dismisses a materially identical complaint

Separate plaintiffs filed similar claims in New Jersey against Cendyn, Caesars, and other casino-hotels in Atlantic City. The court there "observ[ed] that the purported hub-and-spoke conspiracy . . . is nearly identical to" this case because plaintiffs in both cases "alleged that a price-fixing conspiracy was achieved through the casino-hotels' common use of the very same Rainmaker products." *Cornish-Adebiyi v. Caesars*, 2024 WL 4356188, at *4 (D.N.J. Sept. 30, 2024), *appeal docketed*, 24-03006 (3d Cir. Oct. 29, 2024).

On September 30, 2024, *Cornish-Adebiyi* dismissed those claims with prejudice. Like the district court here, *Cornish-Adebiyi* held the "fourteen-year gap" between when the casino-hotels licensed the Revenue Management Products, "coupled with the pricing authority the Casino-Hotels continued to retain and exercise, makes it quite implausible that they tacitly agreed to anything." *Id*. at *5. Another identical defect that *Cornish-Adebiyi* identified is that "the pricing recommendations offered to each Casino-Hotel . . . are not based on a pool of confidential competitor data." *Id*. Instead,

the "complaint[] . . . confirm[s] that the pricing recommendations . . . were never based on the confidential . . . data of their competitors." *Id.*

## SUMMARY OF ARGUMENT

After granting leave to amend, the district court correctly dismissed the FAC. This Court should affirm.

I.    Plaintiffs fail to plead anything plausibly suggesting an agreement among Hotel Defendants.

A.    The district court correctly applied *Musical Instruments* to conclude plaintiffs failed to plead facts plausibly suggesting Hotel Defendants agreed to adopt room rates suggested by the Revenue Management Products. *Musical Instruments* provides the seminal framework for evaluating hub-and-spoke claims, and plaintiffs try to satisfy *Musical Instruments* by pleading a combination of parallel conduct and "plus factors."

But Hotel Defendants' conduct is far less suggestive of a conspiracy than the allegations this Court rejected in *Musical Instruments*. Plaintiffs allege some Hotel Defendants licensed the Revenue Management Products over a decade before the alleged conspiracy. They also acknowledge many reasons why hotels license those Products absent a conspiracy. And plaintiffs concede the Revenue Management Products did not suggest room rates

to one Hotel Defendant based on other Hotel Defendants' confidential information—an allegation that courts have required for antitrust claims based on algorithmic pricing.

B.    Unable to satisfy *Musical Instruments*, plaintiffs, their amici, and DOJ urge this Court to jettison it and adopt a different test for inferring a horizontal agreement under *United States v. Masonite Corp.*, 316 U.S. 265 (1942).  But "*Masonite* makes no holding on horizontal conspiracy," *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 57 (1st Cir. 2016), and this Court has rejected plaintiffs' misconstruction, *see Barry v. Blue Cross of Cal.*, 805 F.2d 866, 869 (9th Cir. 1986).  Nor do plaintiffs' factual allegations satisfy the test they contrive from *Masonite,* because they do not allege Hotel Defendants "delegated" their pricing to the Revenue Management Products.

C.    While DOJ takes no position on whether plaintiffs pleaded an agreement among Hotel Defendants, it speculates about facts that plaintiffs did not—and could not—plead.  DOJ conjectures that Rainmaker "combines non-public, competitively sensitive information to generate prices," DOJ Br. at 36, yet plaintiffs admit that is wrong: the only source providing confidential information for a particular recommendation is the Hotel Defendant receiving that recommendation, 2-ER-74 at 54:12–15.

II.     Plaintiffs' challenge to the vertical software licenses between each Hotel Defendant and Rainmaker fails for two reasons: (A) plaintiffs admit those licenses did not restrain Hotel Defendants' pricing, and (B) there are no well-pleaded allegations that the licenses produced anticompetitive effects.

A.     This Court requires plaintiffs to allege not only a contract, but also that the contract restrains trade.  Plaintiffs cannot do so because they admit that the software licenses in <u>no way</u> restrained Hotel Defendants' pricing authority.

B.     Alternatively, even if plaintiffs could allege Rainmaker's software licenses restrain Hotel Defendants' decisionmaking, plaintiffs fail to allege that those licenses produced anticompetitive effects.  Plaintiffs admit that room rates at hotels that did <u>not</u> license the Revenue Management Products increased <u>more</u> than Hotel Defendants' rates.  Plaintiffs' pricing claims are also disconnected from when Hotel Defendants licensed the Revenue Management Products (the alleged restraint).  And plaintiffs fail to plead a relevant market, much less that any Hotel Defendant had market power.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED COUNT I's HUB-AND-SPOKE CLAIM

The district court correctly concluded that plaintiffs' attempt to allege a horizontal conspiracy in Count I fails under this Court's precedent. "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 553 (2007). The complaint "must contain sufficient factual matter . . . to plausibly suggest that an illegal agreement was made." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022).

"Generally, when a plaintiff alleges facts consistent with both the plaintiff's and the defendant's explanation, and both explanations are plausible, the plaintiff survives a motion to dismiss, [but] in the antitrust context . . . plaintiffs must include additional factual allegations . . . suggesting a[n] . . . agreement." *Id.* at 47. This "higher standard is warranted . . . in antitrust cases, where proceeding to discovery frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Id.*

This Court applied these principles in *Musical Instruments*, while "clarify[ing] the analysis" for "hub-and-spoke" claims. 798 F.3d at 1192. A "hub-and-spoke" conspiracy involves both vertical and horizontal agreements, requiring plaintiffs to allege: "(1) a hub . . .; (2) spokes, such as competi[tors] . . . that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *Id.* To plead the "key" horizontal agreements among the spokes, plaintiffs must plead "direct" or "circumstantial evidence," including "parallel conduct . . . in conjunction with . . . 'plus factors.'" *Id.* at 1193.

The plaintiffs in *Musical Instruments* alleged that Guitar Center served as the hub facilitating an agreement among guitar manufacturers to adopt "substantially similar" pricing policies that "fixed the minimum price at which any retailer could advertise the manufacturers' guitars" ("MAP policies"). *Id.* at 1189, 1194. The plaintiffs based their claim on a consent decree between the Federal Trade Commission and the National Association of Music Merchants ("NAMM"), which revealed that NAMM hosted meetings where the defendants "discussed the adoption . . . of [MAP] policies." *Id.* at 1190. This Court affirmed dismissal because the plaintiffs failed to plead an

agreement among the guitar manufacturers through parallel conduct and plus factors.

Plaintiffs here similarly plead neither parallel conduct nor plus factors.

### A. Hotel Defendants' Allegedly "Parallel" Conduct Is Far Less Suggestive of a Conspiracy Than *Musical Instruments*

Plaintiffs fail to plead parallel conduct because their allegations are much weaker than the allegations rejected by *Musical Instruments*. Pleading parallel conduct requires plaintiffs to allege that defendants contemporaneously engaged in conduct so similar that a conspiracy can be inferred—for instance, that "competitors adopt[ed] similar policies around the same time." *Musical Instruments*, 798 F.3d at 1193. By contrast, "slow adoption of similar policies does not raise the specter of collusion." *Id.* at 1196.

The *Musical Instruments* plaintiffs tried to plead parallel conduct by alleging that the guitar manufacturers adopted similar MAP policies and guitar prices "rose despite falling demand." *Id.* at 1197. This Court held that defendants' "adoption of similar policies d[id] not raise the specter of collusion" because there were three years between when the first and last guitar manufacturer adopted a MAP policy. *Id.* at 1196. The guitar manufacturers' rising prices also did not suggest a conspiracy because the plaintiffs did "not

- 23 -

allege any facts connecting the purported price increase to an illegal agreement" to adopt the MAP policies. *Id.* at 1197.

Plaintiffs seek to play the notes from *Musical Instruments* by relying on (1) when Hotel Defendants allegedly subscribed to the Revenue Management Products and (2) purported increases to room rates. OB at 49-50. Yet their allegations sound a lot <u>less</u> like a conspiracy than those <u>rejected</u> by *Musical Instruments*.

### 1. Licensing the Revenue Management Products across a decade is not parallel conduct

Rather than allege Hotel Defendants began licensing the Revenue Management Products "around the same time," *Musical Instruments*, 798 F.3d at 1193, plaintiffs allege Hotel Defendants subscribed to those Products at different times across a <u>decade</u>:



Because *Musical Instruments* held that adopting the same pricing policy over <u>three years</u> was too "slow . . . [to] raise the specter of collusion," 798 F.3d at 1196, Hotel Defendants licensing the Revenue Management Products a <u>decade</u> apart cannot either. Thus, plaintiffs fail to plead parallel conduct because they cannot allege that "competitors adopt[ed] similar policies around the same time." *Id*. at 1193.

Plaintiffs contend they plead parallel conduct because Hotel Defendants continued to license the Revenue Management Products "from at least 2015 through 2021." OB at 49. But the *Musical Instruments* plaintiffs alleged the same thing: guitar manufacturers adhered to the MAP policies in parallel. *See* Compl. ¶¶97-103, *Musical Instruments*, No. 09-md-2121 (S.D. Cal. Feb. 22, 2012), ECF No. 178. And this Court held that parallel conduct is

measured from when "competitors adopt[ed] similar policies." *Musical Instruments*, 798 F.3d at 1193; *see also Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *1 (9th Cir. July 21, 2023) ("Parallel conduct" must be "reasonably contemporaneous.").

Plaintiffs' attempt to plead parallel conduct is weaker than *Musical Instruments* in another way. There, the plaintiffs alleged that each guitar manufacturer adopted a MAP policy, but plaintiffs here fail to allege that Caesars, Treasure Island, Wynn, or The Cosmopolitan ever adopted a price suggested by a Revenue Management Product. *See Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1267 (9th Cir. 1983) ("[T]here is no evidence that Lamco and Boulevard ever complied with Amana's suggested retail prices . . . . Thus, there is no evidence . . . that Lamco and Boulevard engaged in parallel behavior."). Instead, the district court correctly concluded that "[p]laintiffs allege . . . that Hotel Defendants . . . often" overrode those pricing suggestions because "Rainmaker engaged in a never-ending battle to convince clients not to override its pricing recommendation[s]." 1-ER-15.

## 2. Plaintiffs' statistics do not suggest a conspiracy

Plaintiffs assert Hotel Defendants' room rates moved in parallel when the conspiracy allegedly started in 2015, but these allegations also fail under

*Musical Instruments*. Because "*Twombly* takes into account the economic reality that mere parallel conduct is . . . consistent with . . . independent conduct," plaintiffs must plead facts reflecting "[c]omplex and historically unprecedented changes in pricing structure." *Musical Instruments*, 798 F.3d at 1193, 1195. At minimum, "[p]laintiffs [must] allege . . . facts connecting the purported price increase to an illegal agreement." *Id.* at 1197.

This Court "is not required to indulge unwarranted inferences" from plaintiffs' statistics. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064–65 (9th Cir. 2008). Thus, plaintiffs "are [not] free to rely on conclusory statistical inferences to force their way into discovery" or do so by "relying on apples to study oranges." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 211, 212 (2d Cir. 2020). The Court need not accept plaintiffs' assertion that their statistics "show[] sudden shifts," because statistics "can be finessed" to give the illusion of parallel conduct. *Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 400 (2d Cir. 2024).

Plaintiffs make unwarranted inferences that are unsupported by their statistics in arguing that "since 2015, Casino-Defendants' room prices (1) have moved closely in tandem and (2) rose significantly faster than" several benchmarks. OB at 18-20. These statistics also have facial defects that

- 27 -

prevent plaintiffs from pleading parallel conduct or connecting them to the supposed agreement.

**Room rates were not parallel.** Plaintiffs identify no room rate or occupancy level at <u>any</u> hotel, but rely on yearly or quarterly "statistics" that average room prices across the Strip. 5-ER-690–91 ¶¶15–16 & n.7, 5-ER-811–12 ¶¶213–15, 5-ER-813–15 ¶¶217–20. But this Court requires plaintiffs to allege events closer in time than annually or quarterly to plead parallel conduct. *See DRAM*, 28 F.4th at 49 (defendants reducing production a "quarter" apart is not "indicative of . . . an advance agreement").

**No unprecedented changes to Hotel Defendants' pricing.** Plaintiffs assert that Hotel Defendants' prices "entailed a break from [the] past" because they reduced occupancy and increased prices. OB at 49. But plaintiffs allege no supporting facts, let alone facts showing "[c]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *DRAM*, 28 F.4th at 48.

Instead, the only information plaintiffs provide about occupancy rates suggests Hotel Defendants <u>increased</u> their occupancy levels during the alleged conspiracy. 3-ER-514 n.72, *see also* 4-ER-627–628. Likewise, far from

pleading "historically unprecedented changes in pricing," *DRAM*, 28 F.4th at 48, Hotel Defendants' room rates were <u>more</u> correlated with one another <u>before</u> their alleged conspiracy began, 5-ER-824 ¶240. *See DRAM*, 28 F.4th at 51 (conspiracy implausible where one defendant "announced its intent to stop competing on market share . . . prior to the class period"); *see also BNP*, 92 F.4th at 401 (rejecting pricing statistics because they showed defendants' prices were higher after the conspiracy than during it).

**Hotel Defendants' room rates increased less than hotels that did not license the Revenue Management Products.** Plaintiffs incorrectly argue that Hotel Defendants' room rates "increase[d] significantly faster" than three "benchmark[s]": room rates at a hotel (the Venetian) that did not license the Revenue Management Products, hotels in downtown Las Vegas, and the "Casino Hotel Index." OB at 50. To begin, comparing Hotel Defendants' room rates to the Venetian's does not suggest a conspiracy because plaintiffs admit that another hotel chain that did not license the Revenue Management Products—MGM—increased its room rates <u>more</u> than any Hotel Defendant. *Id*. at 19. Using the Venetian as a benchmark is also inappropriate because the Venetian's rates were only lower than Hotel

Defendants' because plaintiffs attributed 100% rate decreases to rooms that were closed for renovation. *See* 4-ER-649–50.

Comparing room rates on the Las Vegas Strip to rates at hotels in downtown Las Vegas does not suggest a conspiracy because Hotel Defendants' room rates increased <u>less</u> than hotels in downtown Las Vegas. In fact, plaintiffs' chart shows there was an $81 price difference in average room rates between the Strip and downtown Las Vegas when the alleged conspiracy started, and that price difference <u>decreased</u> to $79 by the end. 5-ER-691 ¶16, 5-ER-811 ¶213. *See In re German Auto. Mfrs. Antitrust Litig.*, 2021 WL 4958987, at *1 (9th Cir. Oct. 26, 2021) (conspiracy "implausible because [plaintiffs] have not alleged any facts suggesting that the price of Defendants' vehicles increased while . . . conspiracy was in effect"); *see also BNP*, 92 F.4th at 401 (plaintiffs' "charts . . . vitiat[e] any inference that the Treasury market was . . . subject to manipulation" because "differentials [in defendants' prices] were larger after the class period").

Comparing room rates on the Strip to the St. Louis Federal Reserve's "nationwide casino hotel price index," 5-ER-813–16 ¶¶216–22, also backfires on plaintiffs. Indeed, plaintiffs essentially admit they are "relying on apples to study oranges," *Mandala*, 975 F.3d at 211, because the "nationwide Casino

Hotel Index" to which they compare room rates on the Strip "reflects the prices casino hotels charge for [all] services and goods," not just room rates. OB at 19-20. And plaintiffs admitted below that (1) the St. Louis Federal Reserve also publishes an index measuring <u>only</u> room rates at casino-hotels nationwide and (2) comparing Hotel Defendants' rates to that index shows that Hotel Defendants' rates increased <u>less</u> than casino-hotels nationwide. 3-ER-525, 4-ER-676.

### B. Plaintiffs' "Plus Factors" Are Weaker Than the Plus Factors This Court Rejected in *Musical Instruments* and *DRAM*

Plaintiffs' "plus factors" fail to plausibly suggest a conspiracy because they are (1) irrelevant and (2) weaker than plus factors this Court has rejected. When a plaintiff "has not plausibly alleged any parallel conduct," the complaint's so-called "'plus factors' are . . . irrelevant." *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017). Because plaintiffs fail to plead parallel conduct, their "plus factors" add nothing to their claim.

Even if plaintiffs had pleaded parallel conduct, their alleged "plus factors" would not make the supposed conspiracy plausible. Plus factors are "economic actions and outcomes that are largely inconsistent with unilateral

- 31 -

conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194. The plus factors *Musical Instruments* rejected were: exchanging information on "[p]rice terms [and] margins," an FTC consent decree concluding that those information exchanges "facilitate[d] collusion," a highly concentrated market, "a common motive to conspire," and "act[s] against . . . self-interest." *Id.* at 1190, 1194.

Plaintiffs rely on similar plus factors here, but their allegations are more deficient than those rejected by *Musical Instruments*.

**Hotel Defendants did not exchange information.** Plaintiffs allude to undefined "[i]nformation exchange[s]," OB at 55, but offer weaker allegations than this Court <u>rejected</u> in *Musical Instruments*. Indeed, plaintiffs admit that Hotel Defendants "have not directly exchanged information with each other." 5-ER-836 ¶265.

Plaintiffs also <u>admit</u> they cannot allege the information sharing that courts have concluded is a prerequisite to an agreement among competitors to adopt prices suggested by an algorithm in these circumstances: allegations that pricing recommendations provided to one Hotel Defendant are based on confidential information provided to Rainmaker by another Hotel Defendant. For example, in *Cornish-Adebiyi*—a "case [that] is nearly identical

- 32 -

to" this one—the complaint was dismissed because it "confirm[ed] that the pricing recommendations . . . were never based on the confidential, proprietary data of their competitors."  2024 WL 4356188, at *4, *5.

The court in *District of Columbia v. RealPage* reached the same conclusion in dismissing AvalonBay from a case alleging that landlords conspired to adopt rent prices suggested by RealPage's software.  No. 2023 CAB 6762 (D.C. Super. Ct. July 2, 2024).  Like the court below and *Cornish-Adebiyi*, the D.C. court held that "[t]he fact that AvalonBay [is] not [alleged to] exchange its proprietary data with the other Defendant Landlords through RealPage [is] fatal."  *Id.* at *30.

By contrast, the court in *In re RealPage, Inc., Rental Software Antitrust Litig.* held that the "most persuasive evidence of horizontal agreement is the . . . fact that each [Landlord] Defendant [allegedly] provided RealPage its proprietary commercial data, knowing that RealPage would . . . use all of that data to recommend rental prices to its competitors."  709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023).  While plaintiffs assert this case is "nearly identical" to *RealPage*, OB at 55, the court there clarified that there is a "critical difference" between the allegations in this case and *RealPage* that "destroys the analogy" between them: unlike here, *RealPage* plaintiffs alleged that the

algorithm used competitors' commingled confidential data to suggest prices. 709 F. Supp. 3d at 512.[5]

These same facts distinguish cases alleging that Yardi's software facilitates a conspiracy among landlords. In *Mach v. Yardi Systems, Inc.*, the court denied the defendants' motion to dismiss because "[p]laintiffs allege that Yardi's RENTmaximizer sets lease price terms based on data input by . . . all the defendants." 2024 WL 4443986, at *4 (Cal. Super. Ct. Aug. 19, 2024). And in *Duffy v. Yardi Systems, Inc.*, the court inferred a conspiracy among landlords because plaintiffs alleged that Yardi's software "use[d] all of [defendants'] data to recommend rental prices." 2024 WL 4980771, at *4 (W.D. Wash. Dec. 4, 2024). In fact, in opposing the motion to dismiss, the *Duffy* plaintiffs (represented by the same plaintiffs' counsel here) stressed that "the data . . . incorporated into RENTmaximizer is not publicly available . . . . It is only available through Yardi." *Duffy*, No. 23-cv-01391 (W.D. Wash. Feb. 23, 2024), ECF No. 142 at 20.

Plaintiffs, their amici, and DOJ do not dispute that these decisions

---

[5] Plaintiffs cannot allege that Hotel Defendants knew that the software uses confidential information to recommend prices to their competitors (because it did not), a key point in *RealPage*.

separate the wheat from the chaff under these facts at the pleadings stage. And while DOJ and plaintiffs' amici try to introduce confusion on this issue, DOJ Br. at 36, AAI Br. at 11-12, Dkt. 19.1, plaintiffs allege that the <u>only</u> information about a Hotel Defendant that is shared through a Revenue Management Product's recommendations with other Hotel Defendants is "<u>public pricing information</u>," 5-ER-724 ¶86. Plaintiffs likewise concede that a Hotel Defendant "<u>doesn't get confidential information</u> back out of the algorithm from [another Defendant]." 2-ER-74 at 54:12–15.

Plaintiffs retreat to vague allegations that the Revenue Management Products use "machine learning," 5-ER-830–36 ¶¶258–65, to "improve[]" their algorithms, OB at 55-56, but those allegations fare no better. First, plaintiffs' claim still fails because they concede that their "machine learning" theory does not allege that the Revenue Management Products provided a Hotel Defendant with pricing recommendations based on another Hotel Defendant's confidential information, knowingly or otherwise. 1-ER-12.

Second, plaintiffs do not allege that any machine learning took place on collective <u>confidential</u> competitor data. Indeed, plaintiffs allege <u>no</u> facts about what information trained the algorithm, including whether that information became public long before the class period. While plaintiffs now

assert the algorithm trains on "confidential information collectively pro-vided by Casino-Defendants," OB at 56, the FAC does not allege this. Plaintiffs "may not try to amend [their] complaint through [their] arguments on appeal," *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013), and even if they could, plaintiffs do not identify which subscrib-ers' data encompassed the "collective" training sets.

Third, plaintiffs' generic machine learning allegations may "provide[] a context for [Hotel Defendants licensing the Revenue Management Prod-ucts], but not one that plausibly suggests they entered into illegal horizontal agreements." *Musical Instruments*, 798 F.3d at 1198. Indeed, alleging that the algorithms improved through machine learning is "no different than an at-torney improving her skills over time with the benefit of . . . confidential client information she gains with each client engagement," 1-ER-13, without ever sharing any one client's confidential information with any other client.

**No acts against self-interest.** Plaintiffs assert that Hotel Defendants acted against their "economic self-interest" by subscribing to Revenue Man-agement Products, thereby "rais[ing] room prices above market rates and sacrific[ing] . . . occupancy." OB at 52. "[T]his circuit" only considers "ex-treme action against self-interest" as a "plus factor," obligating plaintiffs to

allege individual action would be "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *DRAM*, 28 F.4th at 49, 50.

Plaintiffs' arguments fail because plaintiffs fail to allege that subscribing to a Revenue Management Product "would be so perilous in the absence of an advance agreement that no reasonable [hotel] would make the challenged move without such an agreement." *Id.* Plaintiffs allege the opposite: most Hotel Defendants subscribed to the Revenue Management Products <u>years</u> before the alleged conspiracy. 5-ER-763 ¶151, 5-ER-770 ¶163, 5-ER-777 ¶170. *See DRAM*, 28 F.4th at 49 ("Plaintiffs' theory is undercut [because] Samsung unilaterally . . . restricted its market supply in late 2015.").

Plaintiffs also undercut any inference that Hotel Defendants would subscribe to the Revenue Management Products "only if" there was a conspiracy, OB at 51, because "thousands" of non-conspirator "hotels and resorts around the world" decided it was in their self-interest to subscribe, 5-ER-801 ¶211. *See German Auto.*, 2021 WL 4958987, at *2 (not against defendants' self-interest to delay releasing electric car because non-conspirator delayed too).

Finally, plaintiffs "provide[] ample independent business reasons why," *Musical Instruments*, 798 F.3d at 1195, a Hotel Defendant would license the Revenue Management Products absent a conspiracy, including because casino-hotels were "flying by the seat of their pants" without the insights provided by the Revenue Management Products, 5-ER-706 ¶60. In fact, plaintiffs allege the Revenue Management Products contained at least ten other features that subscribers "loved" that have nothing to do with pricing suggestions, and these features are not challenged by plaintiffs. *See* 5-ER-720 ¶81, 1-ER-16 (Rainmaker's software "helps hotels do more than just decide how to price their hotel rooms . . . such as . . . forecasting demand based on historical data").

Plaintiffs pivot to asserting that it was against Hotel Defendants' self-interests to "delegate[] their pricing" to the Revenue Management Products because those Products' recommended prices "would be undercut" by competitors absent a conspiracy. OB at 52. But *Musical Instruments* held that indistinguishable allegations—that no guitar manufacturer defendant would adopt a MAP policy setting a floor for its prices absent a conspiracy because those prices would be undercut by competition—did not suggest a conspiracy. *Musical Instruments*, 798 F.3d at 1195.

Plaintiffs also fail to allege that Hotel Defendants in fact "delegated" their pricing to the Revenue Management Products. *See infra* 49-52. Rather, plaintiffs admit that each Hotel Defendant was free to override any pricing suggestion—and indeed overrode them so often that Rainmaker engaged in a Sisyphean "battle" to stop "never-ending" overrides. *See supra* 8.

Plaintiffs' suggestion that Hotel Defendants would not license the Revenue Management Products unless they were conspiring because their room rates would be "undercut" by competitors fares no better. Over 60% of hotels on the Strip—including MGM, "one of the . . . largest players on the Las Vegas Strip," 6-ER-1067, did not license the Revenue Management Products and would presumably have undercut Hotel Defendants' prices if they were inflated, *see Moore v. Mars Petcare US, Inc.*, 820 F. App'x 573, 576 (9th Cir. 2020) ("The main problem with Plaintiffs' conspiracy theory . . . is that they do not . . . account for the role of other players in the market.").[6]

---

[6] Plaintiffs argue that "other courts have found" that statements about exercising "discipline . . . constitute . . . evidence of price fixing," OB at 53, but this Court has held that statements "about the benefits of exercising . . . discipline . . . do[] not support a plausible inference of conspiracy," *DRAM*, 28 F.4th at 50-51.

**"[M]ere participation in trade-organization meetings . . . does not suggest an illegal agreement."** *Musical Instruments*, 798 F.3d at 1196. Plaintiffs assert they "allege more" than the *Musical Instruments* plaintiffs because Hotel Defendants purportedly attended "user conferences, golf . . . events and trade meetings," and employees of Hotel Defendants served on Rainmaker's "customer advisory board." OB at 56-57. But "[g]athering information about pricing and competition in the industry is standard fare for trade associations." *Musical Instruments*, 798 F.3d at 1196. And plaintiffs "do not allege facts demonstrating that [d]efendants actually communicated . . . at the[] [alleged] meetings, much less that they entered an agreement . . . there." *DRAM*, 28 F.4th at 52.

**No plausible motive.** Plaintiffs assert that Hotel Defendants had the "[m]otive to conspire" because "the Great Recession . . . had deep and lasting effects." OB at 50-51. But "common motive does not suggest an agreement" because every "firm that believes that it could increase profits by raising prices has a motive to . . . agree[] with its competitors." *Musical Instruments*, 798 F.3d at 1194.

**No plausibly defined relevant market, no alleged market power, and an alleged conspiracy that makes no sense.** Plaintiffs get nowhere by

alleging that market concentration and market power on the Las Vegas Strip facilitated the purported conspiracy. Plaintiffs' "relevant market must include both a geographic market and a product market" conforming with "common sense." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018). Moreover, "[a]ntitrust claims must make economic sense," *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998), and courts must therefore "determine whether an antitrust claim is plausible in light of basic economic principles," *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

Plaintiffs fail to allege that features of the Las Vegas Strip suggest a conspiracy. First, while plaintiffs assert "[h]otel room rentals . . . on the . . . Strip comprise a distinct product and geographic market," 5-ER-893 ¶346, their definition is too narrow because they also allege that hotels on the Strip "compete with other casino hotels nearby," 5-ER-893 ¶347. *See Hicks*, 897 F.3d at 1120-21 (market failed to include all "sellers . . . who have actual or potential ability to deprive each other of significant levels of business"). In fact, one hotel run by a Hotel Defendant—Hard Rock—is not even located on the Strip, but plaintiffs inexplicably include it within the purported market.

In other respects, plaintiffs' pleadings show that their proposed market is too broad because properties on the Strip are only "fungible" within unidentified "classes of properties." 5-ER-829 ¶256. Yet plaintiffs concede that some hotels run by Hotel Defendants are not substitutes for each other because "a hotel room at Treasure Island appeals to a different kind of customer than a hotel room at the Wynn." *Id*.

Second, while plaintiffs argue that Hotel Defendants "possess market power" on the Strip, 5-ER-895 ¶355, their allegations are deficient because Hotel Defendants only "control approximately 35-40% of the rooms" on the Strip, ER-894 ¶350. *See Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[M]arket share of less than 50 percent is presumptively insufficient to establish market power."). Plaintiffs argue that they might meet their burden if the Court counts MGM and other non-defendants as co-conspirators. OB at 33. But plaintiffs do nothing to suggest those hotels joined the alleged conspiracy. Rather, plaintiffs' allegations about MGM are indistinguishable from those that prompted the district court to hold that they

failed to "plausibly allege that MGM" even licensed the Revenue Management Products. 6-ER-1068.[7]

An alleged conspiracy where defendants collectively have 35-40% of the rooms on the Strip also makes "little economic sense," *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 (9th Cir. 2015), because plaintiffs do "not allege that other . . . competitors . . . were unable to [lower room rates] to offset [Hotel Defendants'] alleged conduct," *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 382 (9th Cir. 2018).[8]

Plaintiffs' failure to plead a relevant market and that Hotel Defendants possessed market power dooms Count I because they "must plead" those elements under the rule of reason. *Hicks*, 897 F.3d at 1120. This Court can easily disregard plaintiffs' suggestion that they need not plead those elements because the "per se" standard applies. 5-ER-896 ¶360. After all,

---

[7] Plaintiffs argue that *Twin City Sportservice, Inc. v. Charles Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982), supports finding market power "where defendant controlled 24% of [the] relevant market," OB at 33 n.52. But *Twin City* holds nothing about market power. 676 F.2d at 1299-1300 (measuring whether defendant "foreclosed" market to support exclusive dealing claim).

[8] Even if Hotel Defendants' 30-40% market share gave them market power, alleging that three defendants "collectively controlled approximately 96% of the . . . market"—is "not enough . . . to plausibly suggest conspiracy." *DRAM*, 28 F.4th at 45, 52.

plaintiffs concede "that this is a novel factual pattern," SER-56 at 39:20, and "per se rules are inappropriate in novel contexts," *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1135 (9th Cir. 2011). And the case plaintiffs incorrectly claim has "nearly identical allegations," OB at 55, held that the "per se standard is not appropriate" for analyzing an alleged agreement to use revenue management software, *RealPage*, 709 F. Supp. 3d at 520.

### C. Plaintiffs' Efforts to Escape *Musical Instruments* Fail

Having pleaded much less than *Musical Instruments*, plaintiffs argue this Court should abandon that decision and adopt a different test under two nearly century-old decisions: *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), and *United States v. Masonite Corp.*, 316 U.S. 265 (1942). But plaintiffs cannot satisfy *Interstate Circuit*, their proposed *Masonite* test finds no support in that case, and this Court has already rejected it.

#### 1. Plaintiffs cannot satisfy *Interstate Circuit*

Plaintiffs cannot satisfy *Interstate Circuit* for some of the same reasons they cannot satisfy *Musical Instruments*: they allege hotels would—and did—subscribe to the Revenue Management Products without any conspiracy. In *Interstate Circuit*, a first-run theater wrote to eight movie distributors at the

same time asking them to restrict distributing movies to second-run theatres. 306 U.S. at 217. The distributors then simultaneously imposed identical restrictions, which forced second-run theaters to raise prices. *Id.* The Supreme Court inferred an agreement among the movie distributors because each distributor "was aware" that "without substantially unanimous action . . . there was risk of a substantial loss of the business." *Id.* at 222.

This Court has construed *Interstate Circuit* as requiring plaintiffs to plead three elements to infer an agreement among the "spokes" (akin to the movie distributors): "[1] . . . the [spokes] gave their adherence to the scheme and participated in it; [2] [e]ach [spoke] was advised that the others were asked to participate; and [3] each knew that cooperation was essential to successful operation of the plan." *Barry*, 805 F.2d at 869. That third element is "[k]ey to *Interstate Circuit*'s conspiracy finding . . . [because] each distributor's decision to accede to [the theatre chains'] demands would have been economically self-defeating unless the other distributors did the same." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010).[9] And while

---

[9] *See also Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1234 (9th Cir. 1982) (*Interstate Circuit* requires plaintiffs to allege "the imposition of the restriction would be feasible only if adhered to by all distributors").

plaintiffs argue that *Interstate Circuit*'s test is "different" than *Musical Instruments*, OB at 39, both require plaintiffs to allege defendants' actions "would have been economically self-defeating" absent a conspiracy, *Brokerage Antitrust*, 618 F.3d at 331; *see also Musical Instruments*, 798 F.3d at 1195 (requiring "extreme action against self-interest . . . where individual action would be . . . perilous in the absence of . . . agreement").

Plaintiffs here cannot satisfy *Interstate Circuit* because they cannot allege subscribing to the Revenue Management Products "would have been economically self-defeating unless the other [Hotel Defendants] did the same." *Brokerage Antitrust*, 618 F.3d at 331. Instead, plaintiffs allege Caesars subscribed to the Revenue Management Products <u>years</u> before any other Hotel Defendant and that "thousands" of non-defendant hotels also unilaterally subscribed to the Revenue Management Products. *See supra* 37.

### 2. *United States v. Masonite* **lends no support**

Plaintiffs, their amici, and DOJ argue that "*Masonite* . . . expanded *Interstate Circuit*" in "holding that neither (a) a motive for joint action nor (b) interdependence are necessary prerequisites for finding" a horizontal agreement. OB at 41. But plaintiffs misconstrue *Masonite*. This Court has rejected

any attempt to eliminate interdependence from *Interstate Circuit*, and plaintiffs flunk their own "expanded" *Masonite* test.

First, "contrary to the plaintiffs' argument, *Masonite* makes no holding on horizontal conspiracy." *Nexium*, 842 F.3d at 57. Masonite had patents for material called hardboard. *Masonite*, 316 U.S. at 267–68. When competitors started making hardboard, Masonite sued for patent infringement, but eventually settled with them on identical terms, including a term allowing the competitors to act as "agents" to distribute Masonite's hardboard, while fixing the price at which the "agents" could sell it. *Id.* at 269–73.

The Court held that the <u>vertical</u> contracts between Masonite and its "agents" restrained trade, but, contrary to plaintiffs' argument, did "not broaden the *Interstate Circuit* formula" because the decision "does not rest on any horizontal conspiracy holding." 6 Areeda & Hovenkamp, *Antitrust Law* ¶1427 (5th ed. 2023). In fact, the First Circuit and the nation's leading antitrust treatise warned "unwary reader[s]" against "believ[ing] that the Court found a horizontal conspiracy among the agents." *Id.*; *see also Nexium*, 842 F.3d at 57. Reading—as plaintiffs, their amici, and DOJ do here—"*Masonite* as having found a[] . . . horizontal conspiracy would be 'nonsensical' because 'an essential conspiracy element [wa]s missing—namely, a motive

for joint action or interdependence.'" *Nexium*, 842 F.3d at 57 (quoting Areeda ¶1427d).

This Court has also rejected this "nonsensical" attempt to eliminate interdependence and motive from *Interstate Circuit*. The plaintiffs in *Barry* argued that *Interstate Circuit* was broad enough to infer a conspiracy even when defendants' conduct was not "interdependent." 805 F.2d at 869. This Court held that a "[c]onspiracy cannot be inferred . . . because [plaintiffs] have not shown that . . . cooperation was essential to successful operation of the plan." *Id*. at 869; *see also Filco*, 709 F.2d at 1266-67 (no conspiracy based on competitors "adhering to . . . suggested retail prices" while knowing competitors were also adhering to those prices because "conscious parallelism alone is insufficient"). While plaintiffs argue "[t]his court has continued to apply" *Masonite*, OB at 43, the case they cite does not mention *Masonite*, and the facts are nothing like it, *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022).[10] Most defendants in *PLS* did not even challenge whether plaintiffs pleaded an agreement, and this Court concluded

---

[10] Plaintiffs repeatedly cite *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), but that case is also nothing like this case, *id*. at 220 ("well organized program" to fix gasoline prices where members expressed "obligation" to participate).

plaintiffs alleged an agreement against the two defendants who did because they joined with the other defendants in adopting a uniform policy, participated in "private interfirm communications" to discuss the policy, and adopted it after signing a "white paper call[ing] for collective action" to exclude a competitor from the market. *Id.*

Plaintiffs also fail their own "nonsensical" *Masonite* test. According to plaintiffs, all they must plead to infer a horizontal agreement under *Masonite* is "the (1) delegation of one's decisionmaking on price to a third party, with (2) knowledge that its competitors have done the same." OB at 43. Plaintiffs cannot satisfy the first prong because their allegations show that Hotel Defendants <u>did not</u> delegate their pricing to the Revenue Management Products. As the court below correctly concluded, the plain meaning of "delegate" requires plaintiffs to allege Hotel Defendants provided the Revenue Management Products "with authority to act." 1-ER-13–14. Yet plaintiffs concede that <u>only</u> Hotel Defendants could price their rooms, *see, e.g.*, 5-ER-719 ¶78, persistently "override" any price recommended by the Revenue Management Products, 5-ER-737 ¶110, and accept those recommendations "as much or as little as [they] want," 5-ER-720 ¶80. As two courts have concluded, plaintiffs' allegations suggest only that Hotel Defendants

"continued to retain and exercise" their own "pricing authority," *Cornish-Adebiyi*, 2024 WL 4356188, at *5, including because Hotel Defendants rejected pricing recommendations so often that Rainmaker waged "a never-ending battle" trying to "convince clients not to override its pricing recommendations," 1-ER-15.

Plaintiffs wish away their allegations that Rainmaker has been unable to end the "battle" over its subscribers "overrid[ing] its pricing recommendations" as being "part . . . of a multifaceted scheme" to "require[]" Hotel Defendants to exercise pricing "discipline." OB at 52-53. But plaintiffs identify <u>no</u> allegations supporting a supposed "multifaceted scheme" by Rainmaker that "required" Hotel Defendants to do anything, much less adopt the Revenue Management Products' pricing suggestions.

Indeed, because plaintiffs admit they cannot allege the "rate at which each [Hotel Defendant] accepted Rainmaker's recommendations," they cannot support the conclusory argument that Hotel Defendants accepted them at a "sufficient rate to give up their trade freedom." OB at 46. Plaintiffs never identify this "sufficient rate," but argue Hotel Defendants' acceptance rate can be inferred because: Rainmaker has touted that its pricing suggestions are accepted 90% of the time "across" its thousands of subscribers;

Hotel Defendants "continue to pay" to license the Revenue Management Products, and some employees have complimented those Products; and the Products offer "automation." *Id.* at 46-47.

None of this fits the bill. Alleging that pricing suggestions are accepted 90% of the time across the over 5,000 hotels that subscribe to the Revenue Management Products fails because it "does not speak to the acceptance rate of the hotels on the Las Vegas Strip." SER-9; *see also Musical Instruments*, 798 F.3d at 1197 & n.12 (marketwide data is too "overinclusive" to plausibly suggest anything about defendants' conduct).

Nor does plaintiffs' argument that Hotel Defendants "continue[d] to pay" for the Revenue Management Products suggest they delegated their pricing. To the contrary, plaintiffs' allegations describe many features subscribers "loved" that are unrelated to pricing suggestions and that plaintiffs do not challenge. *See supra* 7. The alleged employee statements touting the Revenue Management Products only confirm this point because they mention features besides pricing recommendations, such as "demand forecasting," 5-ER-833 ¶261, and booking curves, 5-ER-768 ¶159.

Plaintiffs also allege nothing supporting their assertion that all Hotel Defendants used "automated" features offered by the Revenue Management

Products.  Instead, plaintiffs allege those features were optional, and, at best, that Hard Rock automatically accepted Rainmaker's pricing recommendations "in some circumstances" and "overrode the[m] . . . in other cases," 5-ER-779 ¶175.

Nor can plaintiffs satisfy their second prong because they fail to allege that Hotel Defendants subscribed to the Revenue Management Products knowing that other Hotel Defendants did so.  Instead, plaintiffs allege Caesars subscribed to the Revenue Management Products <u>years</u> before any other Hotel Defendant.  *See* 5-ER-763 ¶151.

### D.  DOJ's Amicus Brief Supports <u>Affirming </u>the District Court's Order Because It Is Based on Imaginary Allegations

While DOJ is clear that it "does not take a position on the sufficiency of the complaint's allegations of horizontal agreement," DOJ Br. at 37, the musings it offers severely undercut plaintiffs' appeal for several reasons.

First, this Court owes no deference to DOJ's views on either the law or its application to the facts.  *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008) ("We do not afford . . . deference to litigation positions unmoored from any official agency interpretation.").  That is especially so here because DOJ acknowledges that it seeks to protect its position as the plaintiff

in a _different_ algorithmic antitrust pricing case. DOJ Br. at 1. In other words, the impetus of DOJ's brief has _nothing_ to do with this case.

Second, DOJ posits "ambiguity" about whether the district court decision "solely" "turned on" Hotel Defendants not being required to adopt Revenue Management Products' suggested prices. DOJ Br. at 33-35. It did not. The district court was clear on this point. It holistically analyzed plaintiffs' complaint and concluded at least three flaws "all point to the conclusion that Hotel Defendants never agreed to fix prices by using GuestRev or GroupRev." 1-ER-16.

DOJ also misreads the import from plaintiffs' allegations that Hotel Defendants either never adopted the prices suggested by the Revenue Management Products or often overrode them. DOJ argues the Sherman Act prohibits agreements to use agreed-upon list prices as "starting" points "even if the competitors" ultimately can "depart from those prices." DOJ Br. at 36. But plaintiffs do not allege that any Hotel Defendant ever agreed to use prices recommended by the Revenue Management Product as "starting" prices either. On the contrary, plaintiffs concede that Hotel Defendants had complete freedom to ignore these recommendations and did so.

DOJ's argument and the cases it cites are also irrelevant to the questions presented by this appeal because they incorrectly assume that plaintiffs sufficiently pleaded an agreement among Hotel Defendants from which to depart. *See Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132-33 (9th Cir. 1960) (irrelevant that defendants departed from list prices because there was no dispute defendants "agreed" to use list prices as a "starting point" to "show[] to customers") (DOJ Br. at 36). This Court's settled precedent holds that variations in defendants' conduct—including their non-acceptance of "suggested . . . prices"—undermine plaintiffs' attempt to plead an agreement. *Filco*, 709 F.2d at 1267.

Third, the Court should ignore DOJ's refrain that "several other allegations tend to support the plausibility of a horizontal conspiracy," DOJ Br. at 36, because they are not based on anything pleaded in this case:

| Allegations DOJ Says Are In The Complaint | Plaintiffs' Allegations And Admissions |
|---|---|
| ▶ "Cendyn combines non-public, competitively sensitive information to generate prices." DOJ Br. at 36. | ✖ Plaintiffs admit that a Hotel Defendant "doesn't get confidential information back out of the algorithm from [another Defendant]." 2-ER-74 at 54:4–15. |
| ▶ "The object of the alleged conspiracy is to jointly use certain algorithms to set starting-point prices." DOJ Br. at 36. | ✖ No allegations that Hotel Defendants ever agreed to set starting point prices. Plaintiffs allege only that "Hotel Defendants' . . . acceptance of Rainmaker's/Cendyn's pricing recommendations . . . constitutes an actionable conspiracy." 5-ER-684. |
| ▶ "Cendyn's products go beyond simply recommending prices to hotels . . . . [because] Cendyn touts that hotels use its . . . prices 90% of the time." DOJ Br. at 33. | ✖ No allegations that Caesars, The Cosmopolitan, Wynn, or Treasure Island ever accepted prices suggested by the Revenue Management Products, and plaintiffs allege Rainmaker could not convince subscribers to stop overriding recommendations. 5-ER-687. |
| ▶ "[T]he software recommends an occupancy-limiting pricing strategy contrary to hotels' individual interest." DOJ Br. at 36. | ✖ The only information that plaintiffs provide about occupancy rates suggests Hotel Defendants increased their occupancy levels during the alleged conspiracy. 3-ER-514 n.72, see also 4-ER-627–28. |
| ▶ "[P]rices increased for rooms on the strip compared with rooms elsewhere in Las Vegas." DOJ Br. at 8. | ✖ Prices on the Strip decreased compared to hotels elsewhere in Las Vegas across the alleged conspiracy. 5-ER-691 ¶16, 5-ER-811 ¶213. |
| ▶ "[M]uch of the information on how Cendyn's algorithms work is in defendants' hands." DOJ Br. at 37. | ✖ Hotel Defendants provided verified interrogatory answers informing plaintiffs that they do not adopt prices suggested by the Revenue Management Products. SER-59 at 42:7–12; 4-ER-626. |

Once DOJ's misstatements of the allegations are discarded, nothing in its (or plaintiffs' other amici's) submission can resuscitate Count I. Indeed, by relying on allegations to support plaintiffs' appeal that plaintiffs themselves cannot plead, DOJ's brief merely highlights the FAC's infirmities. Because the court below straightforwardly applied *Musical Instruments* to dismiss Count I, that decision should be affirmed.

## II. THE DISTRICT COURT PROPERLY DISMISSED COUNT II's VERTICAL AGREEMENT CLAIM

The district court correctly dismissed Count II because plaintiffs concede that Rainmaker's software licenses do not restrain Hotel Defendants' decisionmaking. Plaintiffs do not address the district court's analysis, but

argue instead the court should never have even analyzed that issue because all they need to plead a "vertical" restraint is to identify a contract.

Plaintiffs' argument is foreclosed by this Court's settled precedent requiring plaintiffs to plead not only a contract, but one that restrains trade. And even if the software licenses somehow restrained trade, Count II would still fail because plaintiffs fail to plead the Revenue Management Products caused anticompetitive effects.

### A. The District Court Applied Blackletter Law to Hold That Plaintiffs Failed to Plead a Vertical Restraint

Section 1 prohibits "[e]very contract . . . in restraint of trade." 15 U.S.C. § 1. "To state a claim under § 1, plaintiffs must plead (1) a contract [or] combination . . .; (2) which is intended to restrain or harm trade; (3) which actually injures competition; and (4) harm to the plaintiff from the anticompetitive conduct." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022). To challenge the vertical relationship between a Hotel Defendant and Rainmaker, § 1's text makes it "necessary to show that" the software license imposes "some restraint of trade." *Newman*, 813 F.2d at 1522.

### 1. The district court rejected plaintiffs' alleged restraint

The way plaintiffs try to reframe the alleged restraint on appeal finds no support in their FAC. The FAC challenges vertical agreements "to use Rainmaker's revenue management system to set prices for hotel rooms" where Hotel Defendants "each delegated pricing to a centralized third party, Rainmaker." 5-ER-897 ¶¶365, 367. The district court assessed whether plaintiffs alleged anything supporting this supposed "restraint," and held they pleaded the opposite: "Hotel Defendants have not agreed to restrain their ability to price their hotel rooms in any way by licensing GuestRev or GroupRev." 1-ER-18. The court also rejected plaintiffs' claims that Hotel Defendants delegated pricing authority to Rainmaker. 1-ER-13–14 ("Plaintiffs have not alleged that Hotel Defendants have given Cendyn authority to act."). Because plaintiffs do not allege an agreement to use Rainmaker products to set prices, the court held there was no restraint of trade. 1-ER-18.

On appeal, plaintiffs do not challenge the court's holding, but assert that the challenged restraints are the software licenses themselves. OB at 24. In other words, plaintiffs abandon their claim that the licenses provide that Hotel Defendants "set prices" via the software or "delegate[]" pricing to

Rainmaker. 5-ER-897 ¶¶365, 367. Plaintiffs do not identify any provision of the licenses that constrains any Hotel Defendant in any way.

### 2. Rainmaker's software licenses do not restrain Hotel Defendants' decisionmaking

Plaintiffs' new theory is deficient because they do not allege that Rainmaker's software licenses restrain Hotel Defendants in any way. Merely identifying a contract cannot plead a § 1 claim because "§ 1 only prohibits contracts . . . in restraint of trade." *Mularkey v. Holsum Bakery, Inc.*, 146 F.3d 1064, 1065 (9th Cir. 1998). Determining whether a contract restrains trade is a threshold inquiry because "[t]here can be no restraint of trade without a restraint . . . . [T]here is not even the beginning of an antitrust case, no reason to investigate further to determine whether the restraint is reasonable." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397, 399 (7th Cir. 1989) (Easterbrook, J.).

Distinguishing between contracts that restrain trade from those that do not is a bedrock antitrust principle. Contracts covering sales, licenses, and information are ubiquitous, but those contracts "do[] not restrain trade; indeed, without [them], trade would be impossible." *See* Areeda ¶ 1437(a). In the vertical context, "it would be pointless to conclude that the agreement

requirement [of a § 1 claim] is met because the manufacturer and dealer are engaged in buying and selling with each other. That would be tantamount to eliminating the agreement requirement altogether." *Id*. ¶ 1437(b).

For instance, the plaintiffs in *49er Chevrolet, Inc. v. General Motors Corp.* argued that "contractual arrangements between GM and the carriers for shipping vehicles to the dealers is sufficient" to prove that GM and the carriers agreed to restrain trade. 803 F.2d 1463, 1467 (9th Cir. 1986). This Court held that "[t]he particular contract here . . . falls short of establishing an unlawful agreement" because it lacked "anticompetitive content." *Id*.

This Court in *Mularkey v. Holsum Bakery, Inc.* determined that the key to establishing that a contract restrains trade is pleading that it contained provisions limiting the parties' decisionmaking. There, it was undisputed that the defendant had contracts with its distributors that suggested prices to sell the defendant's bread. 146 F.3d at 1065. But those contracts also allowed distributors to reject those suggested prices by reaching a different agreement on bread prices with customers. *Id*. This Court held that the contract containing suggested prices "does not implicate § 1, because there is no restraint of trade resulting from the agreement." *Id*.; *see also Newman*, 813 F.2d at 1522 ("[N]o . . . antitrust violation" because "contract . . . [did] not . . .

affect[] appellants' ability to negotiate with other studios."); *K-91, Inc. v. Gershwin Publ'g Corp.*, 372 F.2d 1, 4 (9th Cir. 1967) (no restraint because "[t]he right of the individual composer . . . to make his own arrangements . . . [is] fully preserved").

The other Circuits agree that contracts that do not restrain parties' decisionmaking fall outside § 1's ambit. *See St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 492 (6th Cir. 2021) (contractual "provision does not restrain trade; it does the opposite by allowing one party to back out of a cooperative venture"); *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984) ("Since the blanket license restrains no one from bargaining over . . . music performance rights, it is not a restraint.").

Here, Rainmaker's software licenses "do[] not implicate § 1, because there is no restraint of trade resulting from the agreement." *Mularkey*, 146 F.3d at 1065. Instead, plaintiffs concede <u>only</u> Hotel Defendants could price their rooms and had unlimited "ability to price their hotel rooms in any way." 1-ER-18. Indeed, like in *Mularkey* (where the distributors could override the prices suggested in their contracts), plaintiffs allege that Hotel Defendants could—and did—override any price recommended by the Revenue Management Products. 5-ER-687 ¶8.

### 3. Identifying a contract does not plead a restraint of trade

Ignoring this settled precedent, plaintiffs assert that they need not identify a restraint because the "existence of express contractual agreements" is sufficient. OB at 5. The only support plaintiffs offer is a few cases that observe, in dicta, that "every commercial agreement is a restraint of trade." *Id.* at 25. But even a glance at those cases sinks plaintiffs' argument because, unlike here, all involved contracts that restrained the parties' decisionmaking.

For instance, *American Ad Management v. GTE Corp.* concluded that an agreement among phone companies was unlawful because they restrained themselves from paying commissions for phone advertisements by "agree[ing] to eliminate" them. 92 F.3d 781, 784 (9th Cir. 1996) (OB at 5). In *Epic Games, Inc. v. Apple, Inc.*, the "restraint" was "three provisions" within Apple's development licenses that restricted developers' decisionmaking. 67 F.4th 946, 968 (9th Cir. 2023) (OB at 26). And *Paladin Associates, Inc. v. Montana Power Co.* concluded that contracts assigning rights restrained customers from purchasing gas from the plaintiff "for a period of five years." 328 F.3d 1145, 1153 (9th Cir. 2003) (OB at 25-26).

The cases that plaintiffs cite about "non-binding price schedules" fare no better because the pricing schedules in those cases limited the defendants' decisionmaking. For example, in *United States v. National Association of Real Estate Boards*, the Supreme Court concluded that the Washington Real Estate Board's publishing "standard rates of commissions for its members," which required members to "agree <u>not to "solicit[] at lower rates,"</u> was a per se restraint. 339 U.S. 485, 488-89 (1950) (OB at 26).[11] By contrast, the Revenue Management Products recommend prices that the subscriber can accept as "much or little as they want." 5-ER-720 ¶80. Indeed, *National Association* recognized this distinction by holding that one association was "not laced into the conspiracy" because its membership agreement was "advisory only." 339 U.S. at 495.

The cases on which amici and DOJ rely are similarly inapt. The principal authority cited by DOJ, *Plymouth Dealers' Ass'n of Northern California v. United States*, is nothing like this case because the plaintiff there identified a

---

[11] *See also Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-82 (1975) ("naked agreement" to fix prices where state bar published "fee schedules [that] cannot be ignored"; "purely advisory fee schedule" would present "a different question") (OB at 26); *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 701-03 (1969) (array of "restrictive rules") (OB at 26).

restraint that limited defendants' decisionmaking. 279 F.2d 128 (9th Cir. 1960). In *Plymouth*, car dealers "agreed" to use a "fixed uniform list price" as a "starting point" for their negotiations with buyers. *Id.* at 132. This Court held that "[t]he test is . . . whether such agreements interfere with the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Id.*[12] The plaintiff passed that test because the "uniform list price[s]" were "an agreed starting point" that restrained dealers' ability to start their negotiations using prices they reached in "their own judgment." *Id.*

Plaintiffs here flunk the *Plymouth* test because they cannot identify anything in Rainmaker's software licenses that "interfere[s] with the freedom of [hotels] and thereby restrain[s] their ability to [set room rates] in accordance with their own judgment." *Id.* Unlike the plaintiffs in *Plymouth*, plaintiffs here allege that Hotel Defendants were <u>not</u> required to use the Revenue Management Products for any purpose, much less use the prices they suggest as a starting point for negotiating with consumers. *See supra* 8.

---

[12] Similarly, *In re High Fructose Corn Syrup Antitrust Litigation* stands for the unremarkable proposition that "[a]n agreement to fix list prices" among competitors does not become legal simply because defendants do not follow those list prices. 295 F.3d 651, 656 (7th Cir. 2002).

DOJ characterizes the software licenses as "an agreement among competitors to use certain pricing algorithms to generate default or starting-point prices," DOJ Br. at 15, but that is divorced from any pleaded facts. No facts support any "agreement among competitors." *See supra* 21-34. And plaintiffs do not allege that Hotel Defendants used the pricing recommendations as "starting points" for anything. *See supra* 53.

## B. Plaintiffs Also Fail to Allege Harm to Competition

Count II also fails because plaintiffs do not allege anticompetitive effects. The rule of reason requires a plaintiff to allege "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Amex*, 585 U.S. 529, 541 (2018). To do so, plaintiffs must plead facts showing that the restraint caused: (1) "actual detrimental effects" on competition, or (2) indirect evidence of "substantial anticompetitive effects." *Epic Games*, 67 F.4th at 983.

Plaintiffs plead neither direct nor indirect evidence and rely instead on unsupported characterizations, pricing statistics untethered to the alleged restraint, and an implausible market where no Hotel Defendant has market power.

### 1. Conclusory allegations and statistics disconnected from the software licenses are not direct evidence

Plaintiffs start their analysis with characterizations rather than pleaded facts. They argue that "the vertical agreements here facilitate horizontal collusion because each Casino-Defendant has delegated a portion of its pricing decision-making" to Rainmaker. OB at 28. But plaintiffs allege neither "horizontal collusion" nor that Hotel Defendants "delegated" their pricing to Rainmaker. *Supra* 23-44, 49-52. Plaintiffs never acknowledge the district court's holding or identify any pleaded facts to challenge it.

Instead, plaintiffs attempt to fall back on their pricing statistics, OB at 30-31, but those statistics are not direct evidence. "[A]llegations that an agreement has the effect of . . . increasing prices to consumers does not sufficiently allege an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). Instead, higher prices can be "fully consistent with a free, competitive market," and can "result from pro-competitive conduct." *Id.* Plaintiffs must show that the alleged restraint "raises . . . prices . . . above competitive levels." *Rebel Oil*, 51 F.3d at 1433.

Plaintiffs do not even try to meet this high bar. To begin, plaintiffs allege no facts plausibly suggesting that any software license between a

Hotel Defendant and Rainmaker could cause room rates to increase across the Las Vegas Strip. Nor do plaintiffs allege that licensing of Revenue Management Products—which Hotel Defendants separately licensed over the course of a decade—coincided with any changes to room rates. And even if plaintiffs could show marketwide price changes, they fail to allege that prices are higher than the relevant metric—what prices would have been <u>but for</u> the anticompetitive restraint. *See id.*

Plaintiffs' misleading and flawed statistics do nothing to supply those missing allegations. As a threshold matter, plaintiffs present no allegations supporting the baseless assertion that the Venetian provides the appropriate benchmark for the rates that other hotels on the Las Vegas Strip should have charged. *See* OB at 30. Similarly, plaintiffs provide no basis to assert that Hotel Defendants' rates are anticompetitive simply because their revenue increases exceeded a "nationwide Casino Hotel Index." *Id.* This would require that rates in every locality be equal to or lower than some nationwide index, or else they are anticompetitive. Neither example provides an appropriate benchmark for what prices would have been in the but-for world. And in any event, plaintiffs' "statistics" <u>do not</u> show the rate increases

plaintiffs assert.  In fact, they show that Hotel Defendants' rates increased less than plaintiffs' chosen comparators.  *See supra* 30.

More fundamentally, comparing room rates "beginning in 2015," OB at 30, cannot show anticompetitive effects caused by the challenged restraint.  Most Hotel Defendants licensed the Revenue Management Products many years before 2015.  *See supra* 25.  Plaintiffs suggest that 2015 is an appropriate starting point because Rainmaker "incorporate[d] the pricing of competitors" into the software's algorithm in 2015.  OB at 12, 31.  But plaintiffs concede that any "competitor rates" incorporated into Rainmaker's algorithms are publicly available room rates.  5-ER-724 ¶86.  And as the court below correctly reasoned, this Court has routinely held that there is nothing anticompetitive "about consulting public sources to determine how to price your product."  1-ER-10.  Thus, by alleging that the Revenue Management Products' use of public data is the but-for cause of higher prices, plaintiffs concede that any price increases resulted from lawful conduct.[13]

---

[13] *See Musical Instruments*, 798 F.3d at 1197 ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors."); *Intel Corp. v. Fortress Inv. Grp.*, 2022 WL 16756365, at *2 (9th Cir. 2022) ("A plaintiff must allege that a price increase is traceable to a restraint of trade.").

Plaintiffs' argument that GuestRev is anticompetitive because it trained on data that "steadily improves the profit-optimization recommendations it provides" is also meritless.  OB at 31.  Nothing in the FAC ties any vague software "training" to 2015.  There is also nothing anticompetitive about software that helps hotels become more profitable by, for example, more effectively forecasting demand.  As the district court observed, training cannot be anticompetitive because it is how <u>any</u> advisor—whether human or software—gets better at her job.  1-ER-13.

### 2. Plaintiffs fail to plausibly allege indirect evidence

Plaintiffs also fail to plausibly allege facts to establish anticompetitive effects through indirect evidence because they do not plead: (1) a plausible market, (2) in which a defendant exercises market power, and (3) harm to competition in that market.  *See Amex*, 585 U.S. at 541-42.[14]  <u>First</u>, while plaintiffs contend that "[h]otel room rentals . . . on the . . . Strip comprise a distinct product and geographic market," 5-ER-893 ¶346, their allegations demonstrate that market is implausible.  *See supra* 40-44.  Even though the

---

[14] Plaintiffs are wrong that they need not plausibly allege a relevant market for their vertical claim.  OB at 29 n.44.  *See Amex*, 585 U.S. at 543 n.7; *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step . . . is to accurately define the relevant market.").

law requires that a relevant market include only substitute products, plaintiffs admit that consumers do not consider rooms offered by Hotel Defendants to be substitutes.  *See supra* 42.

Second, even accepting the Las Vegas Strip as a market, no allegations show that any Hotel Defendant has market power there.  This failing is critical because "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power."  *Amex*, 585 U.S. at 543 n.7.  Plaintiffs argue that the licenses "collectively" impair competition, and Hotel Defendants' market share, in "aggregate," totals 35-40%.  OB at 22, 33.  But "[a]bsent a conspiracy among defendants, plaintiff[s] may not aggregate the respective market shares of individual defendants to establish market power."[15]  *Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984), *aff'd*, 794 F.2d 1359 (9th Cir. 1986); *see also Rebel Oil*, 51

---

[15] Plaintiffs cannot "aggregate" the effects of the alleged vertical agreements to show harm to competition.  OB at 31.  *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.* made clear that aggregation is appropriate only where each "agreement has a discrete effect on competition."  588 F.3d 659, 665 (9th Cir. 2009).  If bilateral agreements "only facilitate coordinated activity," then those agreements cannot support a § 1 claim absent an agreement among the defendants to coordinate their actions: the horizontal agreement required for a hub-and-spoke claim.  *Id.*  Each license here does not have a discrete effect on competition, and plaintiffs fail to plead an agreement among Hotel Defendants to coordinate pricing.  *See supra* 22-51.

F.3d at 1437 (aggregating "market shares . . . is justified <u>if the rivals are alleged to have conspired</u>"). Moreover, the 35-40% "aggregate" share still cannot allege market power. *See supra* 42-43.

<u>Finally</u>, plaintiffs fail to allege facts showing "that the challenged restraint harms competition." *Amex*, 585 U.S. at 542. Instead, plaintiffs appeal to theoretical academic papers and analysis of dissimilar software in different industries. OB at 34-36. This does not substitute for facts about the Revenue Management Products here. As the district court concluded, "[t]his case remains a relatively novel antitrust theory premised on algorithmic pricing going in search of factual allegations that could support it." 1-ER-6.

## CONCLUSION

For these reasons, the Court should affirm the decision below.

Dated: December 18, 2024

Respectfully submitted,

Sadik Huseny
Brendan McShane
LATHAM & WATKINS LLP
505 MONTGOMERY STREET, SUITE 2000
SAN FRANCISCO, CA 94111

Melissa Arbus Sherry
Anna M. Rathbun
Christopher J. Brown
Graham Haviland
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004

*Counsel for Defendant-Appellee Cendyn Group, LLC*

Matthew L. McGinnis
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199

*Counsel for Defendants-Appellees Blackstone Inc. and Blackstone Real Estate Partners VII L.P.*

*/s/ Boris Bershteyn*
Boris Bershteyn*
  *Counsel of Record*
Ken Schwartz
Michael Menitove
Sam Auld
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000

*Counsel for Defendant-Appellee Caesars Entertainment, Inc.*

Mark Holscher
Tammy Tsoumas
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
ttsoumas@kirkland.com
mholscher@kirkland.com

*Counsel for Defendant-Appellee Wynn Resorts Holdings, LLC*

---

* *I attest that all parties listed concur in the contents of this filing.*

- 71 -

Arman Oruc
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036-1612
Tel.: (202) 346-4000 / Fax: (202) 346-4444
AOruc@goodwinlaw.com

Alicia Rubio-Spring
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02110
Tel.: (617) 570-1000 / Fax: (617) 523-1231
ARubio-Spring@good-winlaw.com

Patrick J. Reilly
Arthur A. Zorio
Emily Garnett
Eric D. Walther
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Ste. 1600
Las Vegas, NV 89106
Telephone:  702.382.2101
preilly@bhfs.com
azorio@bhfs.com
egarnett@bhfs.com
ewalther@bhfs.com

*Counsel for Defendant-Appellee Treasure Island, LLC*

Nicholas J. Santoro
Spencer Fane, LLP
300 S 4th Street
Suite 1600
Las Vegas, NV 89101
702-408-3400

*Counsel for Defendant-Appellee The Rainmaker Group Unlimited, Inc.*

Kasey J. Curtis
Charles P. Hyun
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 457-8089
Facsimile: (213) 457-8080
kcurtis@reedsmith.com
chyun@reedsmith.com

*Counsel for Defendant-Appellee JC Hospitality, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-3576

 

I am the attorney or self-represented party.

**This brief contains 13,946 words,** including 331 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). 1

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Boris Bershteyn*     **Date** December 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 18, 2024          Respectfully submitted,

*/s/ Boris Bershteyn*
Boris Bershteyn
  *Counsel of Record*
Ken Schwartz
Michael Menitove
Sam Auld
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000

*Counsel for Defendant-Appellee
Caesars Entertainment, Inc.*