No. 24-3576

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RICHARD GIBSON and ROBERTO MANZO, individually and on behalf
of all others similarly situated,

Plaintiffs-Appellants,

v.

CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED,
INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC,
WYNN RESORTS HOLDINGS, LLC, BLACKSTONE, INC.,
BLACKSTONE REAL ESTATE PARTNERS VII L.P., JC
HOSPITALITY, LLC,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Nevada,
The Honorable Judge Miranda Du, District Judge
No. 2:23-cv-00140-MMD-DJA

---

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

---

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.  The district court erred in dismissing Plaintiffs' Vertical Claim. ................. 3

    A.  The software license agreements between Rainmaker and Casino-Defendants are "restraints." .................................................... 3

    B.  The contracts between Rainmaker and Casino-Defendants unreasonably restrained trade. ....................................... 12

        1.  Plaintiffs allege direct evidence of harm to competition................................................................. 13

        2.  Plaintiffs allege indirect evidence of harm to competition................................................................. 24

            a.  The relevant market makes sense. ............................... 25

            b.  Casino-Defendants have market power........................ 27

            c.  The restraints here harm competition. .......................... 31

II.  Plaintiffs no longer appeal the dismissal of their hub-and-spoke claim............................................................................................................. 32

011141-11/3030953 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adriana Int'l Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990) ........................................................................32

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010)...................................................................................2, 24

*Brantley v. NBC Universal, Inc.*
675 F.3d 1192 (9th Cir. 2012) .......................................................14, 15, 17, 19

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................................................26

*Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*,
744 F.2d 917 (2d Cir. 1984) .............................................................................8

*California Dental Ass'n v. F.T.C.*,
526 U.S. 756 (1999).......................................................................................12

*Chevrolet, Inc. v. Gen. Motors Corp.*
803 F.2d 1463 (9th Cir. 1986) .......................................................................7, 8

*Chicago Board of Trade v. U.S.*,
246 U.S. 231 (1918)......................................................................................8, 9

*City of Phila. v. Bank of Am. Corp.*,
498 F. Supp. 3d 516 (S.D.N.Y. 2020) .............................................................17

*Duffy v. Yardi Sys., Inc.*,
2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) .................................................4

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ...................................................................*passim*

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*,
2023 WL 4677017 (9th Cir. 2023) ..................................................................17

*High Tech. Careers v. San Jose Mercury News*,
996 F.2d 987 (9th Cir. 1993) .............................................................27

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ...........................................................18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)..............................................................7, 8, 15, 16

*LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ...................................................4, 13, 14

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................................................*passim*

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ......................................18

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ......................................................26, 27

*Newman v. Universal*,
813 F.2d 1519 (9th Cir. 1987) .............................................................8

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985)......................................................................1, 2, 9

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) .................................................2, 5, 8, 9

*Plymouth Dealers' Ass'n of No. Cal. v. United States*,
279 F.2d 128 (9th Cir. 1960) .......................................................10, 12

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) ............................................28

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................28, 29

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
8 F.4th 479 (6th Cir. 2021) .................................................................8

*Stubhub, Inc. v. Golden State Warriors, LLC*,
2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ....................................................26

*Teradata Corp. v. SAP SE*,
124 F.4th 555 (9th Cir. 2024) ................................................................4

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ...............................................................27

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
512 F.2d 1264 (9th Cir. 1975) ..................................................26, 28, 29

*United States v. Nat'l Ass'n of Real Est. Bds.*,
339 U.S. 485 (1950)..........................................................................10

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
822 F.2d 656 (7th Cir. 1987) ...............................................................28

## OTHER AUTHORITY

Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law: An Analysis
of Antitrust Principles and Their Application (Fourth & Fifth
Editions 2018–2022)..........................................................................30

011141-11/3030953 V1

# INTRODUCTION

In Count II, Plaintiffs allege that Casino-Defendants and Rainmaker entered a set of vertical agreements—contractual agreements by which Rainmaker licensed its revenue management software to Casino-Defendants—that, in the aggregate, unreasonably restrained trade ("Vertical Claim"). Opening Brief ("OB") 22–27.

Plaintiffs plausibly allege this set of agreements violates Section 1 of the Sherman Act.[1] A "collection of purely vertical agreements" may "unreasonably restrain trade."[2] The contractual agreements here are "restraints," and Plaintiffs plausibly allege their cumulative effect was to unreasonably restrain trade— including direct evidence of anticompetitive effects: higher prices. Yet rather than evaluate Plaintiffs' allegations under the rule of reason, the district court found, as a blanket matter, that the contracts at issue are not "restraints" because they do not *require* Casino-Defendants to accept Rainmaker's pricing recommendations. This was error. "[E]very commercial agreement restrains trade."[3] OB 22–36.

---

[1] In this reply brief, Plaintiffs abandon their appeal of the court's dismissal of the separate hub-and-spoke claim Plaintiffs bring in Count I. *See* OB 36–68; *infra* p.32.

[2] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 n.3 (9th Cir. 2015) (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002)).

[3] *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

Defendants' brief is woven around a common theme: algorithmic pricing should be almost impossible to challenge under Section 1, subject to so many rules, exceptions, and excuses that even the most obviously harmful uses of algorithms by competitors—including those that result in flagrantly supracompetitive prices—will evade scrutiny. But that's not how the Sherman Act works. It is "aimed at substance rather than form."[4]

*First*, Defendants defend the court's ruling by manufacturing a legal requirement: before a court can evaluate a contract under the rule of reason, it must first inquire whether it affirmatively restrains a party's "decisionmaking." Answering Brief ("AB") 58–64. But the few cases Defendants cobble together contain no such holding. Nor could they: this Court and the Supreme Court are clear that "every commercial agreement restrains trade. Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint."[5]

*Second*, Defendants argue Plaintiffs fail to plausibly allege the vertical agreements here harmed competition, and that this Court should affirm on these alternate grounds. These arguments are unpersuasive. Defendants claim Plaintiffs'

---

[4] *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 193 (2010) (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218, 227 (1947)).
[5] *Nw. Wholesale*, 472 U.S. at 289 (emphasis in original); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154 n.7 (9th Cir. 2003).

evidence of higher prices is not "direct evidence" of harm to competition (AB 65)—despite recent Ninth Circuit authority holding the opposite. They raise fact-specific challenges to the economic analyses in Plaintiffs' complaint (AB 64–68) that fall apart upon inspection. And they challenge Plaintiffs' market definition and market power allegations (AB 68–70) on grounds that ignore Plaintiffs' well-pled allegations and established caselaw.

The Court should reverse the district court's dismissal of Plaintiffs' Vertical Claim.

## ARGUMENT

**I.     The district court erred in dismissing Plaintiffs' Vertical Claim.**

**A.     The software license agreements between Rainmaker and Casino-Defendants are "restraints."**

There are two differences between Plaintiffs' Vertical Claim and the hub-and-spoke conspiracy alleged in Count I. *First*, a claim premised on a "collection of purely vertical agreements" may be a "conspiracy" that "unreasonably restrain[s] trade" even if—unlike a hub-and-spoke claim—"the defendants have no connection with one another other than the common defendant's involvement in each transaction."[6] *Second*, "courts analyze vertical agreements under the rule of reason

---

[6] *Musical Instruments*, 798 F.3d at 1193 n.3.

… whereas horizontal agreements are violations per se,"[7] which are "presume[d] … anticompetitive without inquiry into the particular market context in which [they] are found."[8] Thus, while Plaintiffs do not need to prove a "rim"—concerted action by Casino-Defendants—to prevail on their Vertical Claim, they do need to prove their contracts with Rainmaker had "a substantial anticompetitive effect that harms consumers in the relevant market," i.e., that the agreements are anticompetitive under the rule of reason standard.

At the pleading stage, Plaintiffs met their burden of alleging that the challenged set of agreements unreasonably restrained trade with direct and indirect evidence of anticompetitive effects. OB 18–21, 29–31. But rather than evaluate this evidence, the court determined that, because Rainmaker does not require customers

---

[7] *Id.*

[8] *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022), (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)). Defendants argue this Court should depart from longstanding precedent and apply the rule of reason (rather than the per se standard) to all algorithmic pricing claims, even those premised in part on a horizontal price-fixing agreement. AB 43–44. But in an analogous case, *Duffy v. Yardi Sys., Inc.*, 2024 WL 4980771 (W.D. Wash. Dec. 4, 2024)—one whose merit Defendants appear to concede (AB 35)—the court rejected this argument and reaffirmed that no "legal authority support[s] the conclusion that an adequately alleged horizontal price-fixing agreement could be a reasonable restraint on trade." *Id.* at *7–8; *Teradata Corp. v. SAP SE*, 124 F.4th 555, 572–73 (9th Cir. 2024) (rejecting argument it would be proper to "depart from the per se approach because" claim at issue was "predicated on innovative conduct within a technology market."). In any event, because Plaintiffs abandon their hub-and-spoke claim, the Court need not reach the issue of which standard should apply to it.

- 4 -

to accept its pricing recommendations, "[i]t cannot be that the vertical agreements

… restrain trade." 1-ER-18.

This was error. Every commercial agreement, by its nature, "restrains" trade.

This Court has explained:

> The Supreme Court's cases demonstrate that "every commercial
> agreement" is a "restraint of trade," [*N'west Wholesale*, 472 U.S. at
> 289], meaning that every commercial agreement, including the
> assignments here, is "an agreement ... among two or more entities," in
> the words of the Ninth Circuit's prima facie § 1 claim. The Supreme
> Court has stated that "the legality of an agreement or regulation cannot
> be determined by so simple a test, as whether it restrains competition.
> Every agreement concerning trade, every regulation of trade, restrains.
> To bind, to restrain, is of their very essence." *Chicago Board of Trade
> v. U.S.*, 246 U.S. 231, 238 (1918). Not every commercial agreement is
> an illegal unreasonable restraint of trade, however.[9]

This makes sense as a matter of logic and policy. Functioning commerce

requires contracts, which are (by their nature) legally binding agreements that create

mutual obligations, or "restraints." And while most contracts raise no antitrust

concern, some do—even those entered without any "intent to control prices or

destroy competition."[10] This is why the rule of reason exists: it provides courts a

framework to conduct a "'fact-specific assessment' to determine a restraint's 'actual

---

[9] *Paladin*, 328 F.3d at 1154 n.7.

[10] *Id.* at 1153.

*effect*' on competition"[11] and thus determine whether it is "unreasonable." In other words, it is a contract's (or set of contracts') "practical impact on competitive conditions" that drives a court's assessment of its legality under Section 1. Br. for the United States as Amicus Curiae at 30–31 ("U.S. Amicus").

The district court's refusal to conduct this fact-specific, practical assessment was error. If accepted, its reasoning would create a loophole: no matter how profound the anticompetitive effects of the contracts here, the court's rule would find no liability so long as the contracts did not contain *binding* limitations on how Casino-Defendants price. This is not the law. Left undisturbed, it would have serious unintended consequences. U.S. Amicus 32–33.

Defendants try to prop up this ruling with two arguments. *First*, they argue that, in any Section 1 case involving a contract, the court must conduct a "threshold inquiry" to "[d]etermine whether a contract restrains trade"—and that any contract that does not "contain[] provisions limiting the parties' decisionmaking" cannot, as a matter of law, violate Section 1. AB 58–59.

But the patchwork of authorities Defendants cite contains no such rule. In *Mularkey v. Holsum Bakery, Inc.*—Defendants' primary authority—this Court, in a

---

[11] *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023) (quoting *AmEx*, 585 U.S. at 541) (emphasis added).

two page *per curiam* opinion at summary judgment, rejected plaintiffs' argument that an individually-negotiated agreement between a bakery and one of its retailers, 7-Eleven, violated Section 1.[12] But at most, *Mularkey* stands for the proposition that—in contrast with a minimum resale price maintenance scheme[13]—a single "contractual relationship" "negotiated ... between a manufacturer and one of its customers regarding the price of the manufacturer's product" is generally not actionable absent some showing that there was a "restraint of trade *resulting from the agreement.*"[14] And this Court specifically found that "under a rule of reason analysis ... such a restraint was entirely reasonable" based on the developed factual record.[15] In contrast with *Mularkey*, Plaintiffs (at the pleading stage) allege in detail the anticompetitive effects "resulting from" Defendants' contracts: higher prices.

Similarly, in *49er Chevrolet, Inc. v. Gen. Motors Corp.*, Defendants' other headline authority, this Court held that the mere existence of contractual agreements between GM and carriers was insufficient, standing alone, to *infer* a *horizontal conspiracy*, i.e., a horizontal agreement.[16] But *Chevrolet* says nothing about whether

---

[12] 146 F.3d 1064, 1065 (9th Cir. 1998).

[13] In the typical such case, a manufacturer enters vertical agreements with all its distributors/suppliers to set a minimum resale price for its products. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007).

[14] *Mularkey*, 146 F.3d at 1065 (emphasis added).

[15] *Id.*

[16] 803 F.2d 1463, 1467 (9th Cir. 1986).

a contract must "limit[] the parties' decisionmaking" to be cognizable as a "restraint"; to the contrary, it even recognizes that the sales contracts at issue "restrain[ed] trade"—they just did not do so "unlawfully."[17] And *Chevrolet*'s comment that the antitrust laws are only "offended by agreements … with an anticompetitive content"[18] is consistent with the Supreme Court's holding that "the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition."[19] What matters is whether an agreement or set of agreements—regardless of the intent behind them[20]—unreasonably restrained trade. Defendants' other authorities are even further afield and/or contradict (when read closely) their argument.[21]

---

[17] *Id.*
[18] *Id.*
[19] *Chicago Board of Trade*, 246 U.S. at 238.
[20] *Paladin*, 328 F.3d at 1153.
[21] *See Newman v. Universal*, 813 F.2d 1519, 1522–23 (9th Cir. 1987) (agreements signed five years before conspiracy began could not have been affected by the conspiracy); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 492 (6th Cir. 2021) (contractual term that simply allowed "one party to back out of a cooperative venture in view of changed business circumstances" did not unreasonably restrain trade; plaintiff's allegations really "boil[ed] down" to refusal to deal claim under Section 2); *Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984) (recognizing "restraining effect of [a] challenged agreement" may "ar[ise] not by virtue of its terms alone," but instead from its "practical" effects).

- 8 -

*Second*, Defendants protest that "[i]dentifying a contract does not plead a restraint of trade." AB 61. But the Supreme Court and this Court have left no doubt on this point: "[E]very commercial agreement restrains trade. Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint."[22] Defendants only answer to these repeated, unambiguous holdings is to characterize them as "dicta," and to read a fictitious "restraint of decisionmaking" requirement into various cases. AB 61–64.

None of these cases contain any such rule. Indeed, rather than being "dicta," these decisions unambiguously and centrally hold that contractual agreements are restraints under the Sherman Act. Most notably, *Paladin* states that in pleading an "agreement," it was "sufficient that Paladin has offered evidence that MPC and Northridge signed agreements assigning certain contract rights."[23] Similarly, in *Epic*, this Court reversed the district court after it found contractual agreements were not restraints and reaffirmed Section 1's plain text "reaches '*[e]very contract, combination …, or conspiracy*' that unreasonably restrains trade."[24]

---

[22] *Nw. Wholesale Stationers*, 472 U.S. at 289 (emphasis in original); *Chicago Board of Trade*, 246 U.S. at 238; *Paladin*, 328 F.3d at 1154 n.7.
[23] 328 F.3d at 1154.
[24] *Epic*, 67 F.4th at 982 (quoting 15 U.S.C. § 1) (emphasis in original).

011141-11/3030953 V1

Here, Plaintiffs also allege contractual agreements between Rainmaker and Casino-Defendants. Accepting the district court's reasoning "would be to read the word[] 'contract' out of the statute."[25]

Defendants also have no answer to the fact that courts regularly find non-binding guidelines involving price or supply constitute unreasonable restraints of trade. OB 25–26 (collecting cases); U.S. Amicus 31–32. Defendants say these cases are distinguishable because they all involved some "restraint that limited defendants' decisionmaking." AB 62–63. But Defendants cannot explain how, in practice, the non-binding list prices in *Plymouth* are different from the prices Rainmaker recommends—both of which function as a "starting point" that warps the competitive process. Nor do they have anything to say about the logic underlying these decisions: the agreements at issue unreasonably restrained trade not because they placed binding restraints on their signatories, but instead because their practical effect was to "prevent the determination of [market] prices by free competition alone."[26]

---

[25] *Id.* (quotation omitted).

[26] *Plymouth Dealers' Ass'n of No. Cal. v. United States*, 279 F.2d 128, 132–33 (9th Cir. 1960) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)); *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 489 (1950) ("immaterial" that "no penalties [were] imposed for deviations from the price schedules").

That is the same mechanism of harm alleged here: Casino-Defendants' joint use of Rainmaker's algorithms through the vertical agreements at issue "distort[s] the competitive process by maximizing price increases, minimizing price decreases, aligning prices among competitors, creating price floors, discouraging discounts, [and] increasing sellers' pricing power." U.S. Amicus 32–33. Further, Defendants' claim Rainmaker simply "recommends" prices ignores the many mechanisms—both "carrots" and "sticks"—Rainmaker builds into its products to ensure "recommendations" are accepted at a high rate. OB 12–16.

Finally, Defendants make no attempt to explain why the rule they advocate makes sense. This is because their reading of the law leads to absurd results. Imagine two scenarios. In the first, Rainmaker licenses its revenue management software to a dozen competitors, each of which is required by contract to accept its "recommendations" at least 1% of the time; those competitors then do so at a rate of approximately 90% and charge supracompetitive prices as a result. In the second, Rainmaker licenses its revenue management to the same group of competitors but does not require they accept its recommendations; nevertheless, they voluntarily do so approximately 90% of the time and charge the same supracompetitive prices as in the previous hypothetical. In each case, the anticompetitive effects of Rainmaker's vertical agreements are identical, and achieved the same way.

- 11 -

Both hypotheticals involve the same binding contractual relationships. Yet according to Defendants' arbitrary test, the first scenario involves a "restraint" under Section 1 whereas the second, as a matter of law, does not. Defendants' novel distinction would allow algorithmic pricing purveyors (and their users) to avoid liability with simple, disingenuous tricks (*see* OB 59) while preventing courts from asking the essential fact-specific question that animates Section 1: did the contracts at issue "prevent the determination of [market] prices by free competition alone"[27]?

This flunks logic, fairness, and blackletter antitrust law, which demands an analysis of "the circumstances, details, and logic of a restraint."[28]

### B. The contracts between Rainmaker and Casino-Defendants unreasonably restrained trade.

Defendants make various arguments why, even assuming Rainmaker's contracts are "restraints" under Section 1, this Court should affirm on the alternative grounds that Plaintiffs do not plausibly allege direct or indirect evidence Rainmaker's contracts had substantial anticompetitive effects. AB 64–70. These arguments fail.

---

[27] *Plymouth*, 279 F.2d at 132–33.
[28] *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 781 (1999).

### 1. Plaintiffs allege direct evidence of harm to competition.

Plaintiffs' complaint includes detailed, mutually corroboratory allegations demonstrating that, beginning in approximately 2015—coinciding almost exactly with when GuestRev incorporated competitor pricing (OB 19–21)—(1) each Casino-Defendant had higher percentage-wise price increases in room prices compared to the Venetian, a casino-hotel on the Strip that did not use Rainmaker's software; and (2) revenue per available room at all Casino-Defendants for which there is publicly-available data generally outpaced the nationwide Casino Hotel Index, despite no corresponding rise in demand to explain these price increases. OB 30–31.

Plaintiffs also allege the mechanism by which Rainmaker's contractually-provided algorithms generate supracompetitive prices: they allow multiple competitors to adopt the same pricing strategy, generated by a common "brain," that is premised on (1) raising prices to match competitors and (2) effecting a "disciplined" shift to a new, Strip-wide business model premised on "maximizing rooms revenue as opposed to filling rooms" (5-ER-733 (¶104)). OB 29–31.

These allegations are direct evidence of harm to competition: "increased prices."[29]

---

[29] *PLS.com*, 32 F.4th at 834.

Defendants attack Plaintiffs' evidence. **First**, they argue Plaintiffs' "statistics" are not "direct evidence," citing *Brantley v. NBC Universal, Inc.* for the proposition that "allegations that an agreement has the effect of ... increasing prices to consumers does not sufficiently allege an injury to competition."[30] AB 65. But *Brantley* concerned a particular kind of tying arrangement whereby a company contractually required that consumers purchase a tying product and a tied product together.[31] Thus, the higher prices at issue were related to the fact consumers were required, because of the tie, to purchase multiple products and pay higher prices. Logically, in such a case, higher prices will not (standing alone) be evidence of injury to competition.

By contrast, this Court—applying recent Supreme Court precedent—has repeatedly held that "proof of actual detrimental effects on competition" includes "increased prices."[32] Nor do Plaintiffs just allege "increased prices." They present multiple empirical analyses showing Casino-Defendants' prices were supracompetitive compared to both a competitor hotel in the same market and to a nationwide benchmark price reflecting demand for casino-hotels.

---

[30] 675 F.3d 1192, 1202 (9th Cir. 2012).

[31] In *Brantley*, consumers were required to purchase cable channels together rather than a la carte. *Id.* at 1201.

[32] *PLS.Com*, 32 F.4th at 834; *Epic Games*, 67 F.4th at 983 (same).

- 14 -

Defendants also omit that their primary authority, *Brantley*, recognizes "vertical agreements can … injure competition by facilitating horizontal collusion"[33]—what Plaintiffs allege here. OB 28–29. And they ignore *Leegin*, which explains that whether a vertical agreement (or set of agreements) is anticompetitive under the rule of reason because it facilitates horizontal collusion is a separate, independent question from whether it is also evidence of the existence of a horizontal cartel.[34] OB 28.

Consistent with this, courts strike down vertical restraints that facilitate horizontal collusion because they injure competition, regardless of whether there is a separately established horizontal agreement. In *Costco Wholesale Corp. v. Maleng*, this Court struck down a Washington requirement that alcohol manufacturers publicly post their wholesale prices and adhere to them for at least 30 days once posted.[35] It held this requirement violated the Sherman Act, explaining "such agreements to adhere to posted prices are anticompetitive because they are highly likely to facilitate horizontal collusion among market participants. When firms in a market are able to coordinate their pricing and production activities, they can

---

[33] *Brantley*, 675 F.3d at 1198.
[34] 551 U.S. at 893.
[35] 522 F.3d 874 (9th Cir. 2008).

increase their collective profits and reduce consumer welfare by raising price and reducing output."[36]

Plaintiffs plausibly allege the vertical agreements here have direct anticompetitive effects in the form of supracompetitive prices.[37] As documented in Plaintiffs' complaint, GuestRev is designed to produce coordinated pricing—it factors in competitor pricing and prioritizes pricing recommendations whereby Casino-Defendants can realize "revenue opportunities" by raising prices to match their competitors. 5-ER-725–48 (¶¶90–127).

**<u>Second</u>**, Defendants make fact-specific challenges to the economic analyses in Plaintiffs' complaint. These arguments are premature because courts do not require comprehensive market analyses or "engage in a *Daubert*-like analysis of Plaintiffs' statistical pleadings" at the pleading stage and "must[] accept as true

---

[36] *Id.* at 896.

[37] Defendants suggest in passing that Plaintiffs do not sufficiently allege "horizontal collusion" in connection with their Vertical Claim. AB 65. But a horizontal agreement—concerted action by Casino-Defendants—is not an element of this claim. *Musical Instruments*, 798 F.3d at 1193 n.3. Defendants otherwise appear to concede that, to state a claim under the rule of reason, Plaintiffs need only allege the contracts here had substantial anticompetitive effects.

Plaintiffs' factual assertions regarding pricing and other data."[38] More importantly, they are factually wrong.

**1.** Defendants argue the Venetian (which did not use Rainmaker) is a flawed comparator, insisting its rates "were only lower than [Casino-Defendants'] because plaintiffs attributed 100% rate decreases to rooms that were closed for renovation." AB 29–30, 66. This is incorrect. In Q4 2020, the Venetian, which operates the hotel towers of the Palazzo and the Venetian, temporarily closed the Palazzo tower and raised prices for the Venetian—shifting all its business to it.[39] In the chart at paragraph 214 of their complaint (5-ER-812), which covers 2015–2023, Plaintiffs account for this by calculating an average price change for the Venetian and Palazzo across the total capacity of those hotel towers—then use that to analyze the Venetian's pricing.

---

[38] *City of Phila. v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 527–28 (S.D.N.Y. 2020); *Brantley*, 675 F.3d at 1198; *see also Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *1 (9th Cir. 2023) (reversing district court's finding of no parallel conduct at pleading stage where plaintiffs lacked sufficient evidence to perform a statistical analysis of certain defendants' pricing).

[39] Bryan Horwath, *Palazzo temporarily closes hotel rooms, citing lack of demand*, LAS VEGAS SUN (Dec. 8, 2022), https://vegasinc.lasvegassun.com/business/gaming/2020/dec/08/palazzo-temporarily-closes-hotel-rooms-citing-lack/.

Defendants also ignore that Plaintiffs' analysis shows higher relative price increases among Casino-Defendants compared with the Venetian between 2015–2019, *before* the renovation took place. 5-ER-812 (¶215).[40]

**2.** Defendants argue Plaintiffs' use of a "nationwide Casino Hotel Index" is inappropriate for two reasons. First, they claim this index has no probative value because its implication (Defendants say) is "that rates in every locality" outside of the Strip are "anticompetitive" if they are "equal to or lower than some nationwide index[.]" AB 66. But antitrust plaintiffs regularly demonstrate impact and damages by comparing a defendant's prices to prices charged in a comparable market or by a "business not affected by the anticompetitive conduct at issue."[41] Defendants' argument amounts to the extraordinary claim that, even if Casino-Defendants' rates grew at an inexplicably higher rate than a comparable market, that is irrelevant to whether Plaintiffs plausibly allege those rates are supracompetitive. This defies logic

---

[40] Defendants also argue that, because a non-defendant casino-hotel, MGM, increased its rates more than Casino-Defendants, the Venetian is an inappropriate comparator. AB 29. But MGM was previously a Rainmaker user and is identified as a co-conspirator in Plaintiffs' complaint. 5-ER-698–99; 5-ER-707; 5-ER-771; 5-ER-783–84; 5-ER-861. Thus, their rates are affected by the anticompetitive conduct at issue.

[41] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023) (expert used "close[ly] analo[gous]" "college football market" as "yardstick" to measure impact and damages, which is "accepted methodology in antitrust cases").

and common sense—particularly at the pleading stage, where Plaintiffs are only required to "sketch the outline of the injury to competition with allegations of supporting factual detail" that are enough to "raise a reasonable expectation that discovery will reveal evidence of an injury to competition."[42]

Defendants also argue Plaintiffs' use of the nationwide casino price index (hereafter "Overall Index") is an "apples to oranges" comparison because this index captures the prices for goods and services—not just room rates. AB 30–31, 66–67. Defendants argue that, compared to a separate index that only measures room rates at casino-hotels, i.e., excludes goods and services (hereafter "Room Index"), Casino-Defendants' rates "increased less than casino hotels nationwide." AB 31.

The problem is that the separate index Defendants reference, the Room Index, is based largely on prices of casino-hotel rooms on both the Las Vegas Strip and in Atlantic City—both markets where cases have been filed alleging that casino-hotels used Rainmaker to artificially inflate prices.[43] Using the Room Index as a benchmark for a "healthy" or "normal" market is thus tantamount to comparing the conduct challenged here to itself—because this index *shows the effect* of Rainmaker use in

---

[42] *Brantley*, 675 F.3d at 1198.

[43] In a separate case pending before the Third Circuit, *Cornish-Adebiyi*, plaintiffs allege that defendants (generally the same Casino-Defendants here) engaged in a similar scheme to inflate prices in Atlantic City by using Rainmaker. *See* 2-ER-183–311 (*Cornish* complaint).

the two major U.S. casino-hotel markets. By contrast, while the Overall Index is not wholly immune from this contamination, it is sufficiently aggregated with other proxies of hotel demand that it provides a conservative reference point for observing the impact of the anticompetitive conduct on guestroom prices.

Contrary to Defendants' assertions, the indices support Plaintiffs' allegations because they show that Casino-Defendants' pricing began its abnormal surge almost precisely at the same time as Rainmaker's integration of competitor pricing into GuestRev in 2015. OB 12–18. Until 2015, there was little difference between the Overall Index and the Room Index. That is what one would expect in a competitive market, because variation in demand for casino-hotel services should determine price levels for both hotel rooms and associated services. This is because both indexes reflect the same demand conditions, i.e., casino-hotel goers who rent rooms in casino-hotels are overwhelmingly the same customers who purchase other goods and services a casino offers.

After 2015, however, the Room Index rapidly outpaced the Overall Index, i.e., room prices accelerated rapidly in a way other hotel goods and services did not.

Moreover, this obvious break post-2015 did not happen for non-casino hotels, where

the room and overall indexes continue to track each other:[44]



<hr />

[44] In the top chart below, the Overall Index and Room Index for casino-hotels are the orange and purple lines, respectively. In the bottom chart, the Overall Index and Room index for non-casino-hotels are the yellow and green lines, respectively.

3-ER-541–42.

In other words, in approximately 2015, *something* happened in the market for casino-hotel rooms—but not in the market for casino-hotel services *or* non-casino hotel rooms—that led room prices to accelerate upward, even as demand for both casino and non-casino hotels remained the same. Plaintiffs plausibly allege that "something" was Rainmaker's integration of competitor pricing. This is further direct evidence that the set of vertical agreements between Casino-Defendants and Rainmaker inflated prices, i.e., had anticompetitive effects.

**3.** Defendants say Plaintiffs' allegations are undermined by the fact that Casino-Defendants' "room rates increased less than hotels in downtown Las Vegas" during the conspiracy period. AB 30, 66-67. This objection is incoherent. The chart Defendants cite (*see* 5-ER-811) shows that, beginning in 2015, the price difference between rooms on the Strip and the rest of Las Vegas widened *and then persisted*—once again consistent with Plaintiffs' allegation that Rainmaker use resulted in durably higher (supracompetitive) prices.

**Third**, Defendants suggest that, to the extent these anticompetitive effects flowed from Rainmaker's use of "publicly available" rates to set prices, "any price increases resulted from lawful conduct." AB 67. In other words, Defendants assert

they are immune from liability even if Plaintiffs plausibly allege that the set of contractual agreements had direct anticompetitive effects.

But the rule of reason contains no such "get out of jail free"-style exceptions. Under blackletter law, if Plaintiffs plausibly allege the challenged agreements had anticompetitive effects at the motion to dismiss stage, then they meet their burden to show these contracts "unreasonably" restrained trade.[45] Defendants cannot avoid well-pled allegations of supracompetitive prices with conclusory claims that there is "nothing anticompetitive" about Rainmaker's software. AB 68. That determination is made by a finder of fact based on a developed factual record.

Defendants' argument also obfuscates the facts, record, and Plaintiffs' theory of liability. Defendants invoke the district court's bromide that "there is nothing anticompetitive" about one company consulting public sources to determine how to price. AB 67. But the court emphasized this point only because it undercut (in its view) the plausibility of a *horizontal agreement* among Casino-Defendants. But that is not an element of Plaintiffs' Vertical Claim. And the court's order failed to analyze whether it is categorically legal for a group of competitors to jointly use a common agent for pricing "recommendations" so long as that agent does not facilitate

---

[45] *PLS.com*, 32 F.4th at 839–40.

confidential information sharing. Nor would such a rule withstand antitrust scrutiny or make economic sense.[46]

Further, Plaintiffs do not allege Casino-Defendants simply observe each other's public prices independently and then make independent pricing decisions based on that information. Instead, they allege that, by using Rainmaker's contractually-provided pricing algorithm, Casino-Defendants replace their independent pricing decisions with decisions made by a single, centralized entity that provides recommendations (1) based on each competitor's prices and created with the explicit goal of (2) maximizing profit across a group of horizontal competitors. OB 65–66. The Supreme Court has made clear antitrust law exists to prevent the anticompetitive joining together of otherwise independent centers of economic decisionmaking.[47]

### 2.     Plaintiffs allege indirect evidence of harm to competition.

Defendants argue Plaintiffs' allegations of indirect evidence of harm to competition are insufficient for various reasons. These arguments also fail.

---

[46] Antitrust law has never required the exchange of confidential information as a precondition for price-fixing liability; instead, in several recent cases, district courts have only treated this as relevant to whether plaintiffs adequately plead the existence of a *horizontal agreement* among an algorithm's users. Nor is it necessary for an algorithmic pricing agent to have access to confidential information to produce anticompetitive effects or fix prices. OB 63-65.

[47] *Am. Needle*, 560 U.S. at 190.

### a. The relevant market makes sense.

Plaintiffs define the relevant market here as the one for casino-hotel guest rooms on the Las Vegas Strip. OB 33. Defendants make the logically irreconcilable argument that this market is both "too narrow" and "too broad." AB 68–69.

**The market is not too narrow**. Defendants say the Strip market is too narrow because it fails to include non-Strip casino-hotels, and contort Plaintiffs' allegation that Strip hotels "may compete with other casino hotels nearby." AB 68. But in defining a relevant market, the question is not whether non-Strip casino-hotels impose *any* competitive constraint on Strip casino-hotels, but instead whether that constraint is sufficient to discipline their pricing—a quintessentially fact-intensive inquiry. Plaintiffs allege Strip hotels were consistently able to charge at least 5% more than downtown hotels (5-ER-811 (¶213))—thus indicating, at the pleading stage, that Plaintiffs' proposed market definition satisfies the "small but significant nontransitory increase in price" ("SSNIP") test.[48] Plaintiffs also plausibly allege the Strip is publicly recognized as a distinct market: it is one of the most iconic tourist

---

[48] *Epic Games*, 67 F.4th at 975. The test asks what would happen if a monopolist imposed a "small but significant nontransitory increase in price" ("SSNIP") in the market. If consumers still stay in the market—despite the room price increase—then the market is properly defined. Here, consumers did not substitute downtown Las Vegas rooms for rooms on the Strip after Strip hotel prices rose more than 5% relative to downtown hotels.

destinations in the United States, and is recognized as a distinct entity by (among others) the Las Vegas Convention and Visitor Authority, whose published statistics distinguish between "Downtown Vegas," the "Las Vegas Area," and the "Las Vegas Strip." 5-ER-893 (¶¶346, 349).

**The market is not too broad**. Defendants say Plaintiffs' market is "too broad" because it includes rooms sold at various price points. AB 69. But a relevant market is not composed just of perfect substitutes; it includes (a) "all economic substitutes for the product" and (b) "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."[49] Courts routinely reject arguments that price differences between products—even substantial ones—"suffice to support the existence of two separate markets, as 'the scope of the relevant market is not governed by the presence of a price differential between competing products.'"[50]

More broadly, Defendants' challenges to Plaintiffs' market—which on their face "ignore commercial reality"[51]—also run afoul of this Court's repeated caution

---

[49] *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

[50] *Stubhub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015) (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975)) (collecting cases); *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) (rejecting argument "medium-priced shoes do not compete with low-priced shoes").

[51] *Twin City*, 676 F.2d at 1300.

that "the validity of the relevant market is typically a factual element rather than a legal element,"[52] and that—absent a "fatal legal defect"[53]—a proper market definition can only be determined through "factual testing by summary judgment or trial."[54]

### b. Casino-Defendants have market power.

Defendants argue that Casino-Defendants' market shares cannot be aggregated in assessing their market power—and that even if they could, that collective share would be insufficient to state a claim. AB 69–70.

Defendants are wrong that their aggregate share of the market—between 35–40%—is insufficient.[55] Many courts have rejected identical arguments and found that, in Section 1 cases, market shares as low as 24% can suffice to show market

---

[52] *Newcal*, 513 F.3d at 1045 (quotation omitted;); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("defining the relevant market is a factual inquiry for the jury").

[53] *Newcal*, 513 F.3d at 1045.

[54] *Id.*; *Todd v. Exxon Corp.*, 275 F.3d 191, 200–01 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

[55] Co-conspirators possess an additional cumulative market share of approximately 45%. Plaintiffs' complaint includes specific allegations regarding each co-conspirator's usage of Rainmaker's pricing algorithms, including statements regarding MGM Mirage's (predecessor of MGM Resorts) usage of Rainmaker in its Las Vegas hotels. 5-ER-783–5 (¶¶183–189). In any event, Plaintiffs sufficiently plead market power regardless of whether co-conspirators' market shares are included.

power—including the court in *RealPage*, which found alleged market shares between 25–50% sufficient to plead market power.[56] Indeed, in Defendants' primary case, the Ninth Circuit went on to recognize a 44% market share as "sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing."[57] Defendants are silent on this holding and make no attempt to otherwise distinguish Plaintiffs' authorities. *See* OB 33.[58] Nor can they dispute that the barriers to entry here are far more significant than in *RealPage*.[59] Acquiring or building a hotel on the Strip costs billions, and just one new hotel has been built since 2007. 5-ER-828 (¶253).

---

[56] *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 526–27 (M.D. Tenn. 2023); *Twin City*, 676 F.2d at 1299 (affirming district court's finding of Section 1 liability where defendant controlled 24% of relevant market); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) ("the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%").

[57] *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1438 (9th Cir. 1995).

[58] Defendants argue *Twin City* "holds nothing about market power." AB 43 n.7. But in *Twin City*, this Court not only found that "substantial evidence support[ed] the district court's finding that Sportservice controlled 24 percent of the relevant market," but "affirm[ed] the district court's conclusion of Section 1 liability"—which was premised on Sportservice's ability to "foreclose[] [competition] in a substantial share of the relevant market" by virtue of that 24% control. 676 F.2d at 1301–02.

[59] *See RealPage*, 709 F. Supp. 3d at 527.

011141-11/3030953 V1

Defendants are also wrong that Plaintiffs are prohibited from aggregating Defendants' market shares absent a "conspiracy" (horizontal agreement) among Casino-Defendants. AB 69–70. Defendants rest their argument on (1) a footnote to a 1984 district court opinion and (2) *Rebel Oil*, where this Court held that "[t]he aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize."[60] Defendants draw a negative inference from this language: that aggregation is only permitted in monopolization cases.

*Rebel Oil* does not hold this. And this Court's other decisions make clear that the aggregation of separate contracts is permitted in Section 1 cases. For example, in *Twin City*, this Court held "it was proper for the district court to have aggregated [the defendant]'s contracts in the relevant market in order to assess the Sherman Act violations resulting from these contracts," explaining that when a cumulative effect is pleaded, courts "may look to the overall effects of a defendant's conduct in the relevant market" rather than being "limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant."[61] In *Toys "R" Us, Inc. v. F.T.C.*, the Seventh Circuit found defendants had market power based on the aggregation of agreements covering "some 40% of the traditional toy market."[62]

---

[60] AB 69–70 (citing *Rebel Oil*, 51 F.3d at 1437).
[61] *Twin City*, 676 F.2d at 1302–03.
[62] 221 F.3d 928, 937 (7th Cir. 2000).

Similarly, the leading antitrust treatise confirms that separate vertical agreements sharing a common element should be aggregated to evaluate their anticompetitive effect.[63]

Defendants' position on aggregation is also impossible to square with this Court's recognition that a plaintiff may bring a Section 1 claim premised on a "collection of vertical agreements," even where "the defendants have no connection with one another other than the common defendant's involvement in each transaction."[64] It is also fundamentally at odds with *U.S. v. Masonite*, which holds that where the practical effect of a set of agreements is to fix prices, it is immaterial whether defendants "intend[ed] to join a combination or to fix prices"—they "must be held to have intended the necessary and direct consequences of their acts."[65] While Defendants dispute the relevance of *Masonite* to Plaintiffs' horizontal claim (AB 46–48), they concede (1) the case concerned a set of "vertical contracts" (AB 47) and (2) the Supreme Court found both Masonite and its agents liable under

---

[63] Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶310 (Fourth & Fifth Editions 2018–2022) (four contracts, each of which forecloses approximately 15 percent of the market, should be aggregated in considering their anticompetitive effect).

[64] *Musical Instruments*, 798 F.3d at 1193 n.3 (quoting *Dickson*, 309 F.3d at 203).

[65] 316 U.S. 265, 275 (1942).

Section 1 based on the combined effect of those contracts—no different from Plaintiffs' Vertical Claim.

Defendants also argue Plaintiffs cannot aggregate "the effects of the vertical agreements to show harm to competition" because each license agreement between Rainmaker and Casino-Defendants "does not have a discrete effect on competition." AB 69 n.15. But each agreement here *does* have a discrete effect on competition: the higher prices charged by each Casino-Defendant compared to relevant benchmarks.

### c.     The restraints here harm competition.

To plead substantial anticompetitive effects indirectly, Plaintiffs must plausibly allege Casino-Defendants have market power and "some evidence" "the challenged restraint harms competition."[66]

Defendants say Plaintiffs fail to clear that bar. AB 70. But they make no attempt to engage with, much less rebut, Plaintiffs' allegations—grounded in economic theory, academic analysis, and regulators' warnings—that competition is harmed where multiple competitors in a market use the same pricing algorithm. OB 34–36. While Defendants argue these "papers and analys[es]" concern "dissimilar software in different industries" (AB 70), they do not substantiate this claim or explain why these authorities' core concern—that common use of an algorithmic

---

[66] *Epic*, 67 F.4th at 983.

pricing agent by horizontal competitors harms competition (OB 34–36, 64–65 & n.114)—does not apply here. Nor do they meaningfully address the qualitative evidence in Plaintiffs' complaint, including Rainmaker's boasting that Casino-Defendants could make *more* money while filling *fewer* rooms by using its algorithms and practicing "discipline."

This evidence is sufficient to show the vertical agreements between Rainmaker and Casino-Defendants "harm[] competition" "as a matter of economic theory,"[67] i.e., plead indirect harm to competition.

## II.   Plaintiffs no longer appeal the dismissal of their hub-and-spoke claim.

Plaintiffs abandon their appeal of the dismissal of their hub-and-spoke claim (Count 1 of the Complaint). *See* OB 36–68. This Court therefore does not need to address Plaintiffs' or Defendants' arguments regarding it.[68]

---

[67] *Id.*

[68] *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 n.1 (9th Cir. 1990).

Dated: February 7, 2025        Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
*Email: steve@hbsslaw.com*

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
*Email: riop@hbsslaw.com*

*Attorneys for Plaintiffs-Appellants*

011141-11/3030953 V1

## CERTIFICATE OF COMPLIANCE

This brief contains 6,868 words, including 132 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). This brief complies with typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point size Times New Roman font.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/3030953 V1

## STATEMENT OF RELATED CASES

In accordance with Circuit Rule 28-2.6, the undersigned certifies that there are no related cases.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/3030953 V1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 7, 2025.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

011141-11/3030953 V1