**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD GIBSON; ROBERTO MANZO, | No. 24-3576 |
| *Plaintiffs - Appellants*, | D.C. No. 2:23-cv-00140-MMD-DJA |
| v. | |
| CENDYN GROUP, LLC; THE RAINMAKER GROUP UNLIMITED, INC.; CAESARS ENTERTAINMENT, INC.; TREASURE ISLAND, LLC; WYNN RESORTS HOLDINGS, LLC; BLACKSTONE INC.; BLACKSTONE REAL ESTATE PARTNERS VII L.P.; JC HOSPITALITY, LLC, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, District Judge, Presiding

Argued and Submitted May 12, 2025
San Francisco, California

Filed August 15, 2025

2            GIBSON V. CENDYN GROUP, LLC

Before: Carlos T. Bea and Ana de Alba, Circuit Judges, and
Jeffrey Vincent Brown, District Judge.[*]

Opinion by Judge Bea

## SUMMARY[**]

### Antitrust

Affirming the district court's dismissal of a putative antitrust class action, the panel held that plaintiffs failed to state a claim under Section 1 of the Sherman Act by alleging that competing hotels independently purchased licenses for software that provided pricing recommendations.

The panel concluded that the choice of several competitors to contract with the same service provider, followed by higher prices, was not sufficient to require antitrust scrutiny under the rule of reason. Section 1 requires a causal link between a contested agreement and an anticompetitive restraint of trade in the relevant market, but here, neither the terms nor the operation of the disputed software licensing agreements imposed any such anticompetitive restraints in the market of hotel-room rentals on the Las Vegas strip.

---

[*] The Honorable Jeffrey Vincent Brown, United States District Judge for the Southern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

GIBSON V. CENDYN GROUP, LLC 3

## COUNSEL

Steve W. Berman (argued), Hagens Berman Sobol Shapiro LLP, Seattle, Washington; Rio S. Pierce, Hagens Berman Sobol Shapiro LLP, Berkeley, California; for Plaitniffs-Appellants.

Melissa A. Sherry (argued), Graham Haviland, Christopher J. Brown, and Anna M. Rathbun, Latham & Watkins LLP, Washington, D.C.; Sadik H. Huseny, Timothy L. O'Mara, and Brendan A. McShane, Latham & Watkins LLP, San Francisco, California; Jon C. Williams, Campbell & Williams, Las Vegas, Nevada; Arman Oruc, Goodwin Procter LLP, Los Angeles, California; Alicia Rubio-Spring, Goodwin Procter LLP, Boston, Massachusetts; Nicholas J. Santoro, Spencer Fane LLP, Las Vegas, Nevada; Boris Bershteyn, Sam Auld, Michael Menitove, and Ken Schwartz, Skadden Arps Slate Meagher & Flom LLP, New York, New York; Adam Hosmer-Henner, Chelsea Latino, and Jane Susskind, McDonald Carano Wilson LLP, Reno, Nevada; Patrick J. Reilly, Arthur A. Zorio, Emily Garnett, and Eric D. Walther, Brownstein Hyatt Farber Schreck LLP, Las Vegas, Nevada; Mark C. Holscher and Tammy Tsoumas, Kirkland & Ellis LLP, Los Angeles, California; Matthew Solum, Kirkland & Ellis LLP, New York, New York; Daniel R. McNutt and Matthew Wolf, McNutt Law Firm PC, Las Vegas, Nevada; Matthew L. McGinnis, Ropes & Gray LLP, Boston, Massachusetts; Kasey J. Curtis, James C. Martin, and Charles P. Hyun, Reed Smith LLP, Los Angeles, California; for Defendants-Appellees.

David C. Kiernan (argued) and Matthew J. Silveira, Jones Day, San Francisco, California, for Amicus Curiae the International Center for Law & Economics.

4       GIBSON V. CENDYN GROUP, LLC

Joshua P. Davis and Matthew Summers, Berger Montague PC, San Francisco, California; Randy Stutz and David O. Fisher, American Antitrust Institute, Washington, D.C.; for Amicus Curiae American Antitrust Institute.

Kellie Lerner, Shinder Cantor Lerner LLP, New York, New York; Gary I. Smith Jr., Hausfeld LLP, San Francisco, California; David M. Cialkowski, Zimmerman Reed LLP, Minneapolis, Minnesota; David B. Rochelson and Deborah A. Elman, Garwin Gerstein & Fisher LLP, New York, New York; Anthony J. Stauber, Gustafson Gluek PLLC, Minneapolis, Minnesota; for Amicus Curiae the Committee to Support the Antitrust Laws.

Sandeep Vaheesan and Tara Pincock, Open Markets Institute, Washington, D.C., for Amicus Curiae Open Markets Institute.

Jon J. Sullivan, Stratton C. Strand, Nickolai G. Levin, and Daniel E. Haar, Attorneys, Antitrust Division; Spencer D. Smith, Yixi Cheng, and Alice A. Wang, Counsels to the Assistant Attorney General; David B. Lawrence, Policy Director; Andrew J. Forman and John W. Elias, Deputy Assistant Attorneys General; Doha G. Mekki, Principal Deputy Assistant Attorney General; Jonathan S. Kanter, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

## OPINION

BEA, Circuit Judge:

Does it violate Section 1 of the Sherman Act ("Section 1") for competing hotels each to purchase a license to use the same price-recommendation software? It would undoubtedly violate Section 1 were those competing hotels to agree among themselves to abide by a third party's pricing recommendations when pricing their own hotel rooms. But the question this case presents, by contrast, is whether Plaintiffs sufficiently state a Section 1 claim when they allege that the competing hotels *independently* purchased licenses for the same software, which software is alleged to have provided pricing recommendations, and which software did not share any licensing hotel's confidential information among the competing licensees.

Plaintiffs argue that the mere identification of a contract (in this case, the licensing agreement between a hotel and a software-provider), when paired with the allegation that prices rose after the adoption of the contract, is sufficient to allege a Section 1 violation. According to Plaintiffs' logic, the district court erred when it dismissed Plaintiffs' complaint for failure to allege a restraint of trade without first analyzing the contested agreement under the "rule of reason". Here, however, Plaintiffs did not allege facts sufficient to permit a plausible inference that the agreements for the provision of the revenue-management software effected a restraint of trade *in the relevant market*—hotel-room rentals on the Las Vegas Strip. Neither the terms nor the operation of the licensing agreements are alleged to have harmed competition by affecting the competitive incentives

6        GIBSON V. CENDYN GROUP, LLC

in the relevant market, nor did the licensing agreements restrain any party's ability to compete in the relevant market.

Plaintiffs push for a rule in which the choice of several competitors to contract with the same service-provider, when followed by higher prices, is sufficient to require antitrust scrutiny under the rule of reason. But Section 1 requires a causal link between the contested agreement and an anticompetitive restraint of trade in the relevant market. Because, as alleged here, neither the terms nor the operation of the disputed licensing agreements imposed any such anticompetitive restraints, we affirm the judgment of the district court which dismissed Plaintiffs' Section 1 claims with prejudice.

**I.**

Plaintiffs, a putative class, regularly traveled to Las Vegas, Nevada, and rented hotel rooms on the Las Vegas Strip. In their present complaint, Plaintiffs alleged that they paid higher prices for their hotel rooms due to Defendants' anticompetitive conduct. Plaintiffs initially alleged two anticompetitive agreements in violation of Section 1 of the Sherman Act. First, they alleged that certain hotels on the Las Vegas Strip ("Hotel Defendants") [1] agreed among

---

[1] The Hotel Defendants are Caesars Entertainment, Inc. ("Caesars", operator of Bally's, Caesars Palace, The Cromwell Hotel and Casino, Flamingo Las Vegas, Harrah's Las Vegas, The Linq Hotel and Casino, Paris Las Vegas, and Planet Hollywood Resort and Casino); Treasure Island, LLC ("Treasure Island", operator of Treasure Island Hotel and Casino); Wynn Resorts Holdings, LLC ("Wynn", operator of Wynn Las Vegas and Encore Wynn Las Vegas); Blackstone Inc. and Blackstone Real Estate Partners VII L.P., (collectively "Blackstone", operator of The Cosmopolitan of Las Vegas); JC Hospitality LLC ("JC Hospitality", operator of Virgin Hotels Las Vegas, LLC and Hard Rock Hotel & Casino Las Vegas).

themselves to purchase the license to the same revenue-management software products from Defendant Cendyn Group, LLC ("Cendyn")[2] and to abide by Cendyn's pricing algorithms' recommendations. (As discussed in more detail below, Plaintiffs "abandon[ed]" their appeal of the district court's dismissal of this claim.) Second, Plaintiffs alleged that the number of individual agreements between Cendyn and Hotel Defendants to license Cendyn's software products resulted, "[i]n the aggregate," in anticompetitive effects in the form of artificially inflated prices.[3] Plaintiffs define the relevant antitrust market as the rental of hotel rooms from hotels located on the Las Vegas Strip, a four-mile stretch in the unincorporated towns near Las Vegas, Nevada.

According to the allegations in the complaint, Cendyn is a private company that provides technology for the hospitality industry. Plaintiffs' allegations concern three of Cendyn's software products: GuestRev, GroupRev, and RevCaster (the "software products" or "revenue-management software").

GuestRev is a pricing algorithm that recommends prices for individual hotel rooms. GuestRev is the "core element"

---

[2] Defendant The Rainmaker Group, Unlimited, Inc. ("Rainmaker") developed the software products at issue and licensed them to Hotel Defendants before 2019. In 2019, Cendyn acquired Rainmaker and licensed the products thereafter. Nothing in this case turns on the details or timing of Defendants' corporate parentage. For the sake of simplicity, we refer to the software provider as "Cendyn."

[3] While Plaintiffs styled this claim as being aimed at the "set" of agreements between Cendyn and each individual Hotel Defendant, Count 2 on its own terms does not allege an agreement among Hotel Defendants to act so as to make the "set." Rather, the term "set" is Plaintiffs' conclusory term for the number of individual agreements between Cendyn and each Hotel Defendant.

8        GIBSON V. CENDYN GROUP, LLC

of Cendyn's revenue-management platform. To use GuestRev, hotels provide GuestRev with granular pricing and occupancy data on a continuous basis. GuestRev then generates pricing recommendations for a hotel's guest rooms on an at-least daily basis. GuestRev provides personalized pricing for every guest and is directly integrated with hotel operators' property management system. Licensees can even set GuestRev on "autopilot," such that its prices are directly and automatically uploaded into the hotel's property management system. While GuestRev requires its licensees to have "override permissions" to deviate from GuestRev's recommended prices, GuestRev does not require a hotel to implement its pricing recommendations.[4]

GroupRev is "a pricing algorithm specifically tailored for quoting custom rates for group travel." GroupRev appears frequently to have been licensed to clients who also licensed GuestRev. The complaint does not specify whether GroupRev offers the same "autopilot" functionality, nor does it state whether deviation from its recommendations requires override permissions.

RevCaster is "a 'rate shopping' tool integrated into GuestRev." RevCaster "collect[s] public pricing information" so that "competitor pricing is easily incorporated as a factor in setting pricing." A "key part of

---

[4] According to the complaint, "GuestRev's pricing function allows pricing managers to 'mark pricing recommendations for upload, override and mark for uploads, make a recommendation or an override persistent, and send the recommendation or override to the [property management system].'" However, "to override a pricing recommendation, a revenue manager must have override permissions." Without the permissions, the software would not permit a user to override the recommendations. The complaint does not allege which employees had override permissions, nor does it allege the requirements for obtaining override permissions.

what makes GuestRev effective" is that it provides the ability for hotels to "use competitor pricing in implementing their own pricing."

Although the precise rate at which Hotel Defendants implemented the software products' pricing recommendations is not in the record, Plaintiffs allege that "Cendyn has repeatedly touted on its website and in marketing materials that GuestRev's pricing recommendations are accepted 90% of the time."

Plaintiffs allege that each user provides Cendyn with non-public pricing and occupancy data, which the software products then use in their algorithms to generate recommendations. Plaintiffs, however, do not allege that Cendyn pools, shares, or uses the confidential information provided by a given Hotel Defendant into the pricing recommendations it generates for any *other* Hotel Defendant.

The Hotel Defendants adopted the relevant revenue-management products over the course of a decade. Caesars began using the software that would become GuestRev in late 2004, Wynn in 2008, Treasure Island by around 2010, Hard Rock by at least 2014, and Cosmopolitan of Las Vegas by at least 2014. All Hotel Defendants were using GuestRev in 2015, when Rainmaker acquired RevCaster, which allowed competitor pricing to be integrated easily into the pricing recommendations GuestRev offered. All Hotel Defendants used GuestRev until at least 2021—two years

10          GIBSON V. CENDYN GROUP, LLC

after Cendyn acquired Rainmaker.[5]   All Hotel Defendants
licensed GroupRev as well.

### *Procedural History*

Plaintiffs sued Defendants, alleging two violations of
Section 1 of the Sherman Act.  In their first claim ("Count
1"), Plaintiffs allege that Hotel Defendants participated in an
illegal "hub-and-spoke" agreement in which Hotel
Defendants agreed among themselves to adopt Cendyn's
revenue-management software and abide by the pricing
algorithms' recommendations.  The district court found that
even accepting the factual allegations as true and drawing all
reasonable inferences in Plaintiffs' favor, Plaintiffs failed to
plead sufficient facts from which the court could infer such
an agreement indeed existed among Hotel Defendants.  The
district court thereby dismissed Count 1 under Rule 12(b)(6).

Although Plaintiffs initially argued in support of Count
1 in their appellate briefing, they ultimately "abandoned[ed]
their appeal of the [district] court's dismissal of the separate
hub-and-spoke claim Plaintiffs [brought] in Count [1]."

In their second claim ("Count 2"), Plaintiffs allege that
the number of individual agreements between Cendyn and
each Hotel Defendant to license Cendyn's software products
resulted, "[i]n the aggregate," in anticompetitive effects in
the form of artificially inflated prices for hotel rooms on the
Las Vegas Strip.[6]

---

[5] At this stage of the proceeding, nothing in this case turns on whether or
when Hotel Defendants stopped using Cendyn's revenue-management
software.

[6] Although both claims arise under Section 1 of the Sherman Act and out
of the same set of facts, the counts allege different agreements.  Count 1
regards an agreement among Hotel Defendants to use Cendyn, whereas

GIBSON V. CENDYN GROUP, LLC                    11

## II.

We exercise appellate jurisdiction under 28 U.S.C.
§ 1291.  We review the dismissal of a complaint under Rule
12(b)(6) *de novo*.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d
1042, 1046 (9th Cir. 2008).  We accept all allegations of
material fact as true and construe them in the light most
favorable to the nonmoving party.  *Burgert v. Lokelani
Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir.
2000).

## III.

### A.

"The antitrust laws of the United States aim to protect
consumers by maintaining competitive markets."  *In re
Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d
1186, 1191 (9th Cir. 2015).  Section 1 of the Sherman Act
thereby prohibits "[e]very contract, combination . . ., or
conspiracy, in restraint of trade or commerce" in interstate
commerce.  15 U.S.C. § 1.

The Supreme Court has clarified that, despite the text of
Section 1, not *every* agreement in restraint of trade violates
Section 1.  *United States v. Topco Assoc's, Inc.*, 405 U.S.
596, 606-607 (1972).  Rather, only unreasonable restraints
of trade are illegal.  *Id*.  And those unreasonable restraints
must be "effected by a contract, combination, or
conspiracy."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553
(2007) (citation omitted).

---

Count 2 alleges several individual agreements, each being between an
individual Hotel Defendant and Cendyn.  Thus, Plaintiffs allege distinct
Section 1 violations, not alternative theories of liability.

12          GIBSON V. CENDYN GROUP, LLC

Agreements can be tacit or express. *Id*. Evidence parties "signed agreements assigning certain contract rights" evinces "an agreement among two or more entities." *Paladin Assoc's. Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1154 (9th Cir. 2003) (cleaned up).

Contracts, like "[e]very agreement concerning trade," restrain trade. *Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). "To bind, to restrain, is of their very essence." *Id*. But to allege a Section 1 violation requires more than merely identifying a contract. "Rather, the plaintiff must allege an 'actual adverse effect on competition' caused by" the disputed agreement. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (citation omitted). And of course, "to plead injury to competition . . . sufficiently to withstand a motion to dismiss, 'a [Section 1] claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.'" *Id*. at 1198 (citation omitted).

Once an agreement that restrains trade is alleged, to state a Section 1 claim a Plaintiff must allege sufficient facts from which the court could infer the agreement is unreasonable. *Topco*, 405 U.S. at 606-607. To determine whether an agreement in restraint of trade is unreasonable, courts apply different standards for evaluating different types of agreements. Antitrust law characterizes these different types of agreements as "horizontal," "vertical," or "hub-and-spoke," based on the economic relationships of the parties to the agreement in restraint of trade. *See Musical Instruments*, 798 F.3d at 1192-93.

A horizontal agreement is "an agreement among competitors on the way in which they will compete with one another." *Aya Healthcare Servs., Inc. v. AMN Healthcare,*

*Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (citation omitted). Some horizontal agreements, such as "agreements among competitors to fix prices, divide markets, and refuse to deal" are "per se" violations of Section 1. *Musical Instruments*, 798 F.3d at 1191. Once such a horizontal agreement is proven, "no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a [Section 1] violation." *Id*. Those restraints of trade are per se violations of Section 1 because they "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

Vertical agreements, by contrast, are "agreements made up and down a supply chain, such as between a manufacturer and a retailer." *Musical Instruments*, 798 F.3d at 1191. To determine whether a restraint of trade caused by a vertical agreement is unreasonable, it is "analyzed under the rule of reason, whereby courts examine 'the facts peculiar to the business, the history of the restraint, and the reason why it was imposed,' to determine the effect on competition in the relevant product market." *Id*. at 1191-92 (citation omitted). Under the rule of reason, courts ask whether "the challenged conduct has a substantial anticompetitive effect that harms consumers in the relevant market." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1084 2025 (9th Cir. 2025) (cleaned up).

"A hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements." *Musical Instruments*, 798 F.3d at 1192. The respective horizontal and vertical agreements composing such a conspiracy are analyzed according to the per se rule and the rule of reason, as applicable. *Id*. at 1192-93.

14        GIBSON V. CENDYN GROUP, LLC

**B.**

Plaintiffs appeal from the district court's order dismissing with prejudice Plaintiffs' complaint for failure to state a claim. To determine whether Plaintiffs sufficiently alleged a Section 1 violation, it is important first to delineate with which allegations we are dealing, and with which allegations we are no longer concerned. Plaintiffs "abandon[ed]" their appeal of the district court's dismissal of Count 1. Count 1 regarded the alleged "hub-and-spoke" agreement—namely, the allegation that Hotel Defendants agreed among themselves to abide by Cendyn's pricing recommendations. We therefore do not address the district court's decision that Plaintiffs failed to allege sufficient facts from which could be inferred the existence of an agreement among Hotel Defendants to license Cendyn's revenue-management software and abide by its pricing recommendations. *See Adriana Intern. Corp. v. Thoeren*, 913 F.2d 1406, 1408 n.1 (9th Cir. 1990).

**C.**

In Claim 2, Plaintiffs allege that the number of agreements between Cendyn and each Hotel Defendant "[i]n the aggregate" "resulted in anticompetitive effects in the form of artificially inflated prices in the relevant market of hotel rooms in the Las Vegas Strip market."

The district court found, and Defendants do not dispute on appeal, that Plaintiffs sufficiently alleged that all Hotel Defendants "licensed and used" Cendyn's software products.[7] An agreement to license software services (i.e., a licensing agreement) is an "agreement" within the meaning

---

[7] Throughout this opinion, we refer to the agreement for the provision of the software products as "licensing agreements" or "contracts."

GIBSON V. CENDYN GROUP, LLC                    15

of Section 1. *See Paladin*, 328 F.3d at 1154; *see also Bd. of Trade.*, 246 U.S. at 238. To determine whether the licensing agreements violate Section 1, we must determine whether the agreements are alleged to restrain trade in the relevant market. Only if so, do we determine whether such restraints are unreasonable.

There can be no question that the licensing agreements restrain *some* trade. *Bd. of Trade*, 246 U.S. at 238. That is, such a licensing agreement would impose on a Hotel Defendant the obligation to pay money to Cendyn, which money would be restrained from its use elsewhere. And it would restrain Cendyn from refusing to provide to that Hotel Defendant use of the software identified in the agreement. To determine whether "an injury to competition flows from" this agreement, however, we must analyze the operation of the restraint of trade imposed by the agreement alleged in the relevant antitrust market. *Brantley*, 675 F.3d at 1201.

The parties characterized the agreements between Cendyn and each Hotel Defendant as "vertical," but that description is not an accurate use of the term "vertical" in the antitrust context. A vertical restraint is a "restraint[] . . . imposed by agreement between firms at different levels of distribution." *Bus. Electr. Corp. v. Sharp Electr. Corp.*, 485 U.S. 717, 730 (1988). In other words, vertical restraints operate "up and down a supply chain, such as between a manufacturer and a retailer." *Musical Instruments*, 798 F.3d at 1191.

Here, relative to Hotel Defendants, Cendyn is not up or down the supply chain in the relevant market: hotel-room rentals on the Las Vegas Strip. The relevant market is defined by the products that can serve as effective substitutes for each other. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543

(2018). Thus, companies can operate in the same *industry* (the hotel industry) without operating in the same *market* (the market for hotel-room rentals on the Las Vegas Strip). Hotel Defendants provide hotel-room rentals, and Cendyn provides revenue-management software to Hotel Defendants. While hotels may use Cendyn's revenue-management software to maximize profits, the software is not an input that goes into the production of hotel rooms for rentals. *See Input*, 7 *Oxford English Dictionary* (2nd ed. 1989) ("The total of resources necessary to production, including raw materials, use of machinery, and manpower, which are deducted from output in calculating assets and profits."). Cendyn's provision of advisory services to the hotel industry does not thereby render Cendyn "up the supply chain" from Hotel Defendants in the market for hotel-room rentals on the Las Vegas Strip.

This distinction may seem opaque here, especially given that Cendyn provides pricing advice—a service that can appear to be wrapped up in the production of the product itself. But take, for example, a tax adviser of whom a hotel is a client. A tax adviser could also provide suggestions to that hotel. A tax adviser could affect that hotel's bottom line, inasmuch as he could charge a fee (eating into a company's profits) or make a suggestion regarding tax loopholes (increasing a company's profits). But that a tax adviser provides suggestions to a hotel does not mean that he operates in the production of hotel-room rentals "at [a] different level[] of distribution" from the hotel that receives his advice. *Bus. Electr. Corp.*, 485 U.S. at 730. So too here. Cendyn's revenue-management software products serve a "back-office" function; they are not used to make hotel rooms available in the first instance.

This is not to say that service-providers cannot be in vertical relationships with their clients. Nor is this to say that Cendyn is incapable of being in a vertical relationship with Hotel Defendants as a general matter. The distinction here lies in the relationship of the parties to the relevant market. Here, Cendyn does not contribute the raw materials, capital, or labor necessary for Hotel Defendants' production of hotel-room rentals on the Las Vegas Strip—such rentals constituting the relevant antitrust market. Cendyn and Hotel Defendants therefore do not have a vertical relationship in the relevant antitrust market.

## D.

Given that the licensing agreement between Cendyn and an individual Hotel Defendant is not horizontal (as it is not between competitors) and given that it is not vertical (as the parties to the agreement do not operate at different levels of distribution in the relevant market), where does that leave us? This agreement appears to be an "ordinary sales contract," which, according to a leading antitrust treatise, "does not restrain trade" and "without [which], trade would be impossible." 6 Phillip E. Areeda & Hovenkamp, *Antitrust Law* (5th Ed. 2023) ¶ 1437a.

While we do not have occasion to state whether it is always true that ordinary sales contracts do not restrain trade, we can say that the agreements here, as alleged, do not restrain trade *in the relevant market*. As alleged, the licensing agreements certainly imposed obligations on Cendyn and on each Hotel Defendant *as to each other* for the provision of and payment for the software products. But the licensing agreements do not restrain trade in the market for hotel-room rentals on the Las Vegas Strip because the licensing agreements do not restrain competition among

Hotel Defendants in that market, nor do they restrain the parties' abilities to compete in that market.

1.

First, the licensing agreements as alleged here do not affect the competitive incentives in the market for hotel-room rentals on the Las Vegas Strip. Competition is "[t]he struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties." *Competition*, *Black's Law Dictionary* (12th ed. 2024). Black's Law Dictionary further notes that "[t]he essence of competition is rivalry." *Id* (quotation marks and citation omitted). In a competitive market, a firm's incentive to make more money by raising prices is "tempered by price competition as individual firms attempt to capture greater market share." *Musical Instruments*, 798 F.3d at 1194 n.8.

An *agreement* among Hotel Defendants to follow Cendyn's pricing recommendations would harm competition because individual hotels would no longer be motivated to compete on price were they to know that they could price their goods without risk of their rivals undercutting their prices and capturing their market share. But here, Plaintiffs do not contest the district court's finding that they failed to allege facts from which such an agreement among Hotel Defendants could be inferred. And that an agreement between competitors to obtain and use Cendyn's software products would stifle competition does not render the individual Hotel Defendants' *independent* choices to use Cendyn's software products anticompetitive. Rather, competitors engage in what antitrust law calls "parallel conduct" when they make the same independent business decisions as each other. *Musical Instruments*, 798 F.3d at

1193. But allegations of parallel conduct, "such as competitors adopting similar policies around the same time in response to similar market conditions," are "insufficient to state a claim" under Section 1. *Id*. And even consciously parallel conduct—i.e., similar conduct resulting from "observation of [one's] competitors' decisions" and "the pressures of an interdependent market"—does not violate Section 1. *Id*. at 1195.

Thus, even were all Hotel Defendants aware of their competitors' adoption and use of Cendyn's software products, their subsequent choices to adopt Cendyn's software products themselves, absent evidence of agreement among Hotel Defendants to do so, is insufficient to state a Section 1 claim.[8] (And, of course, to the extent Plaintiffs allege facts suggesting an agreement of Hotel Defendants to license Cendyn's software products, that would go only to Count 1, the appeal of which claim has been waived.)

Rather than eliminating competition, pricing one's hotel rooms in a manner calculated to maximize profits is how one competes. Cendyn's revenue-management software, therefore, holds itself out as a tool in the struggle for commercial advantage; by itself, it does not take away that struggle.

Why don't the independent choices of Hotel Defendants to obtain pricing advice from the *same company* harm competition, as alleged here? Because here, obtaining information from the same source does not reduce the incentive to compete. Take, for example, a hypothetical firm

---

[8] This analysis might change if Plaintiffs had alleged that Cendyn shared the confidential information of each competing hotel among the licensees. But Plaintiffs do not allege such information-sharing occurred here.

that specializes in market research of the preferences of customers who patronize hotels on the Las Vegas Strip. Many hotels on the Las Vegas Strip would perceive a business advantage to learning about their customers' preferences, and they might hire the firm as a result. Hotels that hired the research firm might take advantage of this newfound knowledge of their consumer base by making changes to their properties and services offered. For example, hotels that learned that their potential customers prioritize sleeping late after a night at the casino might offer a later check-out time for a premium. Here, you see how hotels privy to this market research might make better informed decisions regarding their offerings and charge higher prices as a result. Competing hotels with the same knowledge might also make the same changes. But the fact that competing hotels possess the same knowledge regarding the preferences of their potential customers does not take away any hotel's incentive to compete on quality or price; they remain just as motivated to compete with each other as before they obtained the research.

While antitrust law restricts *agreements* between competitors regarding how to compete, it does not require a business to turn a blind eye to information simply because its competitors are also aware of that same information. Nor does it require businesses to decline to take advantage of a service because its competitors already use that service. Holding otherwise would impose a rule that businesses cannot use the same service providers as their competitors. In the example above, such a holding would require hotels whose competitors hired the research firm to either seek consumer research from another (possibly inferior) firm or to refrain from obtaining such research regarding its customers altogether. Plaintiffs cite no authority for such a

rule. Indeed, such a requirement could ultimately *harm* competition, as it would take away a means by which competitors might compete.

In light of Plaintiffs' decision to "abandon[]" their appeal of Claim 1, we assume that there is no agreement among Hotel Defendants to license Cendyn's software products. Given that assumption, the independent licensing agreements alleged do not harm the competitive incentives in the market for hotel-room rentals on the Las Vegas Strip because the provision of the pricing information does not affect the incentive to compete in that market. The disputed agreements therefore do not restrain trade by harming competition.[9]

2.

Second, as alleged, the licensing agreements, which agreements were for the provision of and payment for Cendyn's software products, did not restrain the abilities of Hotel Defendants to compete in the relevant market. The absence of restraints limiting any party's ability to compete

---

[9] Plaintiffs argue that Cendyn's software "effect[ed] a fundamental change in [Hotel Defendants'] business strategy," resulting in "a shift from [Hotel Defendants'] historical focus on maximizing revenue by increasing occupancy to focus on maximizing 'profitability' by charging higher room rates—even though this decreases occupancy." To the extent Plaintiffs' argument depends on an anticompetitive agreement among Hotel Defendants, this argument is unavailing after Plaintiffs "abandon[ed]" that claim. And while Plaintiffs characterize Cendyn as effecting a change in Hotel Defendants' business strategy, they identify only a "shift from . . . maximizing revenue" to "maximizing 'profitability.'" Assuming this shift in focus occurred, it would not be anticompetitive for a firm to maximize profitability—indeed, a basic economic assumption is that a firm's aim is to maximize profit, not gross revenue.

in the relevant market distinguishes this case from other
cases on which Plaintiffs rely.  In *Musical Instruments*, we
cited to *Leegin Creative Leather Products Inc.*, *v. PSKS, Inc.*
for the proposition that as a general matter, "purely vertical
restraints may unreasonably restrain trade in violation of
[Section 1]."  *Musical Instruments*, 798 F.3d at 1192 n.3
(citing 551 U.S. 877, 898-89 (2007)).   In *Leegin*, the
Supreme Court held that a vertical agreement in which "a
manufacturer [agreed] with its distributor to set the
minimum price the distributor [could] charge for the
manufacturer's goods" was subject to evaluation pursuant to
the rule of reason to determine whether the agreement
violated Section 1.   551 U.S. at 881-82.   There, the
agreement between the manufacturer and the distributor
restrained the distributor's ability to compete *in the relevant
antitrust market* because it limited how a distributor could
price the products it sold in that market.  *Id*. at 882-84.

By contrast, here the relevant antitrust market is that of
hotel-room rentals on the Las Vegas Strip, but the restraint—
which provides for the payment for and provision of
software products, not the rental price of the hotel rooms—
is not alleged to have limited the parties' abilities to compete
in the market for hotel-room rentals on the Las Vegas Strip.

Plaintiffs cite *Plymouth Dealers' Association of
Northern California v. United States*, 279 F.2d 128 (9th Cir.
1960), for the proposition that antitrust law does not require
that an agreement affirmatively restrain a party's decision-
making to restrain trade.  In *Plymouth*, we affirmed the
judgment of conviction under Section 1 of a car-dealership
association that "published a price list and circulated it to its
members." 279 F.2d at 130, 135.  This non-binding price
list was used by car dealers as "an agreed starting point" for
the selling price of cars.  *Id*. at 132.  Plaintiffs argue that

Cendyn's recommended prices function similarly to the non-binding price list and likewise violate Section 1. In *Plymouth*, however, we held the starting point in the price list was "agreed upon between competitors." 279 F.2d at 132. That the price list on its own terms did not bind the dealers is of no matter because it is the agreement among competitors to use the price list that restrained competition. And such an agreement, even if imperfectly followed or not fully enforced, "interfere[d] with 'the freedom of traders and thereby restrain[ed] their ability to sell in accordance with their own judgment.'" *Id*. (citation omitted). Here, by contrast, Plaintiffs have not alleged an agreement among Hotel Defendants to each use Cendyn's services.

Lacking an agreement among Hotel Defendants that interferes with their individual freedoms to rent hotel rooms in accordance with each Hotel Defendant's own judgment, we look to Cendyn's licensing agreement to determine whether it contains such restraints. And here, the agreement for the provision of and payment for software products does not restrain any Hotel Defendant's ability to sell hotel rooms "in accordance with their own judgment." [10] *Id*. (citation omitted). While a hotel might adopt Cendyn's pricing recommendations at high rates because it trusts the recommendations or wants the ease of implementing the recommendations, the agreement for the provision of the

---

[10] Of course, the fact that Hotel Defendants were not required to accept the pricing recommendations of Cendyn's software products would not immunize Hotel Defendants from Section 1 liability for horizontal price-fixing. After all, Cendyn could provide non-binding recommendations and competing hotels could all agree to abide by those recommendations. But such an agreement among competing hotels would be a hub-and-spoke conspiracy, any claim of which was waived here.

recommendations itself is not a *restraint* of a hotel's ability to price its hotel-room rentals.

Contrast the disputed licensing agreements here with a type of vertical agreement that can violate Section 1: exclusive dealing. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). These agreements violate Section 1 when the agreement's effect "foreclose[s] competition in a substantial share of the line of commerce affected." *Id*. (citation omitted). An exclusive dealing agreement that prevents a buyer from purchasing goods from a different vendor restrains that buyer's ability to compete in the market in which the goods of the foreclosed vendors would have been used. Here, by contrast, the alleged agreement is for the *provision* of certain software products—with no exclusion of other software products. The agreement does not prevent Hotel Defendants from using other services, nor does it dictate how Hotel Defendants may otherwise compete in the market for hotel-room rentals on the Las Vegas Strip. Hotel Defendants' trade is not restrained in the market for its hotel-room rentals.

Plaintiffs rely on *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), and *Board of Trade* for the proposition that whenever a contract is identified, that contract must be analyzed pursuant to the rule of reason. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) ("[E]very commercial agreement restrains trade. Whether this action violates [Section 1] of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint." (citation omitted)); *Bd. of Trade*, 246 U.S. at 238 ("[T]he

GIBSON V. CENDYN GROUP, LLC                25

legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. . . [T]he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.").

But Plaintiffs' cited cases do not support the notion that *every contract* a business enters opens it up to antitrust scrutiny *as to any other aspect of the business*. In *Northwest Wholesale*, for example, the Supreme Court held that a party's expulsion from a joint buying cooperative must be analyzed under the rule of reason, as opposed to per se analysis. 472 U.S. at 298. There, the Court held that the restraint (a concerted refusal to deal) should have been analyzed to determine whether "the cooperative possesses market power or unique access to a business element necessary for effective competition." *Id*. In other words, the agreement not to deal with a specific party must be analyzed in the context of the market in which the respective businesses are competing. But Plaintiffs, in arguing that every contract warrants scrutiny under the rule of reason, ask for more. By their logic, a hotel would have to defend its business practices in the market for hotel-room rentals under the rule of reason were it to, say, enter a contract with a painter for the painting of the hotel's dining room, or a contract to sponsor a matching campaign for a charitable cause. A hotel could expect this litigation even when the contracts for the painter or for participation in the matching campaign do not harm competition or prevent a hotel from competing in the market for hotel-room rentals. This interpretation of Section 1 misreads its purpose and our caselaw. The statement that as a general matter a restraint of trade is analyzed under the rule of reason does not support

the holding that every contract triggers scrutiny pursuant to the rule of reason—regardless whether the contract imposes a restraint of trade in the relevant market at all.

Because the licensing agreements for the provision of software services did not restrain how Hotel Defendants could compete in the market for hotel-room rentals on the Las Vegas Strip as alleged, they do not restrain trade in the relevant market.[11]   Absent this restraint of trade in the relevant market, the district court did not err in finding that the agreement did not violate Section 1 without first applying the rule of reason.

**E.**

Plaintiffs style Claim 2 as being aimed at the "set" of agreements between Cendyn and Hotel Defendants and argue that the agreements restrain trade "in the aggregate." To the extent the term "set" implies the existence of a conspiracy between the Hotel Defendants as members of the "set," any such claim would go to an agreement between competitors—i.e., a horizontal agreement. Count 2 cannot act as a backdoor to find such an agreement because Plaintiffs waived a finding of any such horizontal agreement when they abandoned Count 1. Additionally, Count 2 on its

---

[11] This case does not present the question regarding whether an agreement in which a firm independently delegates *binding* pricing decisions to a third party is necessarily a restraint of trade. Of course, any such parties might be structurally incapable of enacting certain restraints of trade. Here, for example, Cendyn and an individual Hotel Defendant cannot enter a price-fixing agreement (because the agreement is not between competitors) or a resale-price-maintenance agreement (as neither party is selling the products of the other). But the question whether a binding delegation of pricing to a third party restrains trade was not presented by Plaintiffs' allegations, so we do not reach that issue here.

own terms contains no factual allegations of a horizontal component to the agreements. Rather, it challenges the mere existence of a number of (non-horizontal and non-vertical) licensing agreements, and calling that number of agreements a "set" is not an allegation of fact; it is merely a conclusion of the pleader. Alleging the existence of a number of licensing agreements, however, absent the allegation of any horizontal conspiracy, does not sufficiently allege a Section 1 violation because antitrust law provides no mechanism by which courts can evaluate the independent agreements between Cendyn and each Hotel Defendant "in the aggregate."

In *Atlantic Richfield*, this Court found that a grouping of individual agreements could not be "aggregated" for the purposes of determining whether together they acted as an unreasonable restraint of trade because the plaintiffs did not allege that each agreement had a discrete effect on competition. *William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009) (per curiam). As alleged here, the agreements between Cendyn and each Hotel Defendant do not have a "discrete effect" on competition; indeed, for the reasons provided above, the agreements do not restrain competition in the relevant market at all.

Plaintiffs argue that "each agreement here *does* have a discrete effect on competition: the higher prices charged by each [Hotel Defendant] compared to relevant benchmarks." True, increased prices can serve as evidence of "a substantial anticompetitive effect" in the context of certain agreements. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (citation omitted). But that does not mean an individual firm's independent choice to charge higher prices itself harms competition. Here, Plaintiffs confuse cause and

28        GIBSON V. CENDYN GROUP, LLC

effect—higher prices can be a possible *result* of anticompetitive behavior, but charging a higher price by itself is not anticompetitive. Indeed, an allegation that "an agreement has the effect of . . . increasing prices to consumers does not sufficiently allege an injury to competition" because raising prices can be "fully consistent with a free, competitive market." *Brantley*, 675 F.3d at 1202. Plaintiffs therefore fail to plead facts which demonstrate each agreement has a discrete effect on competition.

Neither does footnote 3 of *Musical Instruments* provide for the aggregation of the individual licensing agreements. In *Musical Instruments*, we noted that a "rimless hub-and-spoke conspiracy" is "a collection of purely vertical agreements," and that "such a conspiracy may yet unreasonably restrain trade." 798 F.3d at 1192 n.3. In other words, where different parties (the "spokes") enter individual agreements with a central party (the "hub") but there is no agreement between the spokes (the "rim"), that configuration constitutes a collection of purely vertical agreements. We made this observation in the context of noting that "the respective vertical and horizontal agreements [of a hub-and-spoke conspiracy] can be analyzed either under the rule of reason or as violations per se." *Id.* at 1192. In other words, just as a single vertical agreement might unreasonably restrain trade, so too might "a collection of purely vertical agreements." *Id.* at 1192 n.3. But the reference to a "collection of purely vertical agreements," absent a "conspiracy," does not provide a basis for the aggregation of non-vertical agreements—none of which

individually restrains trade in the relevant market—to find a restraint of trade.**12**

Plaintiffs essentially argue for a rule in which a business's entry into any contract typical in its industry, when followed by higher prices, is sufficient to trigger antitrust scrutiny under the rule of reason as to any other aspect of the business. This rule does not comport with the logic of Section 1 or our precedents. To make out a Section 1 claim, Plaintiffs must allege a restraint of trade in the relevant market that causes an "actual adverse effect on competition." *Brantley*, 675 F.3d at 1200 (citation omitted). Here, where the disputed licensing agreements are not alleged to affect the competitive incentives in the relevant market, and where the alleged agreements between Cendyn and each Hotel Defendant are not alleged to restrain a party's ability to compete in the relevant market, Plaintiffs fail to plead a restraint of trade that causes an actual adverse effect on competition in the relevant market. Because the agreement for the provision of software and its payment does not operate as a restraint in the relevant market at all, in Count 2 Plaintiffs fail to plead a Section 1 violation. Thus, no analysis under the rule of reason is required.

## IV.

Plaintiffs have failed to allege sufficient nonconclusory facts to support the plausible inference that the individual agreements between Cendyn and Hotel Defendants

---

[12] Indeed, in footnote 3 we cited to *Dickson v. Microsoft Corp.*, which noted that "the Supreme Court was clear: a wheel without a rim is not a single conspiracy." 309 F.3d 192, 203-204 (4th Cir. 2002); *Musical Instruments*, 798 F.3d at 1192 n.3.

unreasonably restrained trade in the market for hotel-room rentals on the Las Vegas strip.

**AFFIRMED.**