No. 24-3576

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RICHARD GIBSON and ROBERTO MANZO, individually and on behalf
of all others similarly situated,

Plaintiffs-Appellants,

v.

CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED,
INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC,
WYNN RESORTS HOLDINGS, LLC, BLACKSTONE, INC.,
BLACKSTONE REAL ESTATE PARTNERS VII L.P., JC
HOSPITALITY, LLC,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Nevada,
The Honorable Judge Miranda Du, District Judge
No. 2:23-cv-00140-MMD-DJA

## REPLY IN SUPPORT OF PETITION FOR REHEARING EN BANC

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
riop@hbsslaw.com

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................ 1

II.   ARGUMENT ............................................................................. 3

      A.   Defendants' authorities say the opposite of what they
           claim. ....................................................................... 3

      B.   The "independent ground" Defendants invoke is not
           independent at all.......................................................... 8

      C.   The claim that this case is a poor vehicle misunderstands
           what makes a good one. .................................................... 10

III.  CONCLUSION .......................................................................... 14

011141-11/2833890 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,
   803 F.2d 1463 (9th Cir. 1986) ........................................................5, 6

*Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*,
   744 F.2d 917 (2d Cir. 1984) ................................................................7

*Bd. of Trade v. United States*,
   246 U.S. 231 (1918)........................................................................3, 6

*Duffy v. Yardi Sys., Inc.*,
   758 F. Supp. 3d 1283 (W.D. Wash. 2024) ........................................13

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ...............................................................8

*Mularkey v. Holsum Bakery, Inc*,
   146 F.3d 1064 (9th Cir. 1998). ...........................................................5

*Nat'l Collegiate Athletic Assn. v. Alston*,
   594 U.S. 69 (2021)...............................................................................8

*Newman v. Universal*,
   813 F.2d 1519 (9th Cir. 1987) ............................................................6

*Paladin Assocs., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .........................................................3, 6

*In re RealPage, Inc., Rental Software Antitrust Litig.* (No. II),
   709 F. Supp. 3d 478 (M.D. Tenn. 2023) .....................................13, 14

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) .......................................................9, 10

*United States v. Masonite*,
   316 U.S. 265 (1942)............................................................................9

- ii -

*United States v. Se. Underwriters Assn.*,
　322 U.S. 533 (1944)............................................................15

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis
　of Antitrust Principles and Their Application* (Fourth & Fifth
　Editions 2018–2022)..........................................................10

Stephanie Assad et al., *Autonomous algorithmic collusion* (Toulouse
　School of Economics Working Paper No. 1210, 2021) ....................................12

011141-11/2833890 V1

## I.    INTRODUCTION

Defendants' Response to the Petition for Rehearing En Banc ("Resp.") attempts to defend a result the panel never should have reached: a categorical exemption from Section 1 scrutiny for a whole class of written agreements. According to Defendants, because the contracts here are "ordinary sales contracts," they are inherently incapable of "restraining trade" and may be dismissed without any rule-of-reason inquiry. This premise—that certain written agreements are, by their nature, beyond Section 1's reach—is irreconcilable with a century of Supreme Court and Ninth Circuit precedent holding that all contractual restraints must be tested under the rule of reason to determine their competitive effect.

The error is not academic. The contracts at issue here are written agreements through which horizontal competitors effectively delegated their pricing decisions to a shared algorithmic vendor. The panel's holding that such arrangements fall outside Section 1 contradicts long-settled law and, as Professor Herbert Hovenkamp himself recently observed, misreads the very treatise language on which the panel relied. In a public exchange following the Petition, Hovenkamp stated that "the Ninth Circuit got this one wrong," explaining that the software described in the opinion "was basically selling cartel production services." Herbert Hovenkamp (@Sherman1890),          Twitter,          Oct.          4,          2025,

https://x.com/Sherman1890/status/1974581681035350179 (last accessed Nov. 10, 2025).[1] This clarification removes the only authority the panel cited for treating the agreements as categorically outside the Sherman Act.



Plaintiffs respectfully seek leave to file this short reply to correct the Response's mischaracterizations of circuit law and to address new arguments that—

---

[1] A copy of the relevant Twitter thread is attached as Exhibit 1.

if accepted—would further entrench an unprecedented carve-out for algorithmic pricing agreements from the ordinary operation of the rule of reason.

## II.    ARGUMENT

### A.    Defendants' authorities say the opposite of what they claim.

Defendants argue that the panel correctly applied precedent and did not break "new ground" (Resp. 8) when it reasoned that the Rainmaker-hotel contracts at issue are "ordinary sales contract[s]" that "do not restrain trade"—and that dismissal was appropriate "without first applying the rule of reason." Op. 17, 25. The cases and authorities on which they rely hold the exact opposition.

**1.**    Binding precedent establishes that (a) written contractual agreements are "restraints" and (2) that, once a restraint is sufficiently pled, it is analyzed under the rule of reason. *Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)[2]; *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153, 1154 n.7 (9th Cir. 2003); *see* Petition for Rehearing en Banc ("Pet.") 9–12. In rejecting this rule, the panel relied on a single authority: specifically, a single sentence from the Areeda–Hovenkamp treatise that "ordinary sales contract[s] . . . do[] not restrain trade" because "trade

---

[2] Despite its centrality to the issues raised by the panel's decision, Defendants do not cite or acknowledge *Bd. of Trade* once in their Response.

would be impossible" without them. Op. 17 (quoting 6 Phillip E. Areeda & Hovenkamp, *Antitrust Law* (5th Ed. 2023) ¶ 1437a)); *see* Pet. 12.

Defendants hinge their petition largely on the argument that the panel properly understood this language to mean that only some written contracts are "restraints." Resp. 9, 13–14. But recent commentary removes any doubt on this point. In an October 2025 public exchange, Professor Herbert Hovenkamp stated, when presented with this same language from his own treatise, that the panel "got this one wrong" and that, accepting Plaintiffs' allegations as true, Rainmaker was "basically selling cartel production services." Ex. 1. Defendants'—and the panel's— foundational reliance on Hovenkamp's work for the proposition that the contracts here simply fall outside Section 1 has now been rejected.

**2.** Defendants identify several cases—none of which was relied upon by the panel itself—that (they say) prop up the panel's holding that antitrust plaintiffs must plausibly allege a "causal link between [a] contested agreement and an anticompetitive restraint of trade in the relevant market" *before* subjecting that restraint to the rule of reason. *See* Resp. 11–14 (citing Op. 6). These cases in no way support the panel's threshold carve-out—which, as explained in Plaintiffs' petition, gets binding precedent backwards.

In *Mularkey v. Holsum Bakery, Inc.*—Defendants' primary authority—this Court, in a two page *per curiam* opinion at summary judgment, rejected plaintiffs' argument that an individually-negotiated agreement between a bakery and one of its retailers, 7-Eleven, violated Section 1. 146 F.3d 1064, 1065 (9th Cir. 1998). At most, *Mularkey* stands for the proposition that a single "contractual relationship" "negotiated . . . between a manufacturer and one of its customers regarding the price of the manufacturer's product" is generally not actionable absent some showing that there was a "restraint of trade *resulting from* the agreement." *Id.* at 1065 (emphasis added).[3] And this Court specifically found that "under a rule of reason analysis, such a restraint was entirely reasonable" based on the developed factual record. *Id.* Defendants' attempt to locate a seismic jurisprudential shift in *Mularkey* underscores the weakness of their position.

*49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463 (9th Cir. 1986) is even less helpful. There, this Court held that the mere existence of contractual agreements between GM and carriers was insufficient, standing alone, to *infer a horizontal conspiracy*, i.e., a horizontal agreement., between them. *Id.* at 1467. *Chevrolet* thus says nothing about whether this Court first engages in a "threshold

---

[3] By contrast, Plaintiffs' complaint pleads with specificity how the restraints here resulted in higher room prices as a direct result of diminished competition.

inquiry" to determine whether a contract "'restrain[s] . . . trade' in a relevant market" (Resp. 12) before applying the rule of reason; to the contrary, it even recognizes that the sales contracts at issue "restrain[ed] trade"—they just did not do so "unlawfully." *Id.*[4] Again, in this case there are detailed allegations that there was a restraint that elevated prices above a competitive level.

Defendants' remaining cases are even further afield. They cite *Newman v. Universal*, 813 F.2d 1519 (9th Cir. 1987) for the proposition that, "[i]f an agreement does not 'restrain competition' in the relevant market, 'there can be no resulting antitrust violation.'" Resp. 9 (quoting *Newman*, 813 F.2d at 1522); *see also id.* at 11. But this Court's holding in *Newman* turned on the fact that the agreements at issue had been signed at least five years before the alleged conspiracy began and thus could not have been affected by the conspiracy. *Newman*, 813 F.2d at 1522 ("Appellants' fundamental problem is that Newman and Hill entered into the contracts for 'The Sting' and 'Slapshot' between 1972 and 1976, before the alleged conspiracy arose in 1981."). Defendants' out-of-circuit authorities fare no better, and

---

[4] Further, *Chevrolet*'s comment that the antitrust laws are only "offended by agreements . . . with an anticompetitive content," *id.*, is fully consistent with the Supreme Court's holding that "the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition." *Bd. of Trade*, 246 U.S. at 238. What matters is whether an agreement or set of agreements—regardless of the intent behind them, *see Paladin*, 328 F.3d at 1153—unreasonably restrains trade.

(if anything) support Plaintiffs. *See* Resp. 12 (citing *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 492 (6th Cir. 2021) (contractual term that simply allowed "one party to back out of a cooperative venture in view of changed business circumstances" did not unreasonably restrain trade; plaintiff's allegations really "boil[ed] down" to refusal to deal claim under Section 2)) and *Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984) (recognizing, consistent with Plaintiffs' petition here, that the "restraining effect of [a] challenged agreement" may "ar[ise] not by virtue of its terms alone," but instead from its "practical" effects)).

No amount of squinting at these cases supports denying rule-of-reason review to explicit contracts between competitors and a shared pricing algorithm vendor. Defendants' reliance on them only confirms that the panel's novel holding lacks doctrinal footing and breaks from settled precedent.

* * *

Plaintiffs put forward detailed allegations that the practical effect of the contracts here was the de facto delegation of Casino Defendants' decisionmaking on price to a single agent that was, according to Prof. Hovenkamp, "basically selling cartel production services." *See* Ex. 1; Pet. 4–7.

- 7 -

Whether competitors' common use of an algorithmic pricing tool raises prices or dampens undercutting is a question that should be tested with reference to the "circumstances, details, and logic of a restraint," *Nat'l Collegiate Athletic Assn. v. Alston*, 594 U.S. 69, 97 (2021), i.e., by applying to rule of reason to evaluate direct and indirect evidence of a restraint's *actual* anticompetitive effects to determine whether it "harms consumers in the relevant market," *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022). The panel inverted this. It asked first whether each Rainmaker–hotel contract "restrained trade in the relevant market," and, finding no such restraint, declared the agreements non-cognizable without ever testing their effects. That is the wrong question and the wrong order.

## B.    The "independent ground" Defendants invoke is not independent at all.

Defendants argue that the panel affirmed the district court's dismissal on a second basis that they characterize and "unchallenged" and "independent": its finding that the agreements here cannot be "aggregated" for purposes of "determining whether together they acted as an unreasonable restraint of trade." Resp. 14–16 (citing Op. 27–28).

But that reasoning rests entirely on the panel's threshold premise that the agreements are not restraints in the first place. The panel expressly stated that aggregation was improper *because* "the agreements do not restrain competition in

- 8 -

the relevant market at all." Op. 27. Thus, once the panel declared each contract not a restraint, it necessarily found there was nothing to aggregate because the contracts here were (by its reasoning) categorically incapable of "restraining."

If the Court corrects this threshold error, then the panel's aggregation holding cannot stand. Indeed, the panel's opinion recognizes that where restraints like those pled here do have a "discrete effect" on competition, aggregation is proper. *Id.* (citing *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009)). Whether the agreements here produce such an effect is a rule-of-reason question, not a threshold pleading barrier.

This is consistent with well-established Ninth Circuit and Supreme Court precedent. In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, for example, this Court held "it was proper for the district court to have aggregated [the defendant]'s contracts in the relevant market in order to assess the Sherman Act violations resulting from these contracts," explaining that when a cumulative effect is pleaded, courts "may look to the overall effects of a defendant's conduct in the relevant market" rather than being "limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant." 676 F.2d 1291, 1302 (9th Cir. 1982). In *United States v. Masonite*, the Supreme Court held that, where the practical effect of a set of agreements is to fix prices, it is immaterial in evaluating

- 9 -

liability (and anticompetitive effects) whether defendants "intend[ed] to join a combination or to fix prices"—that is, engaged in a horizontal conspiracy—and that they "must be held to have intended the necessary and direct consequences of their acts." 316 U.S. 265, 275 (1942). The leading antitrust treatise also confirms that separate vertical agreements sharing a common element should be aggregated to evaluate their anticompetitive effect. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 310 (Fourth & Fifth Editions 2018–2022) (four contracts, each of which forecloses approximately 15 percent of the market, should be aggregated in considering their anticompetitive effect).

In short, Plaintiffs did not "leave unchallenged" any separate ground for affirmance. The petition explicitly objects to the panel's refusal to apply the rule of reason to the very contracts whose aggregated market effects were pled. That is a direct attack on both holdings, not just the first.

## C.    The claim that this case is a poor vehicle misunderstands what makes a good one.

Defendants present three reasons why this petition is an "unsuitable vehicle" to address growing concerns about the anticompetitive effects of algorithmic pricing. Each is unpersuasive.

*First*, Defendants say that because Plaintiffs abandoned their separate hub-and-spoke theory, this case cannot resolve broader algorithmic-pricing questions. Resp. 17. In fact, that abandonment makes it an ideal vehicle. The only question now is purely legal: when competitors independently contract with the same pricing software vendor, and those contracts are alleged to have raised prices by thwarting free competition (and amount to "cartel production services"), must courts apply the rule of reason—or does antitrust law simply not apply? There are no factual disputes to cloud that issue. Tellingly, Defendants have no answer to the many troubling ways the panel's formalistic exemption of certain agreements from the rule of reason would shelter anticompetitive behavior while turning a blind eye to a restraint's "actual effects"—and thus invite confusion in every future Section 1 case involving technology vendors or shared data platforms. *See* Pet. 14 & n.3.

*Second*, Defendants point to the absence of allegations here that Cendyn's pricing recommendations "were derived from pooled confidential data among the Hotel Defendants." Resp. 18. Once again, this only underscores the significance of the issues raised here.

As a threshold matter, Defendants are correct that district courts have treated confidential information sharing as one factor relevant to whether plaintiffs adequately plead the existence of a *horizontal agreement* among an algorithm's

- 11 -

users to support a hub-and-spoke theory. But Plaintiffs' remaining claim here does not depend on the existence of a horizontal agreement among Casino Defendants.

More importantly, antitrust law has never required the exchange of confidential information as a precondition for price-fixing liability. Indeed, empirical research demonstrates that, in markets like the Las Vegas Strip, where real-time price information is readily available, an algorithmic pricing agent need not have access to confidential information in order to break the competitive machinery of the market, i.e., allow cartel members to charge supracompetitive prices.[5] And academics have concluded that "industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes" is problematic not because the algorithm exists as a conduit for information exchange, but instead because "the market behavior of the competitors aligns due to the use of a similar 'brain' to determine their price strategy." 5-ER-816 (¶ 225). That is exactly what Plaintiffs alleged here.

---

[5] For example, in Germany, where the gasoline retail market is subject to "price disclosure regulations and near perfect price transparency," academics have found the use of algorithmic pricing software by competing gas stations based only on public information nevertheless increased margins by 9% "only through its effects on competition." Stephanie Assad et al., *Autonomous algorithmic collusion* (Toulouse School of Economics Working Paper No. 1210, 2021) at 12, 15, available at https://www.tse-fr.eu/articles/autonomous-algorithmic-collusion-economic-research-and-policy-implications (cited at 5-ER-818 (¶ 229)).

- 12 -

If the exchange of confidential information were a necessary precondition for liability in an algorithmic price fixing case, as Defendants seems to suggest it should be, this would arbitrarily exclude a vast array of harmful conduct from scrutiny. Allowing the panel's decision to stand risks sanctioning that exclusion.

*Third*, Defendants observe that "some algorithmic pricing cases that have survived dismissal allege that competitors 'delegate[ed] their pricing decisions to the same algorithm.'" Resp. 18 (quoting *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1295 (W.D. Wash. 2024)). They then imply that the delegation alleged in those cases is somehow different—and more significant—than what's alleged here. *Id.*

This is an egregious misrepresentation of the allegations in *Duffy* and a related case, *RealPage*. In both, plaintiffs alleged that an algorithmic pricing agent provided "recommendations" to its users (residential landlords) that could be accepted or rejected (or "overridden") by users, and that users them accepted them at a high rate. *Duffy*, 758 F. Supp. at 1293 (plaintiffs alleged that landlords "intended to and, *for the most part*, did adhere to Yardi's pricing recommendations.") (emphasis added); *In re RealPage, Inc., Rental Software Antitrust Litig.* (No. II), 709 F. Supp. 3d 478, 496 (M.D. Tenn. 2023) (RealPage targeted "80 to 85% acceptance rate" for pricing

- 13 -

recommendations).[6] That is functionally identical to what Plaintiffs allege here; indeed, Rainmaker publicly advertises an even *higher* acceptance rate of approximately "90%" across clients. 5-ER-716–17 (¶¶ 74–75).

Notably, the district court in each case rejected defendants' argument that a user's binding delegation of decisionmaking on price to an algorithmic agent is a necessary precondition to liability. *See, e.g.*, *RealPage*, 709 F. at 504. This makes sense as a matter of doctrine, logic, and policy: if liability turned, for example, on whether fixed prices are mandatory, this would allow defendants to avoid liability with simple tricks, e.g., by ensuring that prices generated by a third-party agent were always styled "recommendations." As in *Duffy* and *RealPage*, Plaintiffs here allege facts suggestive of de facto delegation. Yet the panel repeated the same mistake these district courts avoided—treating form as dispositive and ignoring allegations that, in substance, competitors ceded pricing power to a common algorithm whose effects must be tested under the rule of reason.

### III.    CONCLUSION

Rehearing would restore the analytic sequence that this Court and the Supreme Court have always applied in applying Section 1: agreements first, effects

---

[6] Notably, Defendant Rainmaker also created one of the algorithmic pricing products ("LRO") at issue in the *RealPage* litigation; RealPage purchased LRO in 2017. 5-ER-855.

next. Leaving the panel opinion in place would create a roadmap for firms to coordinate pricing through a common vendor so long as that coordination is formalized in "ordinary" written contracts. And, the panel's reasoning, if left untouched, will invite confusion in every future Section 1 case involving technology vendors or shared data platforms. Clarifying that such contracts remain subject to the rule of reason would reaffirm this Court's commitment to a coherent, effects-based approach to antitrust law, and confirm—consistent with its intent—that the Sherman Act reaches both old and new forms of misconduct. *See United States v. Se. Underwriters Assn.*, 322 U.S. 533, 553 (1944).

For the foregoing reasons, Plaintiffs respectfully request that the Court review the panel's decision en banc.

Dated: November 10, 2025        Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*Email: steve@hbsslaw.com*

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300

011141-11/2833890 V1

Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
*Email: riop@hbsslaw.com*

*Attorneys for Plaintiffs-Appellants*

- 16 -

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This document complies with the type-volume limitation of Cir. R. 40-1(b) because this document contains 3,263 words, including 202 words manually counted in any visual images.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

*s/ Steve W. Berman*
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

- 17 -

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 10, 2025.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____*s/ Steve W. Berman*_____
Steve W. Berman

*Attorney for Plaintiffs-Appellants*

# EXHIBIT 1

Home

Explore

Notifications

Messages

Grok

Lists

Bookmarks

Communities

Premium

Profile

More

Post

Post

**Hal Singer** @HalSinger · Sep 10

Hey @Sherman1890, only because you are quoted here by the Ninth Circuit. Do you approve of this decision? Inquiring minds want to know! Seems to me that turning over your pricing a "common" third party, whether machine or human, is problematic, as it facilitates coordination. We want firms to set prices unilaterally. But maybe I'm just old-fashioned.

> Given that the licensing agreement between Cendyn and an individual Hotel Defendant is not horizontal (as it is not between competitors) and given that it is not vertical (as the parties to the agreement do not operate at different levels of distribution in the relevant market), where does that leave us? This agreement appears to be an "ordinary sales contract," which, according to a leading antitrust treatise, "does not restrain trade" and "without [which], trade would be impossible." 6 Philip E. Areeda & Hovenkamp, *Antitrust Law* (5th Ed. 2023) ¶ 1437a.

◯ 2          ⇄ 1          ♡ 6          ᵢₗₗ 987          ▢          ⬆

**Herbert hovenkamp** @Sherman1890

Hal, sorry, I missed this message. I think the 9th Circuit got this one wrong. Read the opinion's discussion of "GuestRev," the feature that automatically set the software's recommended price as a default. The program was basically selling cartel production services.

2:05 PM · Oct 4, 2025 · **692** Views

◯ 1          ⇄ 1          ♡ 7          ▢          ⬆

**@** **Who can reply?**
Accounts @HalSinger mentioned can reply

**Hal Singer** @HalSinger · Oct 4

Agree 💯 percent. And this is true regardless of whether the information that was shared was public or private. By turning over one's pricing authority to a common third party, the hotels can more easily arrive at the jointly profit-maximizing price.

◯ 1          ⇄          ♡ 4          ᵢₗₗ 244          ▢          ⬆

**Herbert hovenkamp** @Sherman1890 · Oct 4

This has gotten to be problematic, in both hotels and rental properties. The Sherman Act is narrow enough in that it requires an "agreement"; however, it does not require that the agreement be among competitors, but only that it be capable of facilitating an output reduction.

◯ 1          ⇄          ♡ 3          ᵢₗₗ 228          ▢          ⬆

**Hal Singer** @HalSinger · Oct 4

Last week, I heard someone on a panel suggest that plaintiffs need to explain how the algorithm works in order to defeat the motion to dismiss— that is, whether the algorithm is choosing the individual profit-maximizing price or the joint profit-maximizing price. But that is ridiculous, as no plaintiff could ever understand the algorithm until after discovery has taken place. The bar for getting over the motion to dismiss in these cases should be low.

◯ 1          ⇄ 3          ♡ 5          ᵢₗₗ 2.2K          ▢          ⬆

**Hal Singer** @HalSinger · Oct 4
Cc @CapitolKVD

◯          ⇄          ♡          ᵢₗₗ 218          ▢          ⬆

**Relevant people**

**Herbert hovenkamp** @Sherman1890     Follow
@lawtwitter University Prof Penn Law and the Wharton School, occasionally comments on antitrust issues and follows legal history, public law, and econ policy

**Hal Singer** @HalSinger     Following
MD @ EconOne | Prof @EconUofU | ED @ UtahProject | NYTimes: "one expert for the plaintiffs" | Prospect:"preeminent watchdog of The Economist's most wrong takes"

**What's happening**

MICHAEL
In theaters and IMAX April 24
📷 Promoted by Michael

Politics · Trending
**RINO**
26.1K posts

Politics · Trending
**Cornell University**

Trending in United States
**TV Off**
9,471 posts

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.